# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:10-cv-1992 (ABJ) |
| | ) |
| THE UNITED STATES DEPARTMENT OF | ) |
| HOMELAND SECURITY, | ) |
| Defendant. | ) |

_____ )

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant United States Department of Homeland Security hereby moves the Court to

enter summary judgment in Defendant's favor pursuant to Rule 56(b) of the Federal Rules of

Civil Procedure.  Attached in support of this motion are a statement of material facts not in

dispute, a memorandum of points and authorities, the Declarations of Paul Sotoudeh, Bert

Coursey, Pamela Beresford, Joy Lazaroff, Peter Modica, Scott Trosper, Joseph Callerame, Rory

Doyle, and their attached exhibits, and a proposed Order.


Date: September 12, 2011

Respectfully submitted,

TONY WEST
Assistant Attorney General

RONALD C. MACHEN JR.
United States Attorney for
the District of Columbia

ELIZABETH J. SHAPIRO
Deputy Branch Director


 /s/ Jesse Z. Grauman
JESSE Z. GRAUMAN (Va. Bar No. 76782)

U.S. Department of Justice
Civil Division, Federal Programs Branch

<u>Mailing Address:</u>
Post Office Box 883
Washington, D.C.  20044

<u>Courier Address:</u>
20 Massachusetts Ave., N.W.
Washington, D.C. 20001

Telephone:     (202) 514-2849
Fax:           (202) 616-8460
Email:         jesse.z.grauman@usdoj.gov

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                  )
ELECTRONIC PRIVACY INFORMATION CENTER, )
                                                  )
           Plaintiff,                             )
                                                  )
     v.                                           )  Case No. 1:10-cv-1992 (ABJ)
                                                  )
THE UNITED STATES DEPARTMENT OF                   )
HOMELAND SECURITY,                                )
                                                  )
           Defendant.                             )
_____ )

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff Electronic Privacy Information Center ("EPIC") has sued Defendant Department of Homeland Security ("DHS") under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").  EPIC seeks agency records concerning radiation safety studies pertaining to Advanced Imaging Technology ("AIT"), also known as whole body imaging ("WBI") or "body scanners," that the Transportation Security Administration ("TSA") employs at airports in the United States,  Because DHS has conducted an adequate search and produced all responsive documents that are not exempt from release under FOIA, summary judgment should be granted in Defendant's favor.

## FACTUAL AND PROCEDURAL BACKGROUND

I.     **EPIC's FOIA Request.**

EPIC's FOIA request, dated July 13, 2010, requested:

   a. All records concerning TSA tests regarding body scanners and radiation emission
      or exposure; and
   b. All records concerning third party tests regarding body scanners and radiation
      emission or exposure.

Declaration of Paul Sotoudeh ("Sotoudeh Decl.") (Ex. 1) ¶ 4 & Ex. A.  EPIC requested expedited

processing pursuant to 5 U.S.C. § 552(a)(6)(E), and preferential fee status as a "representative of

the news media" pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II).  Id. Ex. A.

## II.   DHS's Search for Responsive Records.

Upon review, DHS determined that the information sought by EPIC in the FOIA request

was under the purview of two components of DHS, namely, the TSA and the Science and

Technology Directorate ("S&T").  Id. ¶ 5.  It accordingly transferred the requests to these

components, and informed EPIC of this referral by letter dated July 29, 2010.  Id. ¶¶ 5-6 & Ex.

B.  Both TSA and S&T engaged in searches for responsive records.

### A.   Transportation Security Administration.

The TSA FOIA Office identified those offices most likely to have responsive records as

the Office of Security Technology ("OST"), and the Office of Occupational Safety, Health, and

Environment ("OSHE"), and directed that they search for responsive records.  Id. ¶ 13.  OST is

responsible for TSA's programs for transportation screening equipment and explosive detection

solutions, including the Passenger Screening Program ("PSP"), which includes the AIT

program.[1]  Id. ¶ 14.  OST also administers contracts with vendors of AIT technology.  Id.  OSHE

is responsible for all safety and environmental activities within TSA, and provides program

support and technical assistance to TSA Headquarters, airports, and other field units on all

matters relating to occupational safety, health, and environmental (including hazardous material)

---

[1] Additionally, the PSP maintains, and is responsible for, many of the records posted to the TSA's public website, including two radiation safety assessments regarding the Rapiscan Secure 1000 system performed by the Johns Hopkins University Applied Physics Laboratory ("JHU APL"), a TSA memorandum on implementing the results of the JHU APL study, an assessment of the Rapiscan Secure 1000 for conformity with radiological safety standards prepared by Frank Cerra in 2006 on behalf of the Center for Devices and Radiological Health of the Food and Drug Administration ("FDA"), as well as Site Acceptance Tests ("SATs") and Factory Acceptance Tests ("FATs"). Sotoudeh Decl. ¶¶ 14, 20, 22.

management.  Id. ¶ 15.  OSHE also works together with S&T, the other DHS component that

was tasked with this FOIA request.  Id.

Both OST and OSHE performed electronic searches.  Id. ¶ 16.  OSHE electronically

searched using various keywords related to radiation safety testing and AIT, id. ¶ 17, whereas

OST searched for responsive records on a designated folder related to AIT on the computer of

the Deputy Program Manager for the PSP, id. ¶ 18.  In addition, both offices performed manual

searches for records.  Id. ¶ 16.

### B.   Science and Technology Directorate.

On January 19, 2011, the S&T Office of Executive Secretary requested that the Test,

Evaluation, and Standards Office ("TES"), a component of S&T, conduct a search.  Declaration

of Bert Coursey ("Coursey Decl.") (Ex. 2) ¶¶ 12-13.[2]  TES "develop[s] standards for all types of

equipment, products and services including standards for the detection of chemical, biological,

radioactive, nuclear and explosives substances for use throughout DHS and the private sector."

Id. ¶ 3.  In addition, "TES coordinates with other federal agencies to adopt appropriate standards

and implement effective test and evaluation programs."  Id.  With regard to AIT systems

specifically, TES supports TSA in their certifying and testing AIT systems before they are

deployed at airports.  Id. ¶ 4.  In addition, the Director of TES, Bert Coursey, had previously

served as Chief of the Ionizing Radiation Division in the National Institute on Standards and

Technology ("NIST") Physics Laboratory, where he supervised radiation physicists who

developed and maintained the national standards for x-rays.  Id. ¶ 6.  Due to this expertise, Mr.

Coursey's work at TES has included work on safety standards for explosive detection systems,

---

[2] EPIC's Complaint references an earlier search conducted by S&T.  See Compl. ¶¶ 39-41, 47-49.  This search
began on or about August 2, 2010 and identified a small number of records.  Coursey Decl. ¶ 12 n.1.  Subsequently,
after a conference call between TSA and EPIC on January 19, 2011, during which EPIC indicated that it sought
records that included internal agency e-mails and memoranda, TES was re-tasked to conduct the more expansive
search discussed here.  Id.

including AIT, as well as work with other federal agencies, such as NIST and the Food and Drug

Administration ("FDA"), which are more directly involved in radiation safety standards.  Id. ¶ 9.

In addition, TES provides a certain amount of funding for those agencies to conduct radiation

safety testing.  Id.

      Mr. Coursey, on behalf of TES, conducted a search for responsive records, searching the

folders of e-mails (which included attached files) that he knew to contain information relevant to

AIT safety testing, and reviewing them for responsiveness.  Id. ¶¶ 14-15, 17-21.  In addition, Mr.

Coursey recognized that a component of TES, the Transportation Security Laboratory ("TSL"),

would likely have records responsive to EPIC's FOIA request as well, and informed the S&T

Office of Executive Secretary, which in turn tasked TSL to perform its own search.  Id. ¶ 16.

      TSL, a component of TES within S&T, performs research, development and validation of

solutions to address threats to transportation security, including explosive devices.  Declaration

of Pamela Beresford ("Beresford Decl.") (Ex. 3) ¶ 5.  Although TSL does not conduct formalized

radiation testing of security technologies, it has coordinated and collaborated with other federal

agencies that have engaged in such testing.  Id. ¶ 6.  TSL began its search on February 10, 2011.

Id. ¶ 12.  Specifically, TSL searched records belonging to Lee Spanier, the individual at TSL

who manages AIT testing and who has coordinated with other components of the federal

government, including FDA and NIST, that have engaged in testing and/or evaluation of AIT for

conformity with radiation safety standards.  Id. ¶ 14.  Accordingly, to the extent that TSL

possessed records responsive to the FOIA request, Mr. Spanier would have possessed such

records.  Id.  Mr. Spanier gathered all of the records that were located in specific folders he had

created that could contain information regarding the testing of AIT systems for radiation safety,

and also gathered all records to or from individuals with whom he had corresponded concerning

radiation safety testing.  Id. ¶ 15.  Mr. Spanier's records were then reviewed for responsiveness

by Pamela Beresford, TSL's Technical Editor and Librarian/Archivist, who manually reviewed

over 10,000 such records for responsiveness.  Id. ¶¶ 2, 20-22.

Because the responsive records belonging to TSL and TES concern the AIT program,

which is implemented by the TSA, and because many of the records in the possession of TSL

and TES consisted of correspondence to and from TSA personnel, TSA was consulted to assist in

the processing of these records pursuant to 6 C.F.R. § 5.4(c)(1), a DHS FOIA regulation that

states that "[w]hen a component receives a request for a record in its possession, it shall

determine whether another component, or another agency of the Federal Government, is better

able to determine whether the record is exempt from disclosure under the FOIA and, if so,

whether it should be disclosed as a matter of administrative discretion."  Beresford Decl. ¶ 23;

Coursey Decl. ¶ 22.  The regulation further states that the receiving component may, if

necessary, "[r]espond to the request regarding that record, after consulting with the component or

agency best able to determine whether to disclose it and with any other component or agency that

has a substantial interest in it."  6 C.F.R. § 5.4(c)(1).

TSA assisted in reviewing TES and TSL records for responsiveness, eliminating

duplicate records, and processing records.  Beresford Decl. ¶¶ 23-25; Coursey Decl. ¶¶ 22-23.  In

addition, because of its expertise in the area, TSA processed all TES and TSL records, in

addition to TSA records, that potentially contained confidential business information regarding

AIT system manufacturers and therefore implicated FOIA Exemption 4, as well as any records

that potentially contained Sensitive Security Information ("SSI").  Beresford Decl. ¶ 24; Coursey

Decl. ¶ 22; Sotoudeh Decl. ¶ 25.  On behalf of TES and TSL, TSA engaged in the "submitter

notice" process required by Executive Order 12,600, contacting vendors who had submitted

information to the government to assist in determining whether such information was

confidential and subject to Exemption 4, and made determinations as to whether such material

was exempt from disclosure.  Beresford Decl. ¶ 24; Coursey Decl. ¶ 22; Sotoudeh Decl. ¶¶ 43-

44.  In addition, for two records concerning testing by the FDA on the impact of millimeter wave

AIT technology on personal medical devices, the FDA was consulted pursuant to 6 C.F.R. §

5.4(c)(1), conducted the submitter notice process, and processed these records.  See Beresford

Decl. ¶¶ 30, 42; Declaration of Joy Lazaroff ("Lazaroff Decl.") (Ex. 4) ¶¶ 3-7.

**III.     This Civil Action and Production of Documents.**

       On November 19, 2010, EPIC filed this civil action, alleging that DHS had violated

FOIA with regard to the July 13, 2010 request and asking the Court to order DHS to produce the

responsive documents.  Compl. ¶¶ 50-58 & Requested Relief, ¶¶ A-C.   By letter on December

22, 2010, TSA sent EPIC a letter that included links to numerous responsive records that had

already been made publicly available on the TSA website.  See Sotoudeh Decl. ¶ 20 & Ex. G.

Pursuant to an agreed schedule, TSA produced responsive documents to EPIC on June 6, 2011.

Id. ¶ 21 & Ex. H.  TSA and S&T (including TES and TSL) produced responsive documents to

EPIC on June 21, 2011.  Id. ¶ 22 & Ex. I; Beresford Decl. ¶ 26 & Ex. A; Coursey Decl. ¶ 24.

S&T also notified EPIC on this date that certain records containing potentially confidential

business information were being withheld because the "submitter notice process" pursuant to

Executive Order 12600 had not yet been completed.  Beresford Decl. ¶ 26 & Ex. A.

       TES made a supplemental production of documents to EPIC on July 27, 2011, consisting

of documents, and excerpts thereof, previously withheld that were subsequently determined to be

releasable, either in full or in part.  Coursey Decl. ¶ 25.  On August 7, 2011, pursuant to a

negotiated extension of time, DHS agreed to review its withholdings under Exemption 4 to

determine whether certain portions of records that had been withheld might be releasable, either in whole or in part.  See Unopp. Mot. to Modify Schedule, ECF No. 8 (Aug. 7, 2011). Accordingly, on September 7, 2011, TSL and TSA made a final production of documents; this production included records that had initially been withheld pending completion of the submitter notice process and review for SSI, but were subsequently determined to be releasable, as well as records that had been initially withheld either in whole or in part under Exemption 4 but, upon reassessment, were determined to be releasable.  Beresford Decl. ¶ 27 & Ex. B; Sotoudeh Decl. ¶ 23 & Ex. J.

Additionally, TSA, in its June 21, 2011 response to EPIC, referred EPIC to a section of its website that now includes hundreds of pages of Site Acceptance Tests ("SATs") and Factory Acceptance Tests ("FATs").  Sotoudeh Decl. ¶ 22 & Ex. I; see also TSA: X-Ray Screening Technology Safety Reports,

http://www.tsa.gov/research/reading/xray_screening_technology_safety_reports_march_2011.shtm (last visited Sept. 11, 2011).  A FAT is conducted on each AIT at the manufacturer's facility prior to shipment to ensure that system is in compliance with contractual requirements. Sotoudeh Decl. ¶ 14.  A SAT is conducted on each AIT at every installation site location to ensure the system is properly set up, operationally configured, and remains in compliance with contractual requirements.  Id.  Both SATs and FATS are witnessed by Government and/or Government-designated representative(s).  Id.

## IV.    Agreements Between the Parties.

As a result of good-faith negotiations, the parties have come to certain agreements concerning the scope of the request, as well as regarding certain withholdings by DHS.  On January 19, 2011, EPIC agreed that its request was limited to records pertaining to vendors and

technologies that are either currently being deployed by TSA, or are under consideration by

TSA.  Sotoudeh Decl. ¶ 12.  In addition, on August 5, 2011, EPIC agreed not to contest any of

DHS's withholdings pursuant to FOIA Exemption 6, as well as DHS's withholdings pursuant to

Exemption 4 that consisted of documents withheld because they were subject to copyright.  See

E-mail from John Verdi to Jesse Grauman, Aug. 5, 2011 (Ex. 9).  Accordingly, these

withholdings will be addressed only briefly here.

## STANDARD OF REVIEW

Summary judgment is appropriate when the there is no genuine issue as to any material

fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c);

Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  FOIA actions are typically resolved

on summary judgment.  Reliant Energy Power Generation, Inc. v. FERC, 520 F. Supp. 2d 194,

200 (D.D.C. 2007).  A court reviews an agency's response to a FOIA request de novo. See 5

U.S.C. § 552(a)(4)(B).

On summary judgment in a FOIA case, the agency must demonstrate that it has

conducted an adequate search.  To do so, it must explain the "scope and method of the search" in

"reasonable detail[,]" but need not provide "meticulous documentation [of] the details of an epic

search."  Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982).  The agency must show "that it

made a good faith effort to conduct a search for the requested records, using methods which can

be reasonably expected to produce the information requested." Oglesby v. U.S. Dep't of the

Army, 920 F.2d 57, 68 (D.C. Cir. 1990). "There is no requirement that an agency search every

record system." Id. Rather, "the issue to be resolved is not whether there might exist any other

documents possibly responsive to the request, but rather whether the search for those documents

was adequate." Weisberg v. U.S. Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984)

(emphasis in original).  On this issue, courts accord agency affidavits "a presumption of good

faith, which cannot be rebutted by 'purely speculative claims about the existence and

discoverability of other documents.'" SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C.

Cir. 1991) (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).

        The agency must also justify any records withheld subject to FOIA's statutory

exemptions.  FOIA "represents a balance struck by Congress between the public's right to know

and the government's legitimate interest in keeping certain information confidential." Ctr. for

Nat'l Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 925 (D.C. Cir. 2003).  As such, while

the statute "affords the public access to virtually any federal government record that FOIA itself

does not specifically exempt from disclosure," Elec. Privacy Info. Ctr. v. Dep't of Homeland

Sec., 384 F. Supp. 2d 100, 106 (D.D.C. 2005), Congress recognized "that legitimate

governmental and private interests could be harmed by release of certain types of information

and provided nine specific exemptions under which disclosure could be refused." FBI v.

Abramson, 456 U.S. 615, 621 (1982).  These exemptions are specified in 5 U.S.C. § 552(b).

        The agency has the burden of justifying nondisclosure based on any exemptions.  Elec.

Privacy Info. Ctr., 384 F. Supp. 2d at 106.  It may meet this burden by providing affidavits and a

"Vaughn index" that provides an adequate description of each withheld document or portion

thereof, and how each asserted exemption applies.  Id. (citing Vaughn v. Rosen, 484 F.2d 820

(D.C. Cir. 1973)).  A court may grant summary judgment to an agency on the basis of its

affidavits if they "(a) describe the documents and the justifications for nondisclosure with

reasonably specific detail, (b) demonstrate that the information withheld logically falls within the

claimed exemption, and (c) are not controverted by either contrary evidence in the record nor by

evidence of agency bad faith." Id. (quoting Military Audit Project v. Casey, 656 F.2d 724, 738

(D.C. Cir. 1981)) (internal quotation marks and brackets omitted).

## ARGUMENT

### I.   DHS CONDUCTED AN ADEQUATE SEARCH.

As outlined in the attached Declarations of Paul Sotoudeh, Bert Coursey, and Pamela

Beresford, DHS conducted an adequate search that was "reasonably expected to produce the

information requested." Oglesby, 920 F.2d at 68.  DHS referred the requests to TSA and S&T,

the two components likely to have responsive records.  Sotoudeh Decl. ¶ 5.  TSA then undertook

a search of the divisions within TSA that were identified as likely to have responsive records,

including OST and OSHE.  Id. ¶¶ 13-19.  Similarly, S&T tasked EPIC's request to TES and,

later, to TSL.  Coursey Decl. ¶¶ 12-13, 16.

The choices of the components and offices to be searched were reasonable based on the

subject matter covered by these components and offices, and their likelihood to have records

responsive to EPIC's specific requests.  Within TSA, OST was selected for a search because its

Passenger Screening Program focuses on the implementation of checkpoint security equipment,

Sotoudeh Decl. ¶ 14, whereas OSHE was searched because it is responsible for TSA's safety and

environmental activities, id. ¶ 15.  Similarly, within S&T, TES supports TSA in their certifying

and testing AIT systems before they are deployed at airports, and its chief, Bert Coursey, has

worked on safety standards for AIT; similarly, TSL has coordinated and collaborated with other

federal agencies that have engaged in such testing.  Coursey Decl. ¶¶ 3-9, 16; Beresford Decl. ¶¶

5-6.  Moreover, each component of DHS searched using either text-based electronic searches, or

manual searches in the locations deemed most likely to have responsive records.  See Sotoudeh

Decl. ¶¶ 16-18; Coursey Decl. ¶¶ 14-19; Beresford Decl. ¶¶ 14-17.

In sum, the searches by DHS were reasonably expected to produce the information requested. The search employed by DHS was therefore adequate, and the Defendant should be granted summary judgment on this issue.

## II. THE WITHHOLDINGS BY DHS WERE PROPER.

TSA, TES, and TSL processed the responsive records in accordance with FOIA's requirements and withheld certain information in full or in part pursuant to the exemptions established by 5 U.S.C. § 552(b)(3), (b)(4), (b)(5), and (b)(6). These withholdings are discussed generally in the declarations of Paul Sotoudeh, Bert Coursey, and Pamela Beresford, and more specifically in the TSA, TES, and TSL Vaughn indices. See Sotoudeh Decl. Ex. K (TSA Vaughn index); Coursey Decl. Ex. A (TES Vaughn index); Beresford Decl. Ex. C (TSL Vaughn index). Because TSA properly invoked all exemptions and released to EPIC all information reasonably segregable from the exempt records, summary judgment should be granted to the Defendant.

### A.   DHS Properly Withheld Material Under Exemption 6.

Exemption 6 of FOIA exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). A court evaluating an Exemption 6 claim should evaluate whether the withheld information is contained in a personnel, medical or "similar" file; whether disclosure would compromise a "substantial privacy interest;" and, if so, whether the public interest in disclosure outweighs the privacy interest in non-disclosure. See Dep't of State v. Wash. Post Co., 456 U.S. 595, 602 (1982); Consumers' Checkbook Ctr. for the Study of Servs. v. HHS, 554 F.3d 1046, 1050 (D.C. Cir. 2009).

Under this exemption, TSA, TES, and TSL withheld information that includes names of government and non-government personnel, e-mail addresses, phone numbers, and signatures. See Sotoudeh Decl. ¶¶ 26-29; Coursey Decl. ¶¶ 29-32; Beresford Decl. ¶¶ 31-34.  EPIC has represented that it is not contesting any of DHS's withholdings under Exemption 6.  See E-mail from John Verdi to Jesse Grauman, Aug. 5, 2011 (Ex. 9).  Accordingly, these withholdings are no longer at issue and DHS should be granted summary judgment on these withholdings.

**B.**   **DHS Properly Withheld Privileged Material Under the Deliberative Process and Attorney-Client Privileges in Exemption 5.**

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  These records are exempt from disclosure if they would be "normally privileged in the civil discovery context."  NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975).  Exemption 5 thus incorporates the privileges that are available to an agency in civil litigation, the three principal ones being the deliberative process privilege, the attorney-client privilege, and the attorney work product doctrine. See id. at 148-49.

**1.**   **Deliberative Process Privilege.**

The deliberative process privilege protects internal communications that are "both predecisional and deliberative." Mapother v. Dep't of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1993).  Accordingly, it applies to "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).  Similarly, records are protected by the deliberative process privilege if they "reflect[] the give-and-take of the consultative process."  Id.; see also Access Reports v. Dep't of Justice, 926 F.2d 1192, 1195 (D.C. Cir. 1991) (citing Coastal States, 617 F.2d at 866); Sears, 421 U.S. at

150 (documents "reflecting . . . deliberations comprising part of a process by which governmental decisions . . . are formulated" are deliberative) (internal citations omitted).

In order for records to fall within the deliberative process privilege, an agency need not necessarily identify a specific final agency decision, but simply must show "what deliberative process is involved, and the role played by the documents in issue in the course of that process." Coastal States, 617 F.2d at 868; see also Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Labor, 478 F. Supp. 2d 77, 82 (D.D.C. 2007) (rejecting argument that agency was required to identify "precisely what policies were under consideration").  As the Supreme Court has stated:

> Our emphasis on the need to protect pre-decisional documents does not mean that the existence of the privilege turns on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared. Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process.

Sears, 421 U.S. at 151 n.18.

The purpose of this privilege is to encourage frank discussion of legal and policy issues within the government, and to protect against public confusion resulting from disclosure of reasons and rationales that were not ultimately the bases for the agency's action.  See, e.g., Dep't of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9 (2001) (internal citations omitted) (noting that the privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government"); EPA v. Mink, 410 U.S. 73, 87 (1973) (internal citations omitted) ("[E]fficiency of Government would be greatly

hampered if, with respect to legal and policy matters, all Government agencies were prematurely forced to 'operate in a fishbowl.'").

The deliberative process privilege protects both "intra-" and "inter-agency" records. 5 U.S.C. § 552(b)(5). This requirement is not difficult to satisfy, see Klamath, 532 U.S. at 8 (defining the "inter-agency or intra-agency" as requiring only that a document's "source must be a Government agency"), and is satisfied here, as the records at issue here are internal government e-mails, memoranda, and drafts.  See Sotoudeh Decl. ¶ 33; Coursey Decl. ¶ 36; Beresford Decl. ¶ 38.

TSA, TES, and TSL withheld documents and excerpts thereof pursuant to the deliberative process privilege.  These withheld records fall into the following broad categories, and specific details regarding the withholdings are contained in the TSA, TES and TSL Vaughn indices:

1)    **Draft documents, and deliberations, comments, and opinions offered during the drafting of documents.**  This category comprises records related to the drafting process of numerous documents such as responses to Congressional inquiries, responses letters from members of the public, internal agency memoranda, and fact sheets on AIT safety.  See Coursey Decl. ¶ 37(a)(i-x); Beresford Decl. ¶ 39(a); Sotoudeh Decl. ¶ 34(a) (referencing categories of records comprising drafts and related records, and citing specific entries on Vaughn indices).  Records withheld in this category include not only draft documents themselves (including marked-up versions), but also communications containing individual authors' opinions, reflections, questions and answers, and comments concerning the drafts.

All of these records are plainly protected by the deliberative process, as such material is the archetype of material that may be withheld under this privilege.  See

Dudman Commc'ns. Corp. v. Dep't of the Air Force, 815 F.2d 1565, 1569 (D.C. Cir. 1987) (stating that "the disclosure of editorial judgments—for example, decisions to insert or delete material or to change a draft's focus or emphasis—would stifle the creative thinking and candid exchange of ideas necessary to produce good historical work"); Coastal States, 617 F.2d at 866 (listing "draft documents" as example of material covered by deliberative process privilege); Fischer v. U.S. Dep't of Justice, 723 F. Supp. 2d 104, 113 (D.D.C. 2010) (noting that "[d]raft documents, by their very nature, are typically predecisional and deliberative") (quoting Exxon Corp. v. Dep't of Energy, 585 F. Supp. 690, 698 (D.D.C.1983)); Donham v. U.S. Forest Serv., No. 07-111, 2008 WL 2157167, at *5 (S.D. Ill. May 21, 2008) (finding draft documents to be "precisely the kind of documents that Exemption 5 and the deliberative process privilege seek to protect from disclosure").  This material was accordingly properly withheld.

2)      **Recommendations regarding future agency policy decisions.**  A second category of withholdings includes those containing recommendations, opinions, and suggestions regarding future agency policy decisions concerning AIT radiation safety, including planned approaches and methods for testing AIT devices and recommendations for ensuring the continued safety of AIT.  See Coursey Decl. ¶ 37(b); Beresford Decl. ¶ 39(b); Sotoudeh Decl. ¶ 34(b) (citing to entries on Vaughn indices).  Such recommendations are also protected by the deliberative process privilege.  See Klamath, 532 U.S. at 8 (holding that "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated" are protected by the deliberative process privilege) (quoting Sears, 421 U.S. at 150).

3)    **Preliminary testing results.**  This category comprises a preliminary progress report, resulting from an interagency agreement between DHS and FDA, concerning the testing of the effects of millimeter wave scanners on personal medical devices.  Beresford Decl. ¶ 39(c) (citing TSL <u>Vaughn</u>, Withheld-In-Full Doc. L).  Shielding such preliminary testing results from disclosure "protects creative debate and candid consideration of alternatives within an agency," "protects the public from the confusion that would result from premature exposure to discussions occurring before the policies affecting it had actually been settled upon," and "protects the integrity of the decision-making process itself by confirming that 'officials should be judged by what they decided(,) not for matters they considered before making up their minds.'"  <u>Russell v. Dep't of the Air Force</u>, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (quoting <u>Jordan v. U.S. Dep't of Justice</u>, 591 F.2d 753, 772-73 (D.C. Cir. 1978)).  Moreover, to the extent that this preliminary assessment contains facts in addition to opinions, they are exempt from disclosure because under these circumstances, given that the assessments are preliminary, "disclosure of even purely factual material would reveal an agency's decision-making process."  <u>Russell,</u> 682 F.2d at 1048; <u>see also</u> <u>Mapother</u>, 3 F.3d at 1537 (stating that "the fact/opinion test . . . is not infallible and must not be applied mechanically.  This is so because the privilege serves to protect the deliberative process itself, not merely documents containing deliberative material.")

4)    **Other deliberations regarding policy matters related to AIT and radiation safety.**  These withholdings comprise general deliberations and expressions of opinion regarding matters concerning the federal government's ongoing evaluation and regulation of the safety of AIT systems.  <u>See</u> Coursey Decl. ¶ 37(c-e); Beresford Decl. ¶ 39(d);

Sotoudeh Decl. 34(c).  Described with more specificity in the <u>Vaughn</u> indices, this broad

array of withholdings includes, for example, deliberations concerning the development of

international standards on ionizing radiation, <u>see</u> Coursey Decl. ¶ 37 (c), deliberations

concerning the public release of 2006 reports on radiation safety and two AIT systems,

<u>see id.</u> ¶ 37(d), summaries of internal agency discussions regarding radiation safety and

factors influencing an upcoming TSA decision as to whether to deploy Rapiscan AIT

systems, <u>see</u> TSA <u>Vaughn</u> at TSA71-72, 71A,[3] deliberations as to how to respond to

claims regarding AIT by a newspaper reporter, <u>see</u> TSL <u>Vaughn</u> at TSL173-175,[4]

opinions expressed by agency personnel interpreting third party reports on radiation

emissions and certain AIT systems, <u>see</u> TSL <u>Vaughn</u> at TSL634-5, 870, 874-876,

deliberations between agency personnel regarding the authority of FDA to regulate health

and safety issues pertaining to AIT scanners, <u>see</u> TES <u>Vaughn</u> at TES636, 640-41, 645-

47, 650, 656-58, 661, 681-84, 687, and many others.  As is apparent from a review of

these entries in the <u>Vaughn</u> indices, all of these records "reflect[] the give-and-take of the

consultative process" concerning numerous and diverse policy decisions concerning AIT,

<u>Coastal States</u>, 617 F.2d at 866, and are protected by the deliberative process privilege.

---

[3] Such summaries "serve primarily to reveal the 'evaluative' process by which different members of the decisionmaking chain arrive at their conclusions and what those predecisional conclusions are," <u>Mead Data Cent., Inc. v. Dep't of the Air Force</u>, 575 F.2d 932, 935 (D.C. Cir. 1978), and thus fall within the ambit of Exemption 5.

[4] As this Court has repeatedly found, "deliberations regarding public relations policy are deliberations about policy, even if they involve 'massaging' the agency's public image." <u>ICM Registry, LLC v. U.S. Dep't of Commerce</u>, 538 F. Supp. 2d 130, 136 (D.D.C. 2008); <u>see also</u> <u>Judicial Watch, Inc. v. Reno</u>, No. Civ. A. 00-0723 (JR), 2001 WL 1902811, at *3 (D.D.C. Mar. 30, 2001) (deliberations regarding "how to handle press inquiries and other public relations issues" are covered by exemption 5); <u>Thompson v. Dep't of the Navy</u>, No. Civ. A. 95-347 (RMM), 1997 WL 527344, at *5 (D.D.C. Aug. 18, 1997) (protecting materials created to brief senior officials who were preparing to respond to media inquiries, on basis that "disclosure of materials reflecting the process by which the Navy formulates its policy concerning statements to and interactions with the press" could stifle honest and frank communication within the agency), <u>aff'd</u>, No. 97-5292, 1998 WL 202253 (D.C. Cir. Mar. 11, 1998) (per curiam).

### 2.     Attorney-Client Privilege.

TSA withheld one record protected by the attorney-client privilege.  This privilege protects confidential communications made between clients and their attorneys for the purpose of securing legal advice or services.  See In re Sealed Case, 737 F.2d 94, 98–99 (D.C. Cir. 1984). Like a private client, a government agency "needs the . . . assurance of confidentiality so it will not be deterred from full and frank communications with its counselors."  Coastal States, 617 F.2d at 863.  The attorney-client privilege fundamentally applies to facts divulged by a client to his attorney, and "also encompasses any opinions given by an attorney to his client based upon, and thus reflecting, those facts."  Elec. Privacy Info. Ctr., 384 F. Supp. 2d at 114.

TSA redacted a portion of one internal email because it contains a TSA attorney's advice to a TSA official as to how to respond to a petition by EPIC to suspend the use of the AIT program.[5]  See Sotoudeh Decl. ¶ 36.  Because TSA, as an agency, is entitled to confidential advice from its in-house counsel under the attorney-client privilege, this redaction was proper. See In re Lindsey, 148 F.3d 1100, 1104 (D.C. Cir. 1998) ("In the governmental context, the 'client' may be the agency, and the attorney may be an agency lawyer.") (quoting Tax Analysts v. IRS, 117 F.3d 607, 618 (D.C.Cir.1997)).

### C.     DHS Properly Withheld Sensitive Security Information Under Exemption 3.

Exemption 3 of FOIA permits an agency to withhold information that is:

specifically exempted from disclosure by statute . . . if that statute

(A) (i) requires that the matters be withheld from the public in such a manner as to leave
    no discretion on the issue; or

---

[5] This portion was additionally withheld pursuant to the deliberative process privilege.  See TSA Vaughn at 26-27; Sotoudeh Decl. ¶ 34(a).

> (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and
>
> (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

5 U.S.C. § 552(b)(3).  DHS is authorized to withhold certain types of information under such a statute.  Congress requires the TSA, "[n]otwithstanding section 552 of title 5 [i.e., the FOIA]," to prescribe regulations prohibiting disclosure of information if the TSA Administrator "decides that disclosing the information would (A) be an unwarranted invasion of personal privacy; (B) reveal a trade secret or privileged or confidential commercial or financial information; or (C) be detrimental to the security of transportation."  49 U.S.C. § 114(r).  This statute meets the standard articulated in 5 U.S.C. § 552(b)(3)(a)(ii), in that it "establishes particular criteria for withholding or refers to particular types of matters to be withheld."  As numerous courts, including this Court, have found, section 114(r), which explicitly indicates that it applies "notwithstanding [the FOIA]," is an Exemption 3 statute.  See, e.g., Tooley v. Bush, No. 06-306, 2006 WL 3783142, at *20 (D.D.C. Dec. 21, 2006), rev'd & remanded in part on other grounds sub nom., Tooley v. Napolitano, 556 F.3d 836 (D.C. Cir. 2009); Elec. Privacy Info. Ctr., 384 F. Supp. 2d at 110 n.10; Gordon v. F.B.I., 390 F. Supp. 2d 897, 900 (N.D. Cal. 2004).[6]

This Court's review of TSA's withholdings under Exemption 3 is extremely limited. Specifically, "[w]hen analyzing whether the defendant is entitled to invoke Exemption 3, the court need not examine the detailed factual contents of specific documents withheld; rather, the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." James Madison Project v. CIA, 607 F. Supp. 2d 109, 126 (D.D.C. 2009) (internal quotation marks omitted).  Moreover, once this threshold requirement is met, the

---

[6] These courts cite to the 49 U.S.C. § 114(s), the former location of the SSI statute.  This subsection was subsequently redesignated as § 114(r) but otherwise unchanged.  See Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, 121 Stat. 1844, Div. E, § 568(a) (2007).

Court lacks jurisdiction to review TSA's designation of the withheld information as SSI pursuant

to 49 U.S.C. § 46110.  See Chowdhury v. Northwest Airlines Corp., 226 F.R.D. 608, 614 (N.D.

Cal. 2004); see also Shqeirat v. U.S. Airways Group, Inc., No. 07-1513, 2008 WL 4232018, at

*2 (D. Minn. Sept. 9, 2008) ("District Courts are without jurisdiction to entertain challenges to

the TSA's decisions regarding disclosure of SSI.").  This statute provides that:

> . . . a person disclosing a substantial interest in an order issued by the Secretary of
> Transportation (or the Under Secretary of Transportation for Security with respect
> to security duties and powers designated to be carried out by the Under Secretary
> or the Administrator of the Federal Aviation Administration with respect to
> aviation duties and powers designated to be carried out by the Administrator) in
> whole or in part under this part, part B, or subsection (l) or (s)[7] of section 114
> may apply for review of the order by filing a petition for review in the United
> States Court of Appeals for the District of Columbia Circuit or in the court of
> appeals of the United States for the circuit in which the person resides or has its
> principal place of business . . .

49 U.S.C. § 46110(a).  It further provides that Courts of Appeals have "exclusive jurisdiction to

affirm, amend, modify or set aside" the final orders issued by TSA referenced in § 46110(a),

including SSI designations.  49 U.S.C. § 46110(c).  As such, District Courts may not review

orders of TSA designating material as SSI.  See Gilmore v. Gonzales, 435 F.3d 1125, 1133 (9th

Cir. 2006); Merritt v. Shuttle, Inc., 245 F.3d 182, 187 (2d Cir. 2001); Scherfen, 2010 WL

456784, at *6; Shqeirat, 2008 WL 4232018, at *2; In re September 11 Litigation; 236 F.R.D.

164, 174-75 (S.D.N.Y. 2006); Chowdhury, 226 F.R.D. at 614.  Thus, the import of 49 U.S.C. §§

114(r) and 46110 is that TSA has the authority to designate material encompassed by the statute

and its regulations as SSI notwithstanding the FOIA, and once TSA makes such a designation,

the designated material is prohibited from disclosure and the designation is reviewable only via a

---

[7] As indicated in the preceding footnote, § 114(s) is the subsection that formerly authorized TSA to designate certain material as SSI; in 2007, this section was redesignated as § 114(r).  Section 46110(a) has not yet been updated to reflect this clerical change.  Courts that have discussed the jurisdictional limitation of § 46110(a) since 2007 have recognized that it continues to apply to orders designating material as SSI.  See, e.g., Scherfen v. U.S. Dep't of Homeland Sec., No. 3:CV-08-1554, 2010 WL 456784, at *6 (M.D. Pa. Feb. 2, 2010); Shqeirat, 2008 WL 4232018, at *2.

petition for review filed in a court of appeals.  The only question remaining, therefore, is "the inclusion of withheld material within the statute's coverage." <u>James Madison Project</u>, 607 F. Supp. 2d at 126.

Pursuant to 49 U.S.C. § 114(r), TSA has promulgated implementing regulations that expressly prohibit disclosure of certain categories of SSI.  <u>See generally</u> 49 C.F.R. part 1520. Under these regulations, there are fifteen specific types of information that constitute SSI, and TSA may also designate other types of information as SSI.  <u>See</u> 49 C.F.R. § 1520.5(b).  As described below, the material withheld under Exemption 3 falls within 49 U.S.C. § 114(r) and its implementing regulations at 49 C.F.R. part 1520, and TSA determined that these materials were exempt from disclosure because their disclosure would be detrimental to the security of transportation.  See Sotoudeh Decl. ¶ 41.

First, DHS has withheld, as SSI, one picture of a "scatter phantom image" generated by the Rapiscan Secure 1000 contained in a report on that machine's radiation safety.  <u>See</u> Sotoudeh Decl. ¶ 41(a).  This image constitutes SSI under 49 C.F.R. § 1520.5(b)(9)(vi), which includes as SSI "[a]ny electronic image shown on any screening equipment monitor, including threat images and descriptions of threat images for threat image projection systems."  Disclosure of images such as the one at issue here would be detrimental to transportation security as disclosure could provide insight into the screening capabilities and limitations of the Rapiscan Secure 1000, a system TSA currently deploys.  <u>See id.</u>  Accordingly, it is exempt from disclosure under 49 U.S.C. § 114(r) and 49 C.F.R. § 1520.5(b)(9)(vi).

DHS has also withheld, as SSI, two identical excerpts describing the specific screening procedures used when utilizing the Rapiscan Secure 1000.  <u>See</u> Sotoudeh Decl. ¶ 41(b).  These excerpts are contained within two reports, *Radiation Safety Engineering Assessment Report for*

*the Rapiscan Secure 1000 in Single Pose Configuration*, prepared for TSA in October 2009 and

August 2010 by the Johns Hopkins University's Applied Physics Laboratory ("JHU APL")

concerning the Rapiscan Secure 1000.  Id.  Redacted versions of these reports appear both in the

TES records and in documents posted to TSA's public website referenced in TSA's letter of

December 22, 2010.  See id.; TES Vaughn index at TES224-348, Sotoudeh Decl. ¶ 20 & Ex. G.

The withheld excerpts, located on pages TES268 and TES333 (page 34 of each report), see

Sotoudeh Decl. ¶ 41(b), are SSI pursuant to 49 C.F.R § 1520.5(b)(9)(i).  This provision

designates as SSI "[a]ny procedures, including selection criteria and any comments, instructions,

and implementing guidance pertaining thereto, for screening of persons, accessible property,

checked baggage, U.S. mail, stores, and cargo, that is conducted by the Federal government or

any other authorized person."  The redacted excerpts, which describe the screening procedures

used when TSA utilizes the Rapiscan Secure 1000, fit squarely within the category of

information defined in § 1520.5(b)(9)(vi).  Moreover, disclosure of such procedures would be

detrimental to transportation security because knowledge of these security procedures could be

used by those seeking to circumvent them as a "road map."  See Sotoudeh Decl. ¶ 41(b).

Accordingly, they are accordingly exempt from disclosure under 49 U.S.C. § 114(r).

Finally, DHS has withheld excerpts from an email exchange between employees of TSL

and TSA, located in TSL's records, describing a phenomenon observed while performance-

testing the Rapiscan Secure 1000.  See Sotoudeh Decl. ¶ 41(c); TSL Vaughn index at TSL836.

This excerpt falls within 49 C.F.R. § 1520.5(b)(9)(v), which designates as SSI "performance or

testing data from security equipment or screening systems."  Moreover, the withheld excerpts

could be used to identify a potential vulnerability of the system; as such, their disclosure would

be detrimental to the security of transportation.  Sotoudeh Decl. ¶ 41(c).  Accordingly, they were properly withheld under 49 U.S.C. § 114(r) and 49 C.F.R. § 1520.5(b)(9)(v).

The withholdings made pursuant to Exemption 3 fell within the definition of SSI under 49 U.S.C. § 114(r), as implemented by 49 C.F.R. part 1520.  To the extent that Plaintiff wishes to challenge the designation of these records as SSI, its recourse is to file a petition for review in a court of appeals.

**D.**     **DHS Properly Withheld Material Under Exemption 4.**

Finally, DHS withheld certain confidential commercial information pursuant to FOIA Exemption 4, which protects records from disclosure that contain "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4).  This exemption covers two distinct categories of information.  One is "trade secrets," which the D.C. Circuit has defined as "a secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort."  Pub. Citizen Health Research Group v. FDA, 704 F.2d 1280, 1288 (D.C. Cir. 1983).

In this case, DHS has withheld certain material pursuant to the second category of information specified in § 552(b)(4), namely, information that is "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential."  Id. at 1290.  With respect to the first element of this category, "commercial" has been interpreted broadly to mean "pertaining or relating to or dealing with commerce."  Am. Airlines, Inc. v. Nat'l Mediation Bd., 588 F.2d 863, 870 (2d Cir. 1978); see also Pub. Citizen Health Research Group, 704 F.3d at 1290 (noting that "the terms 'commercial' and 'financial' in [Exemption 4] should be given their ordinary meanings").  The second element, "obtained from a person," refers to information obtained from

a broad range of entities, including not only individuals, but also "an individual, partnership, corporation, association, or public or private organization other than an agency." Nadler v. FDIC, 92 F.3d 93, 95 (2d Cir. 1996) (quoting definition of a "person" from the Administrative Procedure Act, 5 U.S.C. § 551(2)).  With respect to the third element, different tests for confidentiality apply depending on how the commercial information is obtained by the government.  If private commercial information is provided to the government voluntarily, it is confidential for purposes of Exemption 4 "if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 879 (D.C. Cir. 1992).  Conversely, private commercial information obtained by the government under compulsion is "confidential" for purposes of Exemption 4 if disclosure is likely either "(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." Nat'l Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974); see also Critical Mass, 975 F.2d at 878-79 (affirming that the National Parks test applies to information submitted under compulsion).

Here, DHS withheld the following types of information pursuant to Exemption 4:

**1.     Copyrighted materials.**

Both TES and TSL located records that were protected by copyright.  See Coursey Decl. ¶ 41 (citing TES Vaughn, Withheld-in-full-copyright Docs. A-H); Beresford Decl. ¶ 41 (citing TSL Vaughn, Withheld-in-full Docs. O, P, Q).  These records include standards published by outside organizations, as well as articles in scholarly publications.  See Coursey Decl. ¶ 41; Beresford Decl. ¶ 41.

EPIC has indicated that it does not intend to contest these withholdings.  See E-mail from John Verdi to Jesse Grauman, Aug. 5, 2011 (Ex. 9).  Accordingly, DHS should be granted summary judgment as to these withholdings on this basis.

**2.      Voluntarily Submitted Materials Pertaining to Medtronic.**

Pursuant to an interagency agreement between DHS and FDA, FDA has conducted tests to measure any potential effects of millimeter wave scanners on personal medical devices.  See Lazaroff Decl. ¶ 5.  Two of the records that TSL's search located pertained to such testing and originated from Medtronic, a manufacturer of medical devices.  See id. ¶¶ 6-12.  Because of FDA's expertise in the subject matter, and its role in oversight of the testing program, FDA was consulted, pursuant to 6 C.F.R. § 5.4(c)(1), to determine whether, in fact, any of the material at issue was subject to FOIA Exemption 4.  See Beresford Decl. ¶¶ 30, 42; Lazaroff Decl. ¶ 6.

One such record, which has been withheld in part, is a proposed plan that Medtronic submitted to the FDA and DHS voluntarily for testing its own medical devices.  See Lazaroff Decl. ¶ 10; TSL Vaughn at TSL613-23.  The record is stamped "MEDTRONIC CONFIDENTIAL."  Lazaroff Decl. ¶ 10.  The withheld excerpts contain details regarding Medtronic's plan for testing the effects of millimeter wave scanners on Medtronic devices, including the model names of those devices.  See Lazaroff Decl. ¶ 12; TSL Vaughn at TSL613-23.  Medtronic has represented to the FDA that certain portions of the proposed test plan contain information that it would not normally release to the public, and the FDA, based on its subject matter expertise, has found no reason to dispute Medtronic's assertion.  See Lazaroff Decl. ¶ 13.

The withholdings of excerpts from the Medtronic test plan qualify for Exemption 4.  They are "commercial" records, as they pertain to Medtronic's commercially-sold products, and were "obtained from a person," namely, Medtronic.  The test plan was submitted voluntarily by

Medtronic, which was not required by FDA or DHS either to participate in the testing program at all, or to submit the test plan.  See Lazaroff Decl. ¶ 11.  In light of the entire record being marked "MEDTRONIC CONFIDENTIAL," the contents of the withheld excerpts, Medtronic's representations, and FDA's conclusions, there is sufficient evidence on which this Court can conclude that these excerpts consisted of material that Medtronic would not customarily release to the public.  Critical Mass, 975 F.2d at 879.  Accordingly, these excerpts were exempt from disclosure under Exemption 4.

      The other document in this category is a memorandum written by Medtronic to an individual at Schiphol Airport in the Netherlands, an airport that deploys AIT devices.  See Lazaroff Decl. ¶ 9; TSL Vaughn at TSL28.  The redacted information in the letter includes Medtronic's own findings regarding the interaction between the Provision 100 scanner, manufactured by L-3 Communications, and Medtronic medical devices.  Id. ¶ 12.  The memorandum was authored by Medtronic and written to an individual at Schiphol Airport, and was obtained by DHS and FDA in 2010 when L-3 submitted it in conjunction with the testing described above.  See Lazaroff Decl. ¶ 9.

      Like the Medtronic test plan, this letter is commercial information, as it pertains to Medtronic's (and L-3's) commercially sold devices.  Additionally, although it was obtained from L-3 and not from Medtronic, it was nonetheless "obtained from a person."  See Bd. Of Trade of City of Chicago v. Commodity Futures Trading Comm'n, 627 F.2d 392, 405 (D.C. Cir. 1980) (rejecting argument that Exemption 4 "safeguards commercial information only insofar as it concerns the source of the information"); accord Critical Mass Energy Project v. NRC, 830 F.2d 278, 281 (D.C. Cir. 1987) (protecting from disclosure safety reports submitted by power plant

consortium based on commercial interests asserted by consortium's members).[8]  The document

was not required to be submitted to the government by either Medtronic or L-3.  See Lazaroff

Decl. ¶ 11; Sotoudeh Decl. ¶ 50(2).  Finally, like the test plan, the withheld excerpt contains

information that is of the type that Medtronic would not customarily release to the public, i.e.,

details of Medtronic's own testing and the interaction between Medtronic devices and millimeter

wave scanners, including the model names of those devices.  Id. ¶ 12-13.  Thus, this record was

exempt from disclosure.

### 3.    Confidential Commercial Information Regarding AIT Systems.

The final category of Exemption 4 withholdings consists of confidential commercial

information pertaining to AIT systems.  This information, described generally in the Declaration

of Paul Sotoudeh, see Sotoudeh Decl. ¶¶ 43-71, and more specifically in the pages of the three

Vaughn indices cited in these paragraphs of the Sotoudeh Declaration, can be grouped into four

basic categories: (1) information concerning AIT systems' design features, operational settings

and parameters, and component parts, id. ¶¶ 54-58; (2) information concerning radiation dose

levels emitted by systems of vendors who do not have current contracts with TSA, id. ¶¶ 59-63;

(3) recommendations for product design improvements regarding radiation safety in the AS&E

SmartCheck system, id. ¶¶ 64-68; and (4) a voluntarily-submitted draft document on emissions

by SafeView Corporation, id. ¶¶ 69-71.

As described in the Sotoudeh Declaration and the Vaughn indices, these withholdings are

clearly "commercial" information.  They are specific technical details pertaining to commercially

---

[8] That the document was actually submitted by L-3, rather than by its originator, Medtronic, actually strengthens its status as a voluntary submission as to Medtronic.  See Gov't Accountability Proj. v. U.S. Nuclear Regulatory Comm'n, Nos. Civ.A 86-1976, Civ.A. 86-3201 TFH, 1993 WL 13033518, at *5 (D.D.C. July 2, 1993) (holding that to construe a document that was submitted to the government by an entity other than the document's originator as a "required" submission, thus subjecting it to the more stringent National Parks standard for withholding under Exemption 4, would "contravene the spirit of Critical Mass" and that instead, "the more permissive standard governing voluntary transfers" should apply in such cases).

sold AIT systems.  See Sotoudeh Decl. ¶¶ 43-71.  Moreover, as evidenced by the four

declarations from AIT manufacturers discussed in more detail infra, these manufacturers clearly

have a "commercial interest" in these records, as they have asserted that their release will cause

substantial competitive harm to their commercial interests, and that the information at issue is

relevant to these products' commercial success.  See Pub. Citizen Health Research Group, 704

F.2d at 1290 (holding that records are commercial as long as the submitter has a "commercial

interest" in them, and holding that for the manufacturers in that case, "documentation of the

health and safety experience of their products will be instrumental in gaining marketing approval

for their products").

      Additionally, all of the information at issue was "obtained from a person."  The withheld

information is contained both in materials supplied directly by AIT manufacturers – specifically,

Rapiscan Systems, Inc. ("Rapiscan"), L-3 Communications ("L-3"), American Science &

Engineering ("AS&E"), and Smiths Detection Ireland ("Smiths") – to the government, as well as

in materials drafted by, or at the direction of, the government that relied on, and were derived

from, those submissions.  See Sotoudeh Decl. ¶¶ 45-47.

      Materials supplied directly by AIT manufacturers clearly were "obtained" from the

vendors themselves.  See Sotoudeh Decl. ¶ 45 (listing records obtained directly from AIT

manufacturers).  The remainder of records with Exemption 4 withholdings are five government-

drafted or government-sponsored reports: (1) a 2006 evaluation of the Rapiscan Secure 1000

system by Frank Cerra of NIST, (2) a 2006 evaluation of the AS&E SmartCheck system by Mr.

Cerra, (3) a 2008 evaluation of the Dual Source AS&E SmartCheck by Mr. Cerra, (4) the two

reports prepared for TSA by the Johns Hopkins University's Applied Physics Laboratory ("JHU

APL") concerning the Rapiscan Secure 1000 in October 2009 and August 2010, and (5) a "quick

look brief" summarizing the results of the JHU APL study.  See Sotoudeh Decl. ¶ 46.  Although

"courts . . . have read the requirement that information be 'obtained from a person' to restrict the

exemption's application to data which have not been generated within the Government," Bd. Of

Trade, 627 F.2d at 403-04, a record created by the government can fall within Exemption 4 "to

the extent it contains . . . information obtained from nongovernmental parties on a confidential

basis."  Soucie v. David, 448 F.2d 1067, 1079 n.47 (D.C. Cir. 1971); see also OSHA

Data/C.I.H., Inc. v. U.S. Dep't of Labor, 220 F.3d 153, 162 n.23 (3d Cir. 2000) (ratio calculated

by agency, based on "individual components" obtained from employers, was "obtained from a

person"); Gulf & Western Indus., v. United States, 615 F.2d 527, 530 (D.C. Cir. 1979)

(upholding Exemption 4 withholding of excerpts of government reports where release "would

disclose data supplied to the government from a person outside the government"); Freeman v.

Bureau of Land Mgmt., 526 F. Supp. 2d 1178, 1188 (D. Or. 2007) (research by government was

"obtained from a person" when it "piggyback[ed] upon [an outside individual's] data to such an

extent" that it was "not truly independent"); accord Lion Raisins, Inc. v. USDA, 354 F.3d 1072,

1080-81 (9th Cir. 2004) (finding Exemption 4 applicable to information in USDA quality

assessments of raisins reflected in "Line Check Sheets" prepared by government inspectors

during plant visits).  Here, the information withheld under Exemption 4 in the five government

or government-sponsored reports referenced above is derived from information and materials

submitted by the vendors, namely, (1) third-party radiation reports submitted by these vendors,

(2) communications with, and other materials received from, the vendors, including

documentation, and (3) the AIT systems themselves, which were obtained by the FDA, NIST,

and the JHU APL from some of the vendors for the purpose of radiation testing.  See Sotoudeh

Decl. ¶ 47 ("But for the government's having obtained these third-party reports, materials, and

AIT systems from the vendors for testing, production of the reports described above would not have been possible."). Thus, although the five reports listed above were drafted by, or at the direction of, the government, the information in the reports that was withheld under Exemption 4 was nonetheless "obtained from a person."

Finally, the information at issue was "confidential." The information at issue was acquired through a combination of required and voluntary submissions. See id. ¶¶ 48-51. TSA has deemed "required submissions" to include any information vendors were required to submit as part of, or in connection with, a "qualifications data package" ("QDP") in order to become eligible for TSA contracts; id. ¶ 49. Conversely, TSA has deemed information to be voluntarily submitted if it was obtained through the JHU APL study, in which Rapiscan's participation was completely voluntary, id. ¶ 50(1), if it was submitted in conjunction with a voluntary program to test the effects of millimeter wave scanners on medical devices, id. ¶ 50(2), or if it was otherwise voluntarily submitted by manufacturers, id. ¶ 50(3). For the remainder of the records, TSA has not definitively determined whether they were required or voluntary submissions. See id. ¶ 51.

Regardless, for all but one category of records, see Sotoudeh Decl. ¶¶ 69-71; infra at 32-33, TSA has demonstrated that the withheld information satisfies the standard for confidentiality under the more stringent of the two standards, namely, the National Parks standard for required submissions; thus, it is unnecessary to determine whether these submissions were voluntary or required. See Honeywell Tech. Solutions, Inc. v. Dep't of Air Force, -- F. Supp. 2d --, No. 05-1772, 2011 WL 1595161, at *12 n.2 (D.D.C. Apr. 19, 2011) (finding that "because [the records at issue] should not be released even under the more stringent National Parks test, the Court need not determine [whether the records were required or voluntary submissions]). As explained below, and as supported by declarations submitted by four manufacturers of AIT systems, the

disclosure of the information at issue is likely to cause substantial competitive harm to these

manufacturers.

### a.   Information concerning AIT Systems' Design Features, Operational Setting and Parameters, and Component Parts.

DHS has withheld, under Exemption 4, certain information concerning design features,

operational settings and parameters, and component parts of AIT systems.  See Sotoudeh Decl.

¶¶ 54-58.  Release of this information is likely to cause the vendors who submitted this

information – Rapiscan, L-3, and AS&E – substantial competitive harm.  There is significant

actual competition in the domestic and international marketplace for AIT technology.  See

Sotoudeh Decl. ¶ 53; Declaration of Peter Modica ("Modica Decl.") (Ex. 5) ¶¶ 9-11; Declaration

of Scott Trosper ("Trosper Decl.") (Ex. 6) ¶ 3; Declaration of Joseph Callerame ("Callerame

Decl.") (Ex. 7) ¶¶ 4,6, Declaration of Rory Doyle ("Doyle Decl.") (Ex. 8) ¶ 5.  Competitors in

this industry include, but are not limited to, the four AIT manufacturers whose data is issue in

this litigation.  Sotoudeh Decl. ¶ 53.  Moreover, as explained in declarations submitted by

Rapiscan, L-3, and AS&E, release of the information at issue here is likely to cause these

vendors substantial competitive harm because it would enable competitors to gain insight into

the proprietary systems, components, mechanisms, and design and operational parameters that

these companies use in their technology, and to use this information to design and build their

own systems which could then compete with the systems manufactured by Rapiscan, L-3, and

AS&E.  See Sotoudeh Decl. ¶ 56; Modica Decl. ¶¶ 4-7; Trosper Decl.  ¶¶ 4-7; Callerame Decl.

¶ 5(i-ii).  For the same reasons, these companies would not normally disclose this type of

information to the public.  See Sotoudeh Decl. ¶ 57; Modica Decl. ¶¶ 5, 7; Trosper Decl. ¶ 4-7;

Callerame Decl. ¶ 3.  This information was therefore properly withheld.

### b.  Information Concerning Radiation Dose Levels Emitted by Systems of Non-Contracting Vendors.

DHS has also withheld, under Exemption 4, information concerning specific radiation dose levels emitted at specific locations by the AS&E SmartCheck and the Smiths Detection "eqo," two systems for which TSA does not have any current contracts for deployment at airports.  See Sotoudeh Decl. ¶¶ 59-63.  Release of this information is likely to cause AS&E and Smiths substantial competitive harm because competitors could use this information to derive operational or performance attributes about the scanning technologies used in these products, such as beam characteristics of filtration, which in turn could enable competitors to "reverse engineer" these products.  See id. ¶ 61; Callerame Decl. ¶ 5(iii); Doyle Decl. ¶¶ 4-6.  For the same reasons, these companies would not normally disclose this type of information to the public.  See Sotoudeh Decl. ¶ 62; Callerame Decl. ¶ 3; Doyle Decl. ¶ 9.  This information was therefore properly withheld under Exemption 4.

### c.  Recommendations for Product Design Improvements Regarding Radiation Safety in AS&E SmartCheck.

DHS has also withheld, under Exemption 4, recommendations contained in both third-party and government reports for product design improvements regarding radiation safety in the AS&E SmartCheck.  See Sotoudeh Decl. ¶¶ 64-68.  Release of such information could cause AS&E substantial competitive harm because, to the extent that AS&E may have incorporated some of these recommendations into their product, a competitor could also use these recommendations to design or improve its own system.  See Sotoudeh Decl. ¶ 66; Callerame Decl. ¶ 5(iv).  For the same reasons, AS&E would not normally disclose this type of information to the public.  See Sotoudeh Decl. ¶ 67; Callerame Decl. ¶ 3.  This information was therefore properly withheld under Exemption 4.

> **d.**     **Draft Document on Emissions by SafeView Corporation.**

Finally, DHS has withheld, in full, a 2004 draft document on radiation emissions created

by SafeView, a predecessor entity to L-3.  <u>See</u> Sotoudeh Decl. ¶ 69-71.  This document is largely

a review of information from scientific journals and government documents pertaining to health

effects of electromagnetic exposure, and also includes operating characteristics of an early

version of the L-3 Provision scanner.  <u>Id.</u> ¶ 70; Trosper Decl. ¶ 8.  It was not required to be

submitted to DHS as part of the procurement or qualification process, and was stamped

"DRAFT" and "Proprietary and Confidential."  Sotoudeh Decl. ¶ 70.  Because L-3 would not

normally release this voluntarily submitted document to the public, <u>see</u> Trosper Decl. ¶ 8, it is

confidential and was properly withheld under Exemption 4.

> **E.**     **DHS Produced All Reasonably Segregable Information.**

Under FOIA, "any reasonably segregable portion of a record shall be provided to any

person requesting such record after deletion of the portions which are exempt."  5 U.S.C. §

552(b).  Accordingly, "non-exempt portions of a document must be disclosed unless they are

inextricably intertwined with exempt portions."  <u>Mead Data Central, Inc. v. U.S. Dept. of Air

Force</u>, 566 F.2d 242, 260 (D.C. Cir. 1977).  A court "may rely on government affidavits that

show with reasonable specificity why documents withheld pursuant to a valid exemption cannot

be further segregated."  <u>Juarez v. Dep't of Justice</u>, 518 F.3d 54, 61 (D.C. Cir. 2008) (internal

citation omitted).  An agency has no obligation to segregate non-exempt material that is so

"inextricably intertwined" with exempt material that "the excision of exempt information would

impose significant costs on the agency and produce an edited document with little informational

value."  <u>Neufeld v. IRS</u>, 646 F.2d 661, 666 (D.C. Cir. 1981), <u>abrogated on other grounds by</u>

Church of Scientology of Calif. v. IRS, 792 F.2d 153 (D.C. Cir. 1986); see also Nat'l Sec.

Archive Fund, Inc. v. CIA, 402 F. Supp. 2d 211, 220–21 (D.D.C. 2005) (same).

As outlined in the Sotoudeh, Beresford, and Coursey Declarations, the DHS components

endeavored to provide all reasonably segregable non-exempt information to EPIC.  See Sotoudeh

Decl. ¶ 72; Beresford Decl. ¶ 44; Coursey Decl. ¶ 43.  Indicative of these efforts are the

numerous records that were withheld in part rather than in full, and the fact that DHS twice made

supplemental releases of documents that had previously been withheld after determining that

further segregable non-exempt information could be released.  See Sotoudeh Decl. ¶¶ 23, 72;

Beresford Decl. ¶¶ 27, 44; Coursey Decl. ¶¶ 25, 43.  DHS should accordingly be granted

summary judgment on this issue.

## CONCLUSION

Because DHS has conducted an adequate search and produced all non-exempt responsive

documents to EPIC, and because no further segregation of non-exempt responsive documents is

possible, summary judgment should be granted to the Defendant.


Date: September 12, 2011                              Respectfully submitted,

                                                     TONY WEST
                                                     Assistant Attorney General

                                                     RONALD S. MACHEN JR.
                                                     United States Attorney for
                                                     the District of Columbia

                                                     ELIZABETH J. SHAPIRO
                                                     Deputy Branch Director

                                                      /s/ Jesse Z. Grauman
                                                     JESSE Z. GRAUMAN (Va. Bar No. 76782)
                                                     U.S. Department of Justice
                                                     Civil Division, Federal Programs Branch

<u>Mailing Address:</u>
Post Office Box 883
Washington, D.C.  20044

<u>Courier Address:</u>
20 Massachusetts Ave., N.W.
Washington, D.C. 20001

Telephone:      (202) 514-2849
Fax:            (202) 616-8460
Email:          jesse.z.grauman@usdoj.gov

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                                    )
ELECTRONIC PRIVACY INFORMATION CENTER, )
                                                                    )
                        Plaintiff,                      )
                                                                    )
            v.                                              )   Case No. 1:10-cv-1992 (ABJ)
                                                                    )
THE UNITED STATES DEPARTMENT OF           )
HOMELAND SECURITY,                             )
                                                                    )
                        Defendant.                   )
_____ )

### DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Local Civil Rule 7(h) of the Rules of the United States District Court for the

District of Columbia, Defendant United States Department of Homeland Security ("DHS")

hereby submits the following statement of material facts as to which the defendant contends

there is no genuine issue in connection with its motion for summary judgment under Rule 56(b)

of the Federal Rules of Civil Procedure.  Where appropriate, the statement cites to the

Declarations attached to its motion for summary judgment and supporting exhibits.

1.      On July 13, 2010, Plaintiff, the Electronic Privacy Information Center ("EPIC"),

submitted a request under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), to DHS,

seeking the following agency records:

> a.   All records concerning TSA tests regarding body scanners and radiation emission
>      or exposure; and
>
> b.   All records concerning third party tests regarding body scanners and radiation
>      emission or exposure.

Declaration of Paul Sotoudeh ("Sotoudeh Decl.") (Ex. 1) ¶ 4 & Ex. A.  EPIC requested expedited

processing pursuant to 5 U.S.C. § 552(a)(6)(E), and preferential fee status as a "representative of

the news media" pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II).  Id. Ex. A.

2.      DHS transferred EPIC's FOIA request to two of its components, the

Transportation Security Administration ("TSA") and the Science and Technology Directorate

("S&T"), and informed EPIC of this referral by letter dated July 29, 2010.  Id. ¶¶ 5-6 & Ex. B.

3.      TSA directed that two of its offices, the Office of Security Technology ("OST")

and the Office of Occupational Safety, Health, and Environment ("OSHE"), search for

responsive records.  Id. ¶ 13.  OST is responsible for TSA's programs for transportation

screening equipment and explosive detection solutions, including the AIT program, and

administers contracts with vendors of AIT technology.  Id.  OSHE is responsible for all safety

and environmental activities within TSA.  Id. ¶ 15.

4.      Both OST and OSHE performed electronic and manual searches for responsive

records.  Id. ¶¶ 16-17.

5.      S&T directed two of its offices, the Test, Evaluation, and Standards Office

("TES"), and the Transportation Security Laboratory ("TSL"), to conduct searches.  Declaration

of Bert Coursey ("Coursey Decl.") (Ex. 2) ¶¶ 12-13, 16; Declaration of Pamela Beresford

("Beresford Decl.") (Ex. 3) ¶ 12.  TES develops standards for various equipment, products, and

services, including those used for explosives detection, coordinates such activities between other

federal agencies, and supports TSA in their certifying and testing AIT systems before they are

deployed at airports.  Coursey Decl. ¶¶ 3-4.  TSL performs research, development and validation

of solutions to address threats to transportation security, and has coordinated and collaborated

with federal agencies, including the Food and Drug Administration ("FDA") and National

Institute on Standards and Technology ("NIST"), that have engaged in testing security

technologies for radiation safety.  Beresford Decl. ¶¶ 5-6.

6.    Both TES and TSL searched the records of those individuals within these

components whom these components determined were likely have responsive records.  Coursey

Decl. ¶¶ 14-15, 17-21; Beresford Decl. ¶¶ 14-22.

7.    Because the responsive records belonging to TSL and TES concern the AIT

program, which is implemented by the TSA, and because many of the records in the possession

of TSL and TES consisted of correspondence to and from TSA personnel, TSA was consulted to

assist in the processing of these records pursuant to 6 C.F.R. § 5.4(c)(1), a DHS FOIA regulation

that allows for consultation between DHS components and other agencies.  Beresford Decl. ¶ 23;

Coursey Decl. ¶ 22.  TSA assisted in reviewing TES and TSL records for responsiveness and

eliminating duplicate records, as well as in determining whether records were exempt from

disclosure under FOIA Exemptions 3 and 4.  Beresford Decl. ¶¶ 23-25; Coursey Decl. ¶¶ 22-23;

Sotoudeh Decl. ¶ 25, 43-44.

8.    In addition, for two records concerning testing by the FDA on the impact of

millimeter wave AIT technology on personal medical devices, the FDA was consulted pursuant

to 6 C.F.R. § 5.4(c)(1), and processed these records.  See Beresford Decl. ¶¶ 30, 42; Declaration

of Joy Lazaroff ("Lazaroff Decl.") (Ex. 4) ¶¶ 3-7.

9.    EPIC filed this civil action on November 19, 2010, alleging that DHS had

violated FOIA with regard to the July 13, 2010 request and asking the Court to order DHS to

produce the responsive documents.  Compl. ¶¶ 50-58 & Requested Relief, ¶¶ A-C.

10.     By letter on December 22, 2010, TSA sent EPIC a letter that included links to numerous responsive records that had already been made publicly available on the TSA website. See Sotoudeh Decl. ¶ 20 & Ex. G.

11.     TSA produced responsive documents to EPIC on June 6, 2011. Id. ¶ 21 & Ex. H. TSA and S&T (including TES and TSL) produced responsive documents to EPIC on June 21, 2011, id. ¶ 22 & Ex. I; Beresford Decl. ¶ 26 & Ex. A; Coursey Decl. ¶ 24. S&T also notified EPIC on this date that certain records containing potentially confidential business information were being withheld because the "submitter notice process" pursuant to Executive Order 12600 had not yet been completed. Beresford Decl. ¶ 26 & Ex. A. On this date, TSA also referred EPIC to a section of its website that now includes hundreds of pages of Site Acceptance Tests ("SATs") and Factory Acceptance Tests ("FATs"), Sotoudeh Decl. ¶ 22 & Ex. I, posted online at http://www.tsa.gov/research/reading/xray_screening_technology_safety_reports_march_2011.shtm.

12.     On July 27, 2011, TES made a supplemental production consisting of documents, and excerpts thereof, previously withheld that were subsequently determined to be releasable, either in full or in part. Coursey Decl. ¶ 25.

13.     On September 7, 2011, TSL and TSA made a final production, including records that had initially been withheld pending completion of the submitter notice process and review for sensitive security information ("SSI"), but were subsequently determined to be releasable, as well as records that had been initially withheld either in whole or in part under Exemption 4 but, upon reassessment by Defendant, were determined to be releasable. Beresford Decl. ¶ 27 & Ex. B; Sotoudeh Decl. ¶ 23 & Ex. J.

14.     During a conference call between the parties on January 19, 2011, EPIC agreed to narrow its request to records pertaining to vendors and technologies that are either currently being deployed by TSA, or are under consideration by TSA.  Sotoudeh Decl. ¶ 12.

15.     TSA, TES, and TSL have withheld certain records or portions thereof from disclosure.  In support of these withholdings, TSA, TES, and TSL have asserted the exemptions established by 5 U.S.C. § (b)(3) ("Exemption 3"), (b)(4) ("Exemption 4"), (b)(5) ("Exemption 5"), and (b)(6) ("Exemption 6").  See Sotoudeh Decl. ¶¶ 25-71 & Ex. K (TSA Vaughn index); Coursey Decl. ¶¶ 27-42 & Ex. A (TES Vaughn index); Beresford Decl. ¶¶ 28-43 & Ex. C (TSL Vaughn index); Lazaroff Decl. ¶¶ 6-14.

16.     On August 5, 2011, EPIC agreed that it would not contest DHS's withholdings pursuant to FOIA Exemption 6, as well as any of DHS's withholdings pursuant to Exemption 4 that consisted of documents withheld solely because they were subject to copyright.  See E-mail from John Verdi to Jesse Grauman, Aug. 5, 2011 (Ex. 9).

17.     With regard to the withholdings under Exemption 4 that are at issue between the parties, TSA (on behalf of itself, TES, and TSL) and FDA (on behalf of TSL for a limited subset of records) contacted five corporations that had submitted certain information to the government contained in the responsive records, pursuant to Executive Order 12600.  See Sotoudeh Decl. ¶¶ 43-44; Coursey Decl. ¶ 22; Beresford Decl. ¶ 24, 30, 42; Lazaroff Decl. ¶¶ 3-7.  As a result, certain records or portions thereof have been withheld because they have been determined to constitute "commercial or financial information obtained from a person and privileged or confidential."  In support of these assertions, Defendants have attached the declarations of representatives of four of these corporations, all of which are manufacturers of AIT systems: Peter Modica, Rapiscan Systems, Inc. ("Modica Decl.") (Ex. 5); Scott Trosper, L-3

Communications ("Trosper Decl.") (Ex. 6); Joseph Callerame, American Science & Engineering

("Callerame Decl.") (Ex. 7), and Rory Doyle, Smiths Detection Ireland ("Doyle Decl.") (Ex. 8).

18.     The Sotoudeh, Coursey, and Beresford Declarations set forth the details of the

scope of DHS's search, and these declarations, and their attached <u>Vaughn</u> indices, set forth the

grounds on which DHS has based its withholdings pursuant to the FOIA exemptions at issue

between the parties.  As to Exemption 4 specifically, DHS also submits the Lazaroff, Modica,

Trosper, Callerame, and Doyle Declarations in support of its withholdings.

19.     To the extent possible, the DHS components endeavored to provide all reasonably

segregable non-exempt information to EPIC, and withheld records in full only when no

meaningful non-exempt portions thereof remained.  <u>See</u> Sotoudeh Decl. ¶ 72; Coursey Decl. ¶

43; Beresford Decl. ¶ 44.

Date: September 12, 2011                    Respectfully submitted,

                                           TONY WEST
                                           Assistant Attorney General

                                           RONALD S. MACHEN JR.
                                           United States Attorney for
                                           the District of Columbia

                                           ELIZABETH J. SHAPIRO
                                           Deputy Branch Director

                                            /s/ Jesse Z. Grauman
                                           JESSE Z. GRAUMAN (Va. Bar No. 76782)
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch

                                           Mailing Address:
                                           Post Office Box 883
                                           Washington, D.C.  20044

                                           Courier Address:

20 Massachusetts Ave., N.W.
Washington, D.C. 20001

Telephone:      (202) 514-2849
Fax:            (202) 616-8460
Email:          jesse.z.grauman@usdoj.gov

Attorneys for Defendants