# Exhibit 1
# Declaration of Paul Sotoudeh

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                      )
ELECTRONIC PRIVACY INFORMATION CENTER  )
                                                      )
        Plaintiff,                    )
                                                      )
    v.                                   )  Case No. 1:10-cv-1992 (ABJ)
                                                      )
THE UNITED STATES DEPARTMENT OF      )
HOMELAND SECURITY,                       )
                                                      )
        Defendant.                   )
_____  )

## DECLARATION OF PAUL SOTOUDEH

       I, Paul Sotoudeh, do hereby declare as follows:

       1.      I am currently the Acting Freedom of Information Act (FOIA) Officer ffor the

Transportation Security Administration ("TSA") within the Department of Homeland Security

("DHS").

       2.      Due to the nature of my official duties, I am familiar with DHS and TSA's

obligations under FOIA and the Privacy Act, including application of the various exemptions.

The statements made in this declaration are based on my personal knowledge, information made

available to me in the performance of my official duties, and conclusions reached in accordance

therewith.

       3.      The purpose of this declaration is to set forth the chronology of correspondence

relating to the FOIA requests by the Plaintiff, the Electronic Privacy Information Center

("EPIC"), at issue in this action, to describe the searches conducted to identify responsive

records, to explain TSA's procedures for processing responsive records; and to identify the basis

for TSA's decision to withhold information requested by EPIC pursuant to exemptions 3, 4, 5

and 6 of the FOIA.  In addition, as discussed further below, this declaration also explains the

basis for a limited number of withholdings made in the records of the Science and Technology

Directorate ("S&T"), another component of DHS, pursuant to Exemptions 3 and 4.

FOIA Request

4.     By letter dated July 13, 2010, Ginger P. McCall submitted a FOIA request ("the

request") on behalf of EPIC to DHS.  The request is attached as Exhibit A.  EPIC sought the

following two categories of records:

> 1)  All records concerning TSA tests regarding body scanners and radiation
>     emission or exposure; and
>
> 2)  All records concerning third party tests regarding body scanners and radiation
>     emission or exposure.

5.     Upon initial review of the request, DHS determined that the information sought

by EPIC was under the purview of two agency components, TSA and S&T, and on July 29,

2010, DHS referred the FOIA request to both TSA and S&T.

6.     By letter dated July 29, 2010, DHS acknowledged EPIC's request and informed it

of the referrals to TSA and S&T.  This letter is attached as Exhibit B.

7.     TSA assigned FOIA request identification number TSA10-0674 to the request.

8.      By letter dated August 12, 2010, TSA acknowledged receipt of the request and

denied its request for a fee waiver and expedited processing.  This letter is attached as Exhibit C.

9.     By letter dated August 27, 2010, Ginger McCall, on behalf of EPIC, wrote

Kimberly Walton, TSA Special Counselor, to appeal "TSA's denial of EPIC's request for a fee

waiver and expedited processing."  This letter is attached as Exhibit D.

10.     By letter dated September 21, 2010, TSA acknowledged receipt of EPIC's FOIA

appeal of the TSA denial of its request for fee waiver and expedited processing.  This letter is

2

attached as Exhibit E.

11.     By letter dated November 24, 2010, TSA affirmed its initial expedited processing denial but agreed to waive the fees.  This letter is attached as Exhibit F.

12.     During a phone call on January 19, 2011, EPIC agreed to limit the scope of its request to records pertaining to vendors and technologies that were either (1) currently being deployed by TSA, or (2) under consideration by TSA.  Accordingly, any records located by either TSA or S&T pertaining to vendors or technologies that are not either being deployed by TSA or under consideration by TSA have been deemed non-responsive to EPIC's request.

<u>Scope of Search for Responsive Records</u>

13.     TSA's FOIA Office identified TSA offices that were most likely to have records concerning the two items in Plaintiff's request and directed that they search for responsive records. The offices identified as likely to have responsive records were the Office of Security Technology ("OST"), and the Office of Occupational Safety, Health, and Environment ("OSHE"), which is under the Office of the Chief Administrative Officer ("CAO").  These offices were therefore directed to search for responsive records.

14.     The Office of Security Technology ("OST") is responsible for TSA's programs for transportation screening equipment and explosive detection solutions.  Specifically, the Advanced Imaging Technology ("AIT") program is part of the Passenger Screening Program ("PSP") within the OST, which focuses on identifying, testing, procuring, deploying, and sustaining checkpoint security equipment that detects explosives and/or prohibited items that may be concealed on people and/or their carry-on items.  OST also administers the contracts with the respective AIT vendors.  This administration includes, but is not limited to, oversight of Factory Acceptance Tests and Site Acceptance Tests.  A Factory Acceptance Test ("FAT") is

conducted on each AIT machine at the manufacturer's facility prior to shipment to ensure that system is in compliance with contractual requirements. A Site Acceptance Test ("SAT") is conducted on each AIT machine at every installation site location to ensure the system is properly set up, operationally configured, and remains in compliance with contractual requirements. Both FATs and SATs are witnessed by Government and/or Government-designated representative(s). The PSP also maintains, and is responsible for, many of the records posted to the TSA's public website, including those records referenced in letters sent to EPIC on December 22, 2010 and June 21, 2011, which are further described below.

15.     OSHE is responsible for all safety and environmental activities within TSA. OSHE provides program support and technical assistance to TSA Headquarters, airports, and other field units on all matters relating to occupational safety, health, and environmental (including hazardous material) management. OSHE also interfaces with S&T, the other DHS component that was tasked with EPIC's FOIA request.

16.     Both OST and OSHE performed both electronic and manual searches.

17.     The following terms were used in the electronic search conducted by OSHE: "Advanced Imaging Technology," "AIT," "radiation," "surveys," "assessment," "evaluation," "backscatter," "general-use," "millimeter wave," "FDA," "Food and Drug Administration," "Ionizing radiation," "x-rays," "Health Physics Society," "HPS," "ANSI," "American National Standards Institute," "U.S. Army Public Health Command," "USAPHC," "USACHPPM," Johns Hopkins University, Applied Physics Laboratory, JHU, APL, "Certified Health Physicists," "and CHP."

18.     OST electronically searched for responsive records by searching the "AIT"-related folder on the computer of the Deputy Program Manager for the Passenger Screening

Program ("PSP").  In addition to these records, a review of emails in the AIT folder revealed only transmittal or other non-substantive or non-responsive emails.  As such, they were not deemed responsive to the request.

19.     During the course of the search by both offices, it was determined that thousands of pages of responsive records either were already posted, or were in the process of being posted, to TSA's public website, located at www.tsa.gov.  As described further below, links to these records were included in TSA's response letters to EPIC.

Release of Responsive Records

20.     By letter dated December 22, 2010, TSA provided an interim response letter to EPIC's request.  This letter is attached as Exhibit G.  In that letter, TSA identified several responsive TSA records that were publicly available and posted, or linked to, on TSA's public web page on AIT safety and in the TSA Electronic Reading Room.  TSA identified those publicly available records and provided the web addresses and links to those records, which included:

- *Assessment of the Rapiscan Secure 1000 Body Scanner for Conformance with Radiological Safety Standards*, Frank Cerra, Food and Drug Administration's Center for Devices and Radiological Health ("CDRH"), July 21, 2006, http://www.tsa.gov/assets/pdf/rapiscan_secure_1000.pdf[1]

- *Radiation Safety Engineering Assessment Report for the Rapiscan Secure 1000 in Single Pose Configuration*, Applied Physics Laboratory ("APL"), Johns Hopkins University, October 2009 & August 2010 (Versions 1 & 2), http://www.tsa.gov/assets/pdf/jh_apl_v1.pdf, http://www.tsa.gov/assets/pdf/jh_apl_v2.pdf

- TSA Memorandum on Implementing the Recommendations from the APL

---

[1] In TSA's letter to EPIC, attached as Exhibit G, the link to Mr. Cerra's report was http://www.tsa.gov/assets/pdf/nist_rapiscan_secure_1000.pdf.  The link has since been updated to http://www.tsa.gov/assets/pdf/rapiscan_secure_1000.pdf to reflect the fact that although Mr. Cerra wrote this report while he was affiliated with the National Institute on Standards and Technology ("NIST"), his work was performed on behalf of CDRH, not on behalf of NIST.

Assessment, October 7, 2010,
http://www.tsa.gov/assets/pdf/tsa_safety_study_ait_info_memo.pdf

- Fact Sheet: Advanced Imaging Technology (AIT) Health & Safety, Department of Homeland Security, DHS Office of Health Affairs, http://www.tsa.gov/assets/pdf/ait_fact_sheet.pdf

- TSA Blog, "White House Blog: Backscatter Backstory" November 9, 2010, http://blog.tsa.gov/2010/11/white-house-blog-backscatter-back-story.html

21.     By letter dated June 6, 2011, TSA provided a second interim response to EPIC's

request and released responsive records to EPIC.  The response letter is attached as Exhibit H.

The June 6, 2011 response included a total of 128 pages, 84 of which were released in full and

42 of which were withheld in part.  In this letter, TSA also identified 5 pages of responsive

records that were withheld in full pursuant to FOIA Exemption 5.

22.     On June 21, 2011, TSA released an additional 69 pages of responsive documents

to EPIC, 25 of which were released in their entirety and 44 of which were released in part.  This

letter is attached as Exhibit I.   In this letter, TSA also provided an address of a web page on

TSA's public website to which hundreds of additional pages of records responsive to EPIC's

request have been posted for viewing and download.  The web page address provided was

http://www.tsa.gov/research/reading/xray_screening_technology_safety_reports.shtm.  This web

page includes links to radiation surveys concerning baggage screening equipment (which are not

responsive to EPIC's request) and backscatter AIT machines (which are responsive to EPIC's

request).  The backscatter AIT radiation surveys linked on this web page consist of the Site

Acceptance Tests ("SATs") and Factory Acceptance Tests ("FATs") that are maintained by OST

and are described in more detail above in Paragraph 14.  They are currently located at

http://www.tsa.gov/research/reading/xray_screening_technology_safety_reports_march_2011.sht

m and can be downloaded at any time.  To provide additional transparency, all future radiation

survey reports will be posted on TSA's website after they are completed.

23.     On September 7, 2011, eighteen (18) pages of TSA records were re-released to EPIC.  These records were re-released after TSA, upon further examination and consultation, determined that certain excerpts previously withheld under Exemption 4 could, in fact, be publicly released.  The email accompanying this release is attached as Exhibit J.

24.     During the processing of responsive records, to the extent possible, if TSA and S&T records contained identical documents, an effort was made to eliminate duplicates to avoid the possibility of inconsistent application of FOIA exemptions.  Notwithstanding these efforts, some duplicates remained in the final document production.

Exemptions

25.     The following paragraphs generally describe the records withheld by TSA pursuant to FOIA's exemptions at 5 U.S.C. § 552(b).  These records are described in greater detail in the TSA Vaughn index, attached as Exhibit K.  These paragraphs also describe, where applicable, records withheld by S&T's components, the Test, Evaluation and Standards Office ("TES") and the Transportation Security Laboratory ("TSL"), pursuant to Exemptions 3 and 4. TSA was consulted to assist in processing these records pursuant to 6 C.F.R. § 5.4(c)(1).  These records are described in greater detail in the TES and TSL Vaughn indices, attached as Exhibit A to the Declaration of Bert Coursey and Exhibit C to the Declaration of Pamela Beresford, respectively.

***Exemption 6***

26.     Exemption 6 of FOIA exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."

7

27.     As set forth in the TSA <u>Vaughn</u> index, records on the following Bates-numbered pages in TSA's records were redacted in part pursuant to Exemption 6 because they contained the names, email addresses, and phone numbers of both government and non-government employees:  Bates Nos. 000001, 000007-000008, 000015-000016, 000017-000019, 000026-000027, 000037-000038, 000042, 000047, 000049-000051, 000052, 000053-000054, 000055-000056, 000069-000070, 000071-000072, 000073, 000106, 000107-000108, 000111-000112, 000113-000114, 000115-000118, 000120, 000127, 000129, 000133-000135, 000136, 000139, 000140, 000141-000143, 000145-000149, 000151-000152, 000154, 000156-000160, 000165, 000167-000171, 000174, 000181, and 000192-000195.

28.     In addition, as set forth in the last row of the TSA <u>Vaughn</u> index, the SATs and FATs posted online at

[http://www.tsa.gov/research/reading/xray_screening_technology_safety_reports_march_2011.shtm](http://www.tsa.gov/research/reading/xray_screening_technology_safety_reports_march_2011.shtm) all have been redacted to withhold the names, signatures, and initials of both government and non-government employees.  These withholdings are contained throughout the SATs and FATs. They are the only portions of the SATs and FATs withheld from release; in all other respects, these documents have been released in their entirety.

29.     Disclosure of the information specified above would constitute a clearly unwarranted invasion of the personal privacy of the individuals referenced.  The privacy interests of the individuals referenced outweigh any minimal public interest in disclosure.

### *Exemption 5*

30.     Exemption 5 of FOIA exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  The exemption has been interpreted to

encompass the privileges typically available to a party in litigation.  As described below, TSA has asserted Exemption 5 to withhold information protected under the deliberative process privilege and the attorney-client privilege.

*Deliberative Process Privilege*

31.     TSA has asserted Exemption 5 to withhold certain information protected under the deliberative process privilege.  The deliberative process privilege protects internal agency communications that are both predecisional, that is, that predate an agency decision or policy, and deliberative, that is, containing recommendations or opinions on legal or policy matters.  It therefore applies to records such as recommendations, evaluations, drafts, proposals, suggestions, and other subjective documents (and excerpts thereof) which do not reflect final agency policy.

32.     There are three primary concerns recognized under the deliberative process privilege: (1) to encourage open and frank discussion of policy matters between subordinates and supervisors; (2) to protect against the premature disclosure of proposed policies before they become final; and (3) to protect against public confusion that might result from the disclosure of reasons and rationales that were not, in fact, the ultimate grounds for the agency's action.

33.     As described more specifically in the TSA <u>Vaughn</u> index, portions of the responsive records were withheld in part, and certain records were withheld in full, pursuant to the deliberative process privilege.  These records, or portions thereof, are internal government e-mails, memoranda, and documents.

34.     The records, or portions thereof, withheld pursuant to the deliberative process privilege fit into the following general categories.  More specific descriptions are contained in the numbered entries in the TSA <u>Vaughn</u> index:

a. **Draft documents, and deliberations, comments, and opinions offered during the drafting of documents.**  See TSA <u>Vaughn</u> Index, Bates Nos. 18, 26-27, 52, 69-70, 70A-C, and 108A-F.

b. **Recommendations regarding future policy steps:**  See TSA <u>Vaughn</u> Index, Bates Nos. 38, 42, and 128.

c. **General deliberations on policy matters concerning AIT and radiation safety.**  See TSA <u>Vaughn</u> Index, Bates Nos. 7-8, 71-72, and 71A.

*Attorney-Client Privilege*

35.     The attorney-client privilege protects confidential communications made between clients and their attorneys for the purpose of securing legal advice or services.  It encompasses facts divulged by a client to the client's attorney, as well as communications from the attorney to the client based upon and reflecting those facts.

36.     TSA has withheld portions of two pages containing an internal email, including draft language, from an attorney in TSA's Office of Chief Counsel to TSA official regarding a suggested response letter to EPIC's petition to suspend the use of AIT.  See TSA <u>Vaughn</u> Index, Bates Nos. 000026-27.  These records have also been withheld under the deliberative process privilege.

***Exemption 3***

37.     Exemption 3 of FOIA allows the withholding of information 'specifically exempted from disclosure by statute . . . if that statute "(A) (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009,

10

specifically cites to this paragraph."  5 U.S.C. § 552(b)(3).

38.      49 U.S.C. § 114(r) prohibits the disclosure of certain "sensitive security information" ("SSI") notwithstanding the FOIA.  Disclosure of such information is prohibited if TSA determines that its disclosure would "(A) be an unwarranted invasion of personal privacy; (B) reveal a trade secret or privileged or confidential commercial or financial information; or (C) be detrimental to the security of transportation."  49 U.S.C. § 114(r)(1).  TSA has promulgated regulations pursuant to § 114(r) defining specific categories of SSI, which are set forth at 49 C.F.R. part 1520.

39.      The TSA SSI Branch is responsible for all aspects of the DHS-wide SSI Program, including policy, analysis, SSI Determinations, and regulatory execution.  The SSI Branch serves as the primary point of contact (POC) for the DHS Office of Security, other DHS Components, Stakeholders, and TSA as a whole on issues involving SSI in accordance with 49 C.F.R. part 1520.

40.      The SSI Branch conducts assessments and reviews of TSA and DHS records, and upon request, records of other "covered persons" under 49 C.F.R. § 1520.7, to determine which information contained within those records is SSI.  The SSI Branch thereafter ensures that the appropriate SSI designations and redactions are made in accordance with 49 C.F.R. part 1520. The prohibition on public release of SSI is not discretionary but is mandatory in accordance with 49 C.F.R. § 1520.15(a).  The SSI Branch also determines whether specific information should no longer be protected as SSI in accordance with 49 C.F.R. § 1520.5(c) and whether information previously not deemed SSI should be so designated.

41.      Pursuant to 49 U.S.C. § 114(r) and its implementing regulations, TSA has determined that certain limited portions of records responsive to EPIC's requests were SSI

pursuant to 49 U.S.C. § 114(r)(C) because their disclosure would be detrimental to the security

of transportation.  These include records located as part of TSA's search, as well as records

located by S&T's components, the Transportation Security Laboratory ("TSL") and the Test,

Evaluation, and Standards ("TES") Office:

      a.      One picture of a "scatter phantom image" that was generated by the

Rapiscan Secure 1000.  This image is contained in a July 21, 2006 report by Frank Cerra

evaluating the Rapiscan Secure 1000's safety.  As noted above in Footnote 1, Mr. Cerra

performed the work underlying this report while at FDA/CDRH, but wrote the report

when he was affiliated with NIST.  This report was located in both the TSA and TES

records, Bates Nos. TSA74-105 and TES124-155, and the withheld image is located at

Bates Nos. TSA92 and TES142.  <u>See</u> TSA and TES <u>Vaughn</u> indices.  The image on these

pages was designated SSI under 49 U.S.C. § 114(r) 49 C.F.R. § 1520.5(b)(9)(vi), which

designates as SSI "[a]ny electronic image shown on any screening equipment monitor,

including threat images and descriptions of threat images for threat image projection

systems."  Disclosure of images such as the one at issue here would provide insight into

the screening capabilities and limitations of the Rapiscan Secure 1000 and accordingly be

detrimental to the security of transportation.  The image fits within § 1520.5(b)(9)(vi) and

is accordingly exempt from disclosure under 49 U.S.C. § 114(r) and its implementing

regulations.

      b.      Two identical excerpts describing the specific screening procedures used

by TSA when utilizing the Rapiscan Secure 1000.  These excerpts are contained within

two reports prepared for TSA by the Johns Hopkins University's Applied Physics

Laboratory ("JHU APL") concerning the radiation safety of the Rapiscan Secure 1000 in

October 2009 and August 2010, redacted versions of which appear both in the TES

records and in documents posted to TSA's public website referenced in TSA's letter of

December 22, 2010.  See TES224-348, http://www.tsa.gov/assets/pdf/jh_apl_v1.pdf,

http://www.tsa.gov/assets/pdf/jh_apl_v2.pdf.  The withheld excerpts are located at on

Bates pages TES268 and TES333, or on page 34 of the publicly available report.  See

TES Vaughn index.  They are SSI pursuant to 49 U.S.C. § 114(r) and 49 C.F.R §

1520.5(b)(9)(i), which designate as SSI "[a]ny procedures, including selection criteria

and any comments, instructions, and implementing guidance pertaining thereto, for

screening of persons, accessible property, checked baggage, U.S. mail, stores, and cargo,

that is conducted by the Federal government or any other authorized person."  Disclosure

of such procedures would be detrimental to the security of transportation because

knowledge of the precise procedures used by TSA could be used as a "road map" for

those seeking to circumvent them and to bring prohibited items into the "sterile area" of

an airport and onto aircraft.  The screening procedures described in these pages fit within

§ 1520.5(b)(9)(vi) and are exempt from disclosure under 49 U.S.C. § 114(r) and its

implementing regulations.

   c. Excerpts from an email exchange, located in TSL's records, between

employees of TSL and TSA.  See TSL Vaughn index at TSL836.  The withheld excerpts

describe a particular phenomenon observed while performance-testing the Rapiscan

Secure 1000.  This feature could be used to identify a potential vulnerability of the

system.  It is SSI pursuant to 49 U.S.C. § 114(r) and 49 C.F.R. § 1520.5(b)(9)(v), which

designates as SSI "Performance or testing data from security equipment or screening

systems."

*Exemption 4*

42.     Exemption 4 of the FOIA protects "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential."  In determining whether commercial or financial information is confidential, and therefore withheld from disclosure, there is a distinction between information required to be submitted to the government, and information voluntarily submitted to the government.  If information is required to be submitted to the government, it is considered confidential if its disclosure is likely to have either of the following effects: (1) impair the Government's ability to obtain necessary information in the future; or (2) cause substantial harm to the competitive position of the person from whom the information was obtained.  If information is voluntarily submitted, a less stringent standard applies, and the information is considered confidential if it would customarily not be released to the public by the person from whom it was obtained.

43.     In this action, TSA was consulted to make Exemption 4 determinations pertaining to information obtained from AIT manufacturers on behalf of itself and on behalf of S&T's components, TES and TSL, pursuant to 6 C.F.R.§ 5.4(c)(1), a DHS FOIA regulation stating that "[w]hen a component receives a request for a record in its possession, it shall determine whether another component, or another agency of the Federal Government, is better able to determine whether the record is exempt from disclosure under the FOIA and, if so, whether it should be disclosed as a matter of administrative discretion."  The regulation further states that the receiving component may, if necessary, "[r]espond to the request regarding that record, after consulting with the component or agency best able to determine whether to disclose it and with any other component or agency that has a substantial interest in it."  TSA was consulted to conduct the "submitter notice" process under Executive Order 12600, which requires agencies to

solicit the views of submitters of trade secrets or confidential commercial information prior to

disclosing such information to the public, and to make Exemption 4 determinations on behalf of

TES and TSL, based both on its substantial interest in the responsive records and its expertise in

the subject matter.  In addition, many of these records originated with TSA.

44.     Certain records, and portions thereof, located in the searches of TSA, TES, and

TSL have been withheld pursuant to Exemption 4 because they contain confidential commercial

information obtained from AIT manufacturers.  Further information supporting these

withholdings is contained in declarations attached to Defendants' summary judgment motion in

this action that were submitted by representatives of four AIT manufacturers: Peter Modica,

Rapiscan Systems, Inc. ("Rapiscan"), Scott Trosper, L-3 Communications ("L-3"), Joseph

Callerame, American Science & Engineering ("AS&E"), and Rory Doyle, Smiths Detection

Ireland ("Smiths").

45.     Much of the information withheld pursuant to Exemption 4 consists of portions of

documents that were submitted directly to the government by AIT manufacturers.  As described

in more detail in the TSL Vaughn index, these documents include:[2]

>   (1) Memorandum regarding Radiated Emissions Testing and Power Density Calculation
>
>   for Guardian 100 System; TSL29-31
>
>   (2) Questionnaire from L-3 – "In order to begin the preliminary assessments…" TSL32-
>
>   38
>
>   (3) Addendum to L-3 Communications Safeview, Inc. Test Report ETS-07-009-A;
>
>   TSL48-144

---

[2] The Bates numbers shown here are the Bates numbers for the entire documents at issue, not the pages on which information was withheld.  The Bates-numbered pages on which information was withheld are cited in the sections beginning with paragraph 54, and on the Vaughn indices.

(4) F. X Masse Certificate of Compliance for AS&E Dual SmartCheck HT Personnel

Scanner, April 8, 2010; TSL714-15

(5) F. X. Masse letter of compliance regarding AS&E Dual SmartCheck, June 4, 2008;

TSL829-30

(6) F. X. Masse letter of compliance regarding AS&E SmartCheck, March 2006;

TSL831-32

(7) Dosage map showing radiation dosage from AS&E SmartCheck; TSL1190-91;

(8) Email submitted by AS&E, TSL1192-93

(9) Radiation Survey forms for AS&E SmartCheck submitted by AS&E, TSL1194-97

(10) EMC Test Report WC808134, TUV (Third party reports on radio interference)

regarding Rapiscan Secure 1000 system; TSL1199-1281

(11) Test Report IEC-61010-1 (Electrical Safety) on Rapiscan Secure 1000 System;

TSL1282-1360

(12) Compliance Engineering Ireland radiation safety report on Smiths Detection

Systems "eqo" scanner; TSL1361-78

(13) Excerpts from Underwriters Laboratories, Inc. Test Results regarding L3 ProVision;

TSL1379-82

(14) Draft Report: Radiated Emission and Personnel Health from SafeView's mmWave

Holographic Imaging Portals; TSL Withheld-in-full R.

46.     Some of the information withheld pursuant to Exemption 4 is contained in

documents created by, or at the direction of, the government, to the extent that the information

withheld was itself derived from information obtained from manufacturers.  Specifically, as

described in more detail in the Vaughn indices, such documents include:

16

(1) 2006 evaluation of the Rapiscan Secure 1000 system by Frank Cerra, an employee of

the National Institute of Standards and Technology ("NIST"), TSA74-105, TES124-155;

(2) 2006 evaluation of the AS&E SmartCheck system by Mr. Cerra, TSL924-956;

(3) 2008 evaluation of the Dual Source AS&E SmartCheck by Mr. Cerra, TSL897-899;

(4) the two reports prepared for TSA by the Johns Hopkins University's Applied Physics

Laboratory ("JHU APL") concerning the Rapiscan Secure 1000 in October 2009 and

August 2010, TES224-348; and

(5) "Quick look brief" summarizing the results of the JHU APL study, TSA178-191.

47.     Although the records described in Paragraph 46 were produced by, or at the

direction of, the government, as described in greater detail in the TSA, TES, and TSL Vaughn

indices, the confidential commercial information in these records that is being withheld under

Exemption 4 is derived from information and materials submitted by Rapiscan and AS&E,

namely, (1) third-party radiation reports submitted by the vendors, (2) communications with, and

other materials received from, the vendors, including documentation, and/or (3) the Rapiscan

Secure 1000 and AS&E Smart Check AIT systems themselves, which were obtained by the

FDA, NIST, and the JHU APL from Rapiscan and AS&E for the purpose of radiation testing.

But for the government's having obtained these third-party reports, materials, and/or AIT

systems from the vendors for testing, production of the reports described above would not have

been possible.

48.     As described in more detail in the Vaughn indices, the information withheld under

Exemption 4 was obtained through both required and voluntary submissions by vendors.

49.     Required submissions included information submitted by vendors as part of, and

in connection with, Qualification Data Packages ("QDPs").  A QDP is a set of information,

17

submitted by vendors, used by DHS and TSA to establish a Qualified Product List ("QPL") of products considered for procurement based on the overall performance of each vendor's system against TSA specifications and reasonableness of price. Only vendors who demonstrate compliance with certain requirements are eligible for placement onto the QPL, and only products that are placed on the QPL are considered for a contract award.

50.     TSA has determined that certain types of information were not required submissions, but voluntary ones.  Such information includes:

1) Information obtained through the JHU APL study.  This study was conducted in 2009 at Rapiscan, which voluntarily agreed to host JHU APL at its plant and provided a representative unit there, also voluntarily, for radiation and safety testing.  Because Rapiscan's provision of an AIT unit and other information used to conduct this study were voluntary, information obtained through this study was voluntarily submitted.

2) Information submitted by L-3 Communications in 2010 connection with an FDA/DHS interagency agreement to test the effects of millimeter wave scanners on personal medical devices.  This information was not required to be submitted in order for L-3 scanners to be deployed by TSA; rather, L-3 agreed to do so voluntarily.

3) Other information submitted voluntarily by vendors (see Category 4 below).

51.     For reference, in the discussion below, information definitively obtained from required submissions is **bolded**.  Information definitively obtained from voluntary submissions is *italicized*.  Where TSA, TSL, and TES have been unable to determine the nature of a submission, it is neither italicized nor bolded.  Further details regarding each individual record and the excerpts withheld are contained on the TSA, TSL, and TES <u>Vaughn</u> indices.

52.     Notwithstanding these distinctions, all records discussed below except for one (the record described in Category 4, paragraphs 69-71) were withheld because they have been determined to be confidential under Exemption 4 whether they are voluntary or required submissions; that is, they would not customarily not be released to the public by the person from whom they were obtained, <u>and</u> disclosure is likely to cause substantial harm to the competitive position of the vendors from whom the information was obtained.   Accordingly, both rationales are articulated below.

53.     As explained in greater detail in the Declarations of Peter Modica (Paragraphs 9-11), Scott Trosper (Paragraph 3), Joseph Callerame (Paragraphs 4,6), and Rory Doyle (Paragraph 5), significant actual competition exists in the marketplace for AIT devices, not only in the United States, but worldwide.   AIT devices are in demand, and have been used, not only for airport screening, but at courthouses, prisons, and borders.   Competitors in this industry include, among others, the four AIT manufacturers whose data is at issue in this litigation.

### Exemption 4, Category 1: Information concerning AIT Systems' Design Features, Operational Setting and Parameters, and Component Parts

54.     The first category of information withheld consists of information concerning design features, operational settings and parameters, and component parts of AIT systems.

55.     As described in more detail in the TSA, TES, and TSL <u>Vaughn</u> indices, this type of information is contained on the following Bates pages, organized by vendor:

**Rapiscan:** TSA77, 86, *191*, TES127, 136, *236-239, 241, 244, 247, 252-254, 260, 267-269, 272-276, 283, 301-304, 306, 309, 312, 317-319, 325, 332-334, 337-341, 348;* **TSL1273, 1282, 1283, 1286-1290, 1316, 1326-27, 1333**.

**L3:** *TSL30-31, 33, 35-36,* **82, 1380**.

**AS&E:** **TSL714-715; 829-830; 897-899;** 926-927; 929; 930-935; 937-939; 941-942; 944-945; 954-956; **1192.**

56.     As explained further in the declarations of Peter Modica (Paragraphs 4-7), Scott Trosper (Paragraphs 4-7), and Joseph Callerame (Paragraph 5(i-ii)), disclosure of the information referenced above is likely to cause Rapiscan, L3, and AS&E substantial competitive harm because it would enable competitors to gain insight into the proprietary technologies, methods, mechanisms, and design and operational parameters used by these companies, and to use this information to more effectively design and build their own systems, which could then directly compete with the systems manufactured by Rapiscan, L3, and AS&E.

57.     For the same reasons, as set forth in the Modica Declaration (Paragraphs 5, 7), Trosper Declaration (Paragraphs 4-7), and Callerame Declaration (Paragraph 3), these companies would not normally disclose this type of information to the public.

58.     For these reasons, this information, described more specifically in the <u>Vaughn</u> indices, has been withheld under Exemption 4.

### Exemption 4, Category 2: Information Concerning Radiation Dose Levels Emitted by Systems of Vendors Who Do Not Have Current Contracts with TSA

59.     The second category of information withheld under Exemption 4 consists of information concerning specific radiation dose levels emitted by the AS&E SmartCheck and the Smiths Detection "eqo."  Neither of these vendors currently has a contract with TSA for deployment of their technologies at airports.

60.     As described in more detail in the TSL <u>Vaughn</u> index, this type of information concerning these vendors is contained on the following Bates pages, organized by vendor:

**AS&E:** **TSL714-715; 829-832; 897-899;** 926; 929-942; 944-947; 954-956; **1190-1192;** 1194-1197.

**Smiths: TSL1367, 1368, 1369.**

61.     As explained in the Declarations of Joseph Callerame, paragraph 5(iii), and Rory

Doyle, paragraphs 4-6, release of this information is likely to cause these vendors substantial

competitive harm because it could enable competitors to derive operational or performance

attributes of these products, such as beam characteristics or filtration.  Such characteristics could

enable competitors to "reverse engineer" these products and cause AS&E and Smiths substantial

competitive harm.

62.     For the same reasons, as set forth in the Callerame Declaration (Paragraph 3) and

Doyle Declaration (Paragraph 9), these companies would not normally disclose this type of

information to the public.

63.     For these reasons, this information, described more specifically in the Vaughn

indices, has been withheld under Exemption 4.

**Exemption 4, Category 3: Recommendations for Product Design Improvements
Regarding Radiation Safety in AS&E SmartCheck**

64.     The third category of information withheld includes recommendations contained

in third-party and government reports for product design improvements regarding radiation

safety in the AS&E SmartCheck.

65.     As described in more detail in the TSL Vaughn index, this type of information is

contained at pages **TSL829-830; 897-899;** and 942.

66.     As explained in Paragraph 5(iv) of the Declaration of Joseph Callerame, release

of such information could cause AS&E substantial competitive harm because, to the extent that

AS&E may have incorporated some of these recommendations into their product, a competitor

could utilize these same recommendations to design or improve its system.

67.     For the same reasons, as set forth in the Callerame Declaration (Paragraph 3), these companies would not normally disclose this type of information to the public.

68.     For these reasons, this information, described more specifically in the <u>Vaughn</u> indices, has been withheld under Exemption 4.

### <u>Exemption 4, Category 4: Draft Document on Emissions by SafeView Corporation, Voluntarily Submitted.</u>

69.     This category comprises one document, TSL Withheld-in-Full R.  As noted on the TSL <u>Vaughn</u> index, this is a 2004 draft document on radiation emissions created by SafeView, a predecessor entity to L-3.

70.     This document, obtained from L-3, is largely a review of information selected from scientific journals and government documents pertaining to health effects of electromagnetic exposure.  It also includes system electrical operating characteristics of an early version of the L-3 ProVision scanner. It was created by SafeView, a predecessor entity to L-3.  It was not required to be submitted to DHS as part of the procurement or qualification process.  It is stamped "DRAFT" and "Proprietary and Confidential."

71.     As outlined in the Declaration of Scott Trosper, Paragraph 8, this voluntarily submitted, draft document created by a predecessor entity is not a document that L-3 would normally release to the public.  For this reason, it has been withheld under Exemption 4.

### Conclusion

72.     All TSA offices that were expected to maintain records concerning the two categories identified in Plaintiff's FOIA request were searched.  Further, all non-exempt responsive records that were located were provided to Plaintiff.  For all records partially withheld, TSA produced the segregable portion of each of the records, and provided a justification for withholding the remainder of the information in its response letters, and clearly

marked each document with the applicable exemption.  As noted above, some records were re-released after it was determined they contained additional releasable non-exempt information.  No further segregation was possible.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


**Dated:  September** 12 **, 2011**


Paul Sotoudeh
Acting Freedom of Information Act Officer
Transportation Security Administration
Department of Homeland Security

Exhibit A to
Declaration of Paul Sotoudeh



July 13, 2010

VIA U.S. MAIL (CERTIFIED DELIVERY)
Mary Ellen Callahan
Chief Privacy Officer/Chief FOIA Officer
The Privacy Office
U.S. Department of Homeland Security
245 Murray Drive SW, Building 410
STOP-0655
Washington, D.C. 20528-0655



RECEIVED
JUL 20 2010
By PRIV 10-0869

1718 Connecticut Ave NW

Suite 200

Washington DC 20009

USA

+1 202 483 1140 [tel]

+1 202 483 1248 [fax]

www.epic.org

**RE:    Freedom of Information Act Request and Request for Expedited Processing**

Dear Ms. Callahan:

This letter constitutes a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted on behalf of the Electronic Privacy Information Center ("EPIC"). EPIC seeks agency records concerning radiation and health testing of Full Body Scanning ("FBS") devices.[1]

Background

The Transportation Security Administration ("TSA") currently operates Full Body Scanners at airports throughout the United States. The TSA uses two types of FBS devices: backscatter x-ray and millimeter wave.[2] Both types of FBS devices can capture, store, and transfer detailed, three-dimensional images of individuals' naked bodies. Experts have described full body scans as "digital strip searches."[3] In February 2007, the TSA, a Department of Homeland Security ("DHS") component, began testing FBS technology on American travelers.[4]

EPIC has pending Freedom of Information Act lawsuits against DHS and Department of Justice ("DOJ") regarding whole body imaging technology. As a result of

---

[1] The TSA currently refers to FBS devices as "advanced imaging technology" ("AIT"), and previously called the scanners "whole body imaging" ("WBI") devices. The terms "FBS" and "body scanners" in this request include all body scanners used by the Transportation Security Administration ("TSA") to screen passengers at domestic airports.
[2] TSA: Imaging Technology, http://www.tsa.gov/approach/tech/imaging_technology.shtm (last visited June 7, 2010).
[3] Joe Sharkey, *Whole-Body Scans Pass First Airport Tests*, N.Y. Times, Apr. 6, 2009, *available at* http://www.nytimes.com/2009/04/07/business/07road.html?_r=1; Schneier on Security, June 9, 2005, http://www.schneier.com/blog/archives/2005/06/backscatter_x-r.html ("[whole body imaging] technology is incredibly intrusive. I don't think that people should be subjected to strip searches before they board airplanes.") (last visited June 11, 2010).
[4] [4] TSA: Imaging Technology, http://www.tsa.gov/approach/tech/imaging_technology.shtm (last visited February 3, 2010).

these lawsuits, EPIC has received hundreds of pages of contracts, traveler complaints, TSA specifications, and other documents from DHS and DOJ.[5]

## Body Scanners Subject Air Travelers to Radiation and Health Risks

The health risks posed by the deployment of body scanners in US airports have not yet been fully assessed. FBS devices subject air travelers to radiation during each FBS scan.[6] While TSA has commissioned a Johns Hopkins University study on the machines, no independent study has been conducted on the health risks of these scanners.[7,8]

Experts recognize that frequent exposure to radiation is harmful. The Environmental Protection Agency has documented that frequent exposure to radiation, even in low individual doses, can lead to cancer and birth defects.[9] Studies on Terahertz Wave (T-wave) revealed that exposure to such radiation can cause DNA damage that results in cancer.[10] A recent report by the European Commission found that "it is evident any exposure to ionising radiation, however small, may have health effects in the longer term."[11] American scientists have also expressed concerns regarding the aggregate effect of body scanner radiation on the traveling population.[12]

University of California biochemist David Agard has stated that "While the dose would be safe if it were distributed throughout the volume of the entire body, the dose to the skin may be dangerously high. Ionizing radiation such as the X-rays used in these scanners have the potential to induce chromosome damage, and that can lead to cancer."[13]

The dose of radiation that FBS puts forth is especially risky for certain segments of the population. Professor Agard and several other experts wrote a recent letter to Dr.

---

[5] EPIC, *Whole Body Imaging Technology and Body Scanners*, http://epic.org/privacy/airtravel/backscatter/; EPIC, *EPIC v. DHS*, http://epic.org/privacy/airtravel/backscatter/epic_v_dhs.html.
[6] David Brenner, *Congressional Biomedical Research Caucus: Airport Screening: The Science and Risks of Backscatter Imaging*, 2010, available at http://blip.tv/file/3379880.
[7] The TSA Blog, *Advanced Imaging Technology: "Radiation Risk Tiny,"* March 11, 2010, http://blog.tsa.gov/2010/03/advanced-imaging-technology-radiation.html
[8] http://epic.org/privacy/airtravel/backscatter/EPIC-Nader_WBI_Letter.pdf
[9] http://www.bloomberg.com/apps/news?pid=20601209&sid=aoG.YbbvnkzU
[10] http://www.technologyreview.com/blog/arxiv/24331/
[11] Commission to the European Parliament, *Communication on the Use of Security Scanners at EU Airports*, June 15, 2010, http://www.google.com/url?sa=t&source=web&cd=1&ved=0CBIQFjAA&url=http%3A%2F%2Fec.europa .eu%2Ftransport%2Fair%2Fsecurity%2Fdoc%2Fcom2010_311_security_scanners_en.pdf&el=h6k0TODU FMSBlAenwMzSBw&usg=AFQjCNF7Ck0G64bzz4riFHukJOp4XDaVGA (p. 16)
[12] Kate Schneider, *"Naked" Scanners May Increase Cancer Risk*, news.com.au, May 19, 2010, http://www.news.com.au/travel/news/naked-scanners-may-increase-cancer-risk/story-e6frfq80-1225868706270
[13] Ben Mutzabaugh, *Full-body Scanners Could Pose Cancer Risk at Airports, U.S. Scientists Warn*, USA Today, July 1, 2010, http://travel.usatoday.com/flights/post/2010/07/full-body-scanners-pose-cancer-risk-at-airports-us-scientists-warn/98552/1

John P. Holdren, the Assistant to the President for Science and Technology.[14] They called for further evaluation of the FBS technology, and identified several groups of people – including children and pregnant women, as being especially at risk of harm from the scans.[15] They letter stated that a "large population of older travelers, >65 years of age, is particularly at risk from the mutagenic effects of the X-rays based on the known biology of melanocyte aging."[16] The experts also noted, "A fraction of the female population is especially sensitive to …radiation leading to breast cancer. Notably, because these women, who have defects in DNA repair mechanisms, are particularly prone to cancer, X-ray mammograms are not performed on them. The dose to breast tissue beneath the skin represents a similar risk."[17] Dr. Agard and the other experts also stated, "The population of immunocompromised individuals--HIV and cancer patients (see above) is likely to be at risk for cancer induction by the high skin dose [of FBS technology radiation]."[18]

Other experts have said that FBS radiation could be especially harmful to some segments of the population. In a report restricted to certain agencies and not meant for public dissemination, the Inter-Agency Committee on Radiation Safety said "pregnant women and children should not be subject to scanning."[19] The European Commission report called for a similar exception for pregnant women and children, stating that "Special considerations might also be called for when it comes to passengers that are especially sensitive to ionising radiation, primarily pregnant women and children."[20] In his recent address to the Congressional Biomedical Caucus, Columbia Professor Dr. David Brenner agreed, stating that the dose of radiation delivered by FBS machines would be particularly risky for children and members of the population with a genetically higher sensitivity to radiation.[21]

Experts have also reported that body scanners may emit up to twenty times the reported amount of radiation.[22] Dr. Brenner noted that FBS machines expose the skin of the scalp to up to twenty times the reported amount of radiation.[23] He pointed out that skin is one of the most radiation-sensitive parts of the body.[24]

---

[14] Drs. John Sedat, David Agard, Marc Shuman, and Robert Stroud, *Letter of Concern to Dr. John P. Holdren, Assistant to the President for Science and Technology,* April 6, 2010, available at: http://www.npr.org/assets/news/2010/05/17/concern.pdf
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] http://www.bloomberg.com/apps/news?pid=20601209&sid=aoG.Ybbvnkz U
[20] Commission to the European Parliament, *Communication on the Use of Security Scanners at EU Airports,* June 15, 2010, http://www.google.com/url?sa=t&source=web&cd=1&ved=0CBIQFjAA&url=http%3A%2F%2Fec.europa .eu%2Ftransport%2Fair%2Fsecurity%2Fdoc%2Fcom2010_311_security_scanners_en.pdf&ei=h6k0TODU FMSBlAenwMzSBw&usg=AFQjCNF7Ck0G64bzz4riFHukJOp4XDaVGA (p. 16)
[21] David Brenner, *Congressional Biomedical Research Caucus: Airport Screening: The Science and Risks of Backscatter Imaging,* 2010, available at http://blip.tv/file/3379880.
[22] *Id.*
[23] David Brenner, *Congressional Biomedical Research Caucus: Airport Screening: The Science and Risks of Backscatter Imaging,* 2010, available at http://blip.tv/file/3379880.
[24] *Id.*

Dr. Agard and the other drafters of the letter to the Assistant to the President for Science and Technology called for a truly independent review of FBS technology because the true extent of the risk "can only be determined by a meeting of an impartial panel of experts that would include medical physicists and radiation biologists at which all of the available relevant data is reviewed." In his address to the Congressional Biomedical Caucus, Dr. Brenner also called for greater testing of FBS technology and the effects of "low dose" radiation.[25]

Documents Requested

EPIC requests the following agency records in the possession of DHS:

1. All records concerning TSA tests regarding body scanners and radiation emission or exposure.
2. All records concerning third party tests regarding body scanners and radiation emission or exposure.

Request for Expedited Processing

This request warrants expedited processing because it is made by "a person primarily engaged in disseminating information ..." and it pertains to a matter about which there is an "urgency to inform the public about an actual or alleged federal government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II) (2008); *Al-Fayed v. CIA*, 254 F.3d 300, 306 (D.C. Cir. 2001).

EPIC is "primarily engaged in disseminating information." *American Civil Liberties Union v. Department of Justice*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004).

There is a particular urgency for the public to obtain information about the health implications of the TSA's whole body imaging program. The TSA is presently expanding its FBS program to be used as the primary screening method in all domestic airports.[26] The systems expose passengers to radiation, the exposure levels have not been independently verified, and scientists have warned of the serious health risks for air travelers.

While the TSA claims that the FBS devices do not subject travelers to harmful levels of radiation, the agency has presented no evidence to support that assertion. The documents requested by EPIC will inform the public about the safety of the FBS scanners being deployed at airports nationwide.

---

[25] *Id.*

[26] *An Assessment of Checkpoint Security: Are Our Airports Keeping Passengers Safe?: Hearing Before the Subcomm. On Transp. Sec. and Infrastructure Prot.*, 111th Cong. (2010) (statement of Robin Kane, Assistant Administrator, Operational Process and Technology, Transportation Security Administration), *also available at*
http://hsc.house.gov/SiteDocuments/20100317140301-14594.pdf.

4

<u>Request for News Media Fee Status</u>

EPIC is a "representative of the news media" for fee waiver purposes. *EPIC v. Department of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003). Based on our status as a "news media" requester, we are entitled to receive the requested record with only duplication fees assessed. Further, because disclosure of this information will "contribute significantly to public understanding of the operations or activities of the government," any duplication fees should be waived.

Thank you for your consideration of this request. As provided in 6 C.F.R. § 5.5(d)(4), I will anticipate your determination on our request for expedited processing with ten (10) calendar days.

Sincerely,

Ginger P. McCall
Staff Counsel
Electronic Privacy Information Center

Exhibit B to
Declaration of Paul Sotoudeh

U.S. Department of Homeland Security
Washington, DC 20528



**Homeland Security**

*Privacy Office, Mail Stop 0655*

July 29, 2010

Ms. Ginger P. McCall
EPIC
1718 Connecticut Ave., NW
Suite 200
Washington, DC 20009

Re: **DHS/OS/PRIV 10-0869**

Dear Ms. McCall:

This acknowledges receipt of your July 13, 2010, Freedom of Information Act (FOIA) request to the Department of Homeland Security (DHS), in which you seek records concerning radiation and health testing of Full Body Scanning ("FBS") devices. Your request was received in this office on July 20, 2010.

Upon initial review of your request, I have determined that the information you are seeking is under the purview of the Transportation Security Administration (TSA) and DHS Science and Technology Directorate (S&T). Therefore, I am referring your request to the FOIA Officer for TSA, Kevin Janet, and the FOIA Officer for S&T, Miles Wiley for processing and direct response to you. You may contact those offices in writing at:

Transportation Security Administration
601 S. 12th Street, 11th Floor, East Tower
Arlington, VA 22202
1-866-FOIA-TSA or 571-227-2300

U.S. Department of Homeland Security
Science and Technology Directorate
Washington, D.C. 20528
202-254-6819

As it relates to your fee waiver and expedited processing request, TSA and S&T will make a determination and reply to your request.

If you need to contact this office again concerning your request, please refer to
**DHS/OS/PRIV 10-0869.**  This office can be reached at 866-431-0486.

Sincerely,

Sabrina Burroughs
Disclosure & FOIA Operations Manager

# Exhibit C to
# Declaration of Paul Sotoudeh

U.S. Department of Homeland Security

Freedom of Information Act Office
601 South 12th Street
Arlington, VA 20598-6020

 **Transportation
Security
Administration**

AUG 1 2 2010

Ms. Ginger P. McCall
Staff Counsel
Electronic Privacy Information Center
1718 Connecticut Ave, N.W.
Suite 200
Washington, DC 20009

Re: **TSA10-0674**

Dear Ms. McCall:

This letter acknowledges receipt of your July 13, 2010, Freedom of Information Act (FOIA)
request to the Transportation Security Administration (TSA), seeking all records concerning TSA
tests and third party tests regarding body scanners and radiation emission or exposure.

As it relates to your request for expedited treatment, your request is denied.

Under the DHS FOIA regulation, expedited processing of a FOIA request is warranted if the
request involves "circumstances in which the lack of expedited treatment could reasonably be
expected to pose an imminent threat to the life or physical safety of an individual," 6 C.F.R. §
5.5(d)(1)(i), or "an urgency to inform the public about an actual or alleged federal government
activity, if made by a person primarily engaged in disseminating information," 6 C.F.R. §
5.5(d)(l)(ii). Requesters that seek expedited processing must submit a statement explaining in
detail the basis for the request, and that statement must be certified by the requester to be true and
correct. 6 C.F.R. § 5.5(d)(3).

Your request for expedited processing is denied because you do not qualify for either category.
You failed to demonstrate a particular urgency to inform the public about the government activity
involved in the request beyond the public's right to know about government activity generally.
Your letter was conclusory in nature and did not present any facts to justify a grant of expedited
processing under the applicable standards.

As it relates to your fee waiver request, I have reviewed your letter thoroughly and have
determined that you have not presented a convincing argument that you are entitled to a blanket
waiver of fees.

The DHS FOIA Regulations, 6 CFR § 5.11(k)(2), set forth six factors to examine in determining
whether the applicable legal standard for a fee waiver has been met. We will consider these
factors in our evaluation of your request for a fee waiver:

(1) Whether the subject of the requested records concerns "the operations or activities of the government;"

(2) Whether the disclosure is "likely to contribute" to an understanding of government operations or activities;

(3) Whether disclosure of the requested information will contribute to the understanding of the public at large, as opposed to the individual understanding of the requestor or a narrow segment of interested persons;

(4) Whether the contribution to public understanding of government operations or activities will be "significant;"

(5) Whether the requester has a commercial interest that would be furthered by the requested disclosure; and

(6) Whether the magnitude of any identified commercial interest to the requestor is sufficiently large in comparison with the public interest in disclosure, that disclosure is primarily in the commercial interest of the requestor.

As a requester, you bear the burden under the FOIA of showing that the fee waiver requirements have been met. Based on my review of your July 13, 2010 letter and for the reasons stated herein, I have determined that your fee waiver request is deficient because your request for a fee waiver has failed to satisfy each of the required factors, I am denying your fee waiver request.

Provisions of the Act allow us to recover part of the cost of complying with your request. We shall charge you for records in accordance with the DHS Interim FOIA regulations as they apply to media requestors. As a media requestor you will be charged 10-cents a page for duplication, although the first 100 pages are free. We will construe the submission of your request as an agreement to pay up to $25.00. You will be contacted before any additional fees are accrued.

If you deem the decision to deny expedited treatment and the determination to deny your fee waiver request an adverse determination, you may exercise your appeal rights. In the event that you may wish to appeal this determination an administrative appeal may be made in writing to Kimberly Walton, Special Counselor, Office of the Special Counselor, Transportation Security Administration, 601 South 12th Street, East Building, E7-121S, Arlington, VA 20598-6033. Your appeal **must be submitted within 60 days** from the date of this determination. It should contain your FOIA request number and state, to the extent possible, the reasons why you believe the initial determination should be reversed. In addition, the envelope in which the appeal is mailed in should be prominently marked "FOIA Appeal." Please note the Special Counselor's determination will be administratively final. Your envelope and letter should be marked "Freedom of Information Act Appeal." The implementing Department regulations establish the criteria under which the FOIA is administered. Copies of the FOIA and regulations are available at www.DHS.gov.

We have queried the appropriate program offices of TSA for responsive records. If any responsive records are located, they will be reviewed for determination of releasability. Please be assured that one of the processors in our office will respond to your request as expeditiously as possible. We appreciate your patience as we proceed with your request.

Your request has been assigned reference number **TSA10-0674.**  Please refer to this identifier in any future correspondence.  You may contact this office at 866.364.2872.

Sincerely,

Kevin J. Janet
FOIA Officer
Freedom of Information Act Office

# Exhibit D to
# Declaration of Paul Sotoudeh

# epic.org

August 27, 2010

1718 Connecticut Ave NW

Suite 200

Washington DC 20009

USA

+1 202 483 1140 [tel]

+1 202 483 1248 [fax]

www.epic.org

VIA CERTIFIED MAIL
Kimberly Walton
Special Counselor
Office of the Special Counselor
Transportation Security Administration
601 South 12th St.
East Building, E7-121S
Arlington, VA 20598-6033

**RE:   Freedom of Information Act Appeal on TSA10-0674**

Dear Ms. Walton:

This letter constitutes an appeal under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted to the Transportation Security Administration ("TSA"), a component of the Department of Homeland Security ("DHS"), on behalf of the Electronic Privacy Information Center ("EPIC"). EPIC seeks agency records in the TSA's possession concerning radiation and health testing of the Full Body Scanner ("FBS") devices operated by DHS. This letter appeals the TSA's denial of EPIC's request for a fee waiver and expedited processing.

This appeal arises from EPIC's July 13, 2010 request ("EPIC's FOIA Request") to the DHS for the following agency records:

1) All records concerning TSA tests regarding body scanners and radiation emission or exposure;

2) All records concerning third party tests regarding body scanners and radiation emission or exposure. [1]

## I. Factual Background

The TSA currently operates Full Body Scanners at airports throughout the United States. The TSA uses two types of FBS devices: backscatter x-ray and millimeter wave. [2] Both types of FBS devices can capture, store, and transfer detailed, three-dimensional images of individuals' naked bodies. Experts have described full body scans as "digital

---

[1] EPIC, *FOIA request from Ginger McCall, EPIC to Mary Ellen Callahan, U.S. Dep't. of Homeland Sec.* (July 13, 2010) [hereinafter *EPIC's FOIA Request*]. *See* Appendix 1.
[2] TSA: Imaging Technology, http://www.tsa.gov/approach/tech/imaging_technology.shtm (last visited June 7, 2010).

1

strip searches."[3] In February 2007, the TSA began testing FBS technology on American travelers.[4]

EPIC has pending Freedom of Information Act lawsuits against the DHS and the Department of Justice ("DOJ") regarding whole body imaging technology. As a result of these lawsuits, EPIC has received hundreds of pages of contracts, traveler complaints, TSA specifications, images, and other documents from the DHS and the DOJ.[5] Many of these documents raise questions about the health impacts of airport body scanners.

However, the health risks posed by the deployment of body scanners in US airports have not been fully assessed. FBS devices subject air travelers to radiation during each FBS scan.[6] Although the TSA commissioned a Johns Hopkins University study on the machines, no independent study has been conducted on the health risks of these scanners.[7][8]

Experts recognize that exposure to radiation is harmful. The Environmental Protection Agency has documented that repeated exposure to radiation, even in low individual doses, can lead to cancer and birth defects.[9] Studies on Terahertz Wave (T-wave) radiation reveal that exposure to such radiation can cause DNA damage that results in cancer.[10] A recent report by the European Commission found that "it is evident any exposure to ionising radiation, however small, may have health effects in the longer term."[11] American scientists have also expressed concerns regarding the aggregate effect of body scanner radiation on the traveling population.[12]

University of California biochemist David Agard has analyzed Full Body Scanners, concluding that "While the dose would be safe if it were distributed throughout

---

[3] Joe Sharkey, *Whole-Body Scans Pass First Airport Tests*, N.Y. Times, Apr. 6, 2009, *available at* http://www.nytimes.com/2009/04/07/business/07road.html?_r=1; Schneier on Security, June 9, 2005, http://www.schneier.com/blog/archives/2005/06/backscatter_x-r.html ("[whole body imaging] technology is incredibly intrusive. I don't think that people should be subjected to strip searches they were before they board airplanes.") (last visited June 11, 2010).

[4] TSA: Imaging Technology, http://www.tsa.gov/approach/tech/imaging_technology.shtm (last visited February 3, 2010).

[5] EPIC, *Whole Body Imaging Technology and Body Scanners*, http://epic.org/privacy/airtravel/backscatter/; EPIC, *EPIC v. DHS*, http://epic.org/privacy/airtravel/backscatter/epic_v_dhs.html.

[6] David Brenner, *Congressional Biomedical Research Caucus: Airport Screening: The Science and Risks of Backscatter Imaging*, 2010, available at http://blip.tv/file/3379880.

[7] The TSA Blog, *Advanced Imaging Technology: "Radiation Risk Tiny,"* March 11, 2010, http://blog.tsa.gov/2010/03/advanced-imaging-technology-radiation.html

[8] http://epic.org/privacy/airtravel/backscatter/EPIC-Nader_WBI_Letter.pdf

[9] http://www.bloomberg.com/apps/news?pid=20601209&sid=aoG.YbbvnkzU

[10] http://www.technologyreview.com/blog/arxiv/24331/

[11] Commission to the European Parliament, *Communication on the Use of Security Scanners at EU Airports*, June 15, 2010, http://www.google.com/url?sa=t&source=web&cd=1&ved=0CBIQFjAA&url=http%3A%2F%2Fec.europa.eu%2Ftransport%2Fair%2Fsecurity%2Fdoc%2Fcom2010_311_security_scanners_en.pdf&ei=h6k0TODUFMSBlAenwMzSBw&usg=AFQjCNF7Ck0G64bzz4riFHukJOp4XDaVGA (p. 16)

[12] Kate Schneider, *"Naked" Scanners May Increase Cancer Risk*, news.com.au, May 19, 2010, http://www.news.com.au/travel/news/naked-scanners-may-increase-cancer-risk/story-e6frfq80-1225868706270

the volume of the entire body, the dose to the skin may be dangerously high. In an address to the Congressional Biomedical Research Caucus, Dr. David Brenner noted that FBS machines expose the skin of the scalp to up to twenty times the reported amount of radiation.[13] He pointed out that skin is one of the most radiation-sensitive parts of the body.[14]"Ionizing radiation such as the X-rays used in these scanners have the potential to induce chromosome damage, and that can lead to cancer."[15]

According to experts, the radiation that FBS devices emit is especially risky for certain segments of the population, including pregnant women, children, elderly travelers, and immunocompromised individuals.[16]

Experts have called for a truly independent review of FBS technology because the true extent of the risk "can only be determined by a meeting of an impartial panel of experts that would include medical physicists and radiation biologists at which all of the available relevant data is reviewed." In his address to the Congressional Biomedical Caucus, Dr. Brenner also called for greater testing of FBS technology and the effects of "low dose" radiation.[17]

## II. Procedural History

On July 13, 2010, EPIC submitted, *via* Certified Mail, EPIC's FOIA Request to the DHS.[18]

On July 29, 2010, the DHS wrote to EPIC acknowledging receipt of EPIC's FOIA Request stating that the DHS determined that the information sought by EPIC's FOIA Request is under the purview of the TSA and the DHS' Science and Technology Directorate (S&T).[19] Therefore the request was referred the TSA FOIA Officer, Kevin Janet and FOIA Officer for S&T, Miles Wiley.[20] The DHS assigned EPIC's FOIA Request the case number DHS/OS/PRIV 10-0869.

---

[13] Brenner, *supra* note 6.

[14] *Id.*

[15] *Drs. John Sedat, David Agard, Marc Shuman, and Robert Stroud*, Letter of Concern to Dr. John P. Holdren, Assistant to the President for Science and Technology, *April 6, 2010, available at:* http://www.npr.org/assets/news/2010/05/17/concern.pdf; Ben Mutzabaugh, Full-body Scanners Could Pose Cancer Risk at Airports, U.S. Scientists Warn, *USA Today, July 1, 2010,* http://travel.usatoday.com/flights/post/2010/07/full-body-scanners-pose-cancer-risk-at-airports-us-scientists-warn/98552/1

[16] *Id.*; Jonathan Tirone, *Airport Body Scan Raises Radiation Exposure, Committee Says,* Feb. 5, 2010, http://www.bloomberg.com/apps/news?pid=20601209&sid=aoG.YbbvnkzU; Commission to the European Parliament, *Communication on the Use of Security Scanners at EU Airports*, June 15, 2010, http://www.google.com/url?sa=t&source=web&cd=1&ved=0CBIQFjAA&url=http%3A%2F%2Fec.europa.eu%2Ftransport%2Fair%2Fsecurity%2Fdoc%2Fcom2010_311_security_scanners_en.pdf&ei=h6k0TODUFMSBlAenwMzSBw&usg=AFQjCNF7Ck0G64bzz4riFHukJOp4XDaVGA (p. 16); Brenner, *supra* note 6.

[17] *Id.*

[18] *EPIC's FOIA Request, supra* note 1.

[19] DHS, *Response to EPIC FOIA Request Referring to TSA and S&T,* July 29, 2010, *See* Appendix 2.

[20] TSA, *Response to EPIC Denying Fee Waiver and Expedited Processing,* August 13, 2010, *See* Appendix 3.

On August 12, 2010, the TSA wrote to EPIC denying EPIC's requests for expedited processing and a fee waiver.[21]

### III.  EPIC Appeals the TSA's Denial of Fee Waiver

EPIC hereby appeals the TSA's denial of EPIC's fee waiver request. EPIC's FOIA Request meets the six factors for FOIA fee waivers listed in 6 C.F.R. § 5.11(k)(12). The six factors are:

1. Whether the subject of the requested records concerns "the operations or activities of the government;"
2. Whether the disclosure is "likely to contribute" to an understanding of government operations or activities;
3. Whether disclosure of the requested information will contribute to the understanding of the public at large, as opposed to the individual understanding of the requestor or a narrow segment of interested persons;
4. Whether the contribution to the public understanding of government operations or activities will be "significant;"
5. Whether the requestor has a commercial interest that would be furthered by the requested disclosure; and
6. Whether the magnitude of any identified commercial interest to the requestor is sufficiently large in comparison with the public interest in disclosure, that disclosure is primarily in the commercial interest of the requestor.

We address each of the relevant factors in turn.

> 1.  The Subject of EPIC's FOIA Request Concerns "The Operations or Activities of the Government."

The TSA is a federal agency. The FOIA request concerns the activity of the TSA, specifically, FBS machine use at American airports. The TSA is responsible for "security at the nation's airports and [has] deployed a Federal workforce to meet Congressional deadlines for screening all commercial airline passengers and baggage."[22] The TSA's mission "is to improve homeland security by providing to customers state-of-the-art technology."[23] Currently, the TSA is employing FBS machines to screen air travelers.[24] The TSA has contracted for the development of this technology, has distributed it to airports around the country, and employs workers to operate this equipment in American airports. EPIC's FOIA Request seeks records regarding the testing of FBS devices used by the TSA.[25] As such, the request for "All records concerning …tests regarding body

---

[21] *See* 5 U.S.C. § 552(a)(6)(B).
[22] TSA: What is TSA, http://www.tsa.gov/who_we_are/what_is_tsa.shtm (last visited Aug. 18, 2010).
[23] *Id.*
[24] TSA: Imaging Technology, http://www.tsa.gov/approach/tech/imaging_technology.shtm (last visited June 7, 2010).
[25] TSA: Mission, Vision, and Core Values, http://www.tsa.gov/who_we_are/mission.shtm (last visited Aug. 6, 2010).

scanners and radiation emission or exposure" done by TSA or third party contractors directly and clearly concerns the TSA's operations and activities.

> 2. The Documents Requested by EPIC are "Likely to Contribute" to an Understanding of Government Operations or Activities

Records pertaining to the testing of the radiation emission and dangers of FBS devices will help the public understand the safety implications of the TSA's FBS program and will give the public the opportunity to evaluate the relative value of this program by weighing its risks and alleged benefits. Therefore, the release of radiation test results for FBS devices is "likely to contribute" to the understanding of the safety of the TSA's use of FBS devices. 6 C.F.R. § 5.11(k)(1)(ii) requires that "disclosable portions of the requested records must be meaningfully informative about government operations or activities in order to be 'likely to contribute' to an increased public understanding of those operations or activities.[26]"

In addition, both the D.C. Circuit and the Tenth Circuit have recognized that "an understanding of how [a federal agency] makes policy decisions . . . is important to the public's understanding of the government."[27]

Release of these records would allow the public to further evaluate and study the risks inherent in FBS devises and in turn, enhance the public's ability to understand the government's policy decisions concerning the devices. Public understanding of FBS devices is of particular importance given the acceleration of the FBS program, which is occurring despite public concern about the use of FBS devices in airports and scandal surrounding the use of similar machines.

> 3. The Disclosure of the Documents Will Contribute to the Understanding of the Public at Large

EPIC routinely and systematically disseminates records obtained through the FOIA to the public at large and, as the TSA has acknowledged,[28] is a representative of the news media for FOIA purposes.  EPIC maintains several heavily visited websites that highlight breaking news concerning privacy and civil liberties issues. Two of EPIC's sites, EPIC.org and PRIVACY.org, consistently appear at the top of search engine rankings for searches on "privacy." EPIC's webpage on FBS also consistently appears in the top listings for searches on "whole body imaging" and "body scanners."

EPIC.org, maintained by EPIC, highlights critical portions of documents EPIC obtains under the FOIA. Further, EPIC routinely publishes complete copies of records we

---

[26] 6 C.F.R. § 5.11(k)(1)(ii)

[27] *Natural Resources Defense Council v. U.S. EPA*, 581 F. Supp. 2d 491, 498–99 (S.D.N.Y. 2008) (citing *Forest Guardians*, 416 F.3d at 1179; *Judicial Watch v. Rossotti*, 326 F.3d 1309, 1313–14 (D.C. Cir. 2003)).

[28] *TSA Reply, supra* note 20, *see* Appendix 3.

receive through FOIA requests. EPIC's FOIA documents have routinely been the subject of national news coverage.[29]

EPIC also publishes a bi-weekly electronic newsletter, the EPIC Alert, which is distributed to around 20,000 readers, many of whom report on technology and privacy issues for major news outlets. The newsletter has been published continuously since 1996, and an archive of past issues is available at our website. EPIC is frequently interviewed by mainstream media outlets on the topic of FBS.[30]

Finally, EPIC publishes and distributes printed books that address a broad range of privacy, civil liberties, and technology issues. EPIC will disseminate information gained from disclosure of the requested documents to the public in a form that will ensure wide access to, and further understanding of, FBS privacy and security issues.

4. The Contribution to the Public Understanding of Government Operations or Activities Will be "Significant"

Although there is widespread public discussion of the radiation risk assessments that are the subject of EPIC's FOIA request, test results and related documents regarding the radiation emissions of FBS devices and the radiation exposure of air travelers are not currently available to the public. The DHS, TSA, and S&T have failed to publish any primary source data concerning the radiation emissions and exposure of FBS devices. Without access to these documents, the public has no ability to accurately evaluate the health risks of a controversial screening method that is costing tax-payers millions of dollars and being deployed at an increasing number of airports. Disclosure of the requested documents would contribute significantly to the public's ability to evaluate the use of FBS devices and to assess potential health risks associated with the technology.

5. EPIC has No Commercial Interest in the Disclosure

10 C.F.R. § 1004.9(c) defines a commercial use request as "a request from . . . one who seeks information for a use or purpose that furthers the commercial, trade, or profit interests of the requestor . . ."[31] EPIC is a non-profit, public interest research center. EPIC's work is distributed freely through our website and through the bi-weekly EPIC Alert newsletter. EPIC has no commercial interest that would be furthered by disclosing the requested records.

---

[29] *See e.g. Happening Now: Feds Admit Storing Thousands of Checkpoint Body Scan Images* (Fox News television broadcast Aug. 5, 2010), available at http://www.youtube.com/watch?v=djQ0JWnn8uU; Jeanne Meserve and Mike M. Ahlers, *Body Scanners Can Store, Send Images, Group Says,* CNN, January 11, 2010, http://www.cnn.com/2010/TRAVEL/01/11/body.scanners/.

[30] *See generally, Happening Now: Feds Admit Storing Thousands of Checkpoint Body Scan Images* (Fox News television broadcast Aug. 5, 2010), *available at* http://www.youtube.com/watch?v=djQ0JWnn8uU; *PBS NewsHour: After Christmas Bomb Plot, New Airport Screening Techniques Examined* (PBS television broadcast Jan. 20, 2010), *available at* http://www.pbs.org/newshour/bb/transportation/jan-june10/scanners_01-20.html; *American Morning: New Questions on Body Scanners* (CNN television broadcast Jan. 11, 2010), *available at* http://www.cnn.com/video/?/video/tech/2010/01/11/meserve.full.body.scans.cnn.

[31] 10 C.F.R. § 1004.9(c) (2009).

6. Because EPIC has No Commercial Interest, Commercial Interest Cannot be "Primary"

As established above, EPIC has no commercial interest in this disclosure. EPIC is "primarily engaged in disseminating information."[32] EPIC was established in 1994 to focus public attention on emerging civil liberties issues and to protect privacy, the First Amendment, and constitutional values. EPIC has no clients, no customers, and no shareholders.

## IV. EPIC Appeals the TSA's Denial of Expedited Processing

EPIC further appeals the TSA's denial of EPIC's request for expedited processing. EPIC's FOIA Request meets the two factors for expedited processing listed in 6 C.F.R. § 5.5(d), which states that requests and appeals will be taken out of order and given expedited treatment whenever it is determined that they involve:

(i) Circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

(ii) An urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information.

While EPIC need only meet one of these requirements in order to qualify for expedited processing, EPIC, in fact, meets *both* of these requirements.

1. EPIC's Request Involves Circumstances in Which the Lack of Expedited Treatment Could Reasonably be Expected to Pose an Imminent Threat to the Life or Physical Safety of an Individual

EPIC's request involves "circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual." As detailed in EPIC's FOIA request, many noted experts have raised objections to this technology because it exposes air travelers to unnecessary radiation during each FBS scan.[33]

As described above, many experts have stated that the exposure to radiation, even in low doses, could reasonably be expected to create a greater risk of cancer and birth defects.[34] A recent report by the European Commission found that "it is evident any exposure to ionising radiation, however small, may have health effects in the longer term."[35] American scientists have also expressed concerns regarding the aggregate effect

---

[32] *Am. Civil Liberties Union v. Dep't of Justice*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004).

[33] Brenner, *supra* note 6.

[34] Jonathan Tirone, *Airport Body Scan Raises Radiation Exposure, Committee Says*, Feb. 5, 2010, http://www.bloomberg.com/apps/news?pid=20601209&sid=aoG.YbbvnkzU

[35] Commission to the European Parliament, *Communication on the Use of Security Scanners at EU Airports*, June 15, 2010, http://www.google.com/url?sa=t&source=web&cd=1&ved=0CBIQFjAA&url=http%3A%2F%2Fec.europa

of body scanner radiation on the traveling population.[36]

University of California biochemist David Agard has stated that "While the dose would be safe if it were distributed throughout the volume of the entire body, the dose to the skin may be dangerously high. Ionizing radiation such as the X-rays used in these scanners have the potential to induce chromosome damage, and that can lead to cancer."[37]

The dose of radiation that FBS puts forth is especially risky for certain segments of the population. Professor Agard and several other experts wrote a recent letter to Dr. John P. Holdren, the Assistant to the President for Science and Technology.[38] They called for further evaluation of the FBS technology, and identified several groups of people – including children and pregnant women, as being especially at risk of harm from the scans.[39] They letter stated that a "large population of older travelers, >65 years of age, is particularly at risk from the mutagenic effects of the X-rays based on the known biology of melanocyte aging."[40] The experts also noted, "A fraction of the female population is especially sensitive to …radiation leading to breast cancer. Notably, because these women, who have defects in DNA repair mechanisms, are particularly prone to cancer, X-ray mammograms are not performed on them. The dose to breast tissue beneath the skin represents a similar risk."[41] Dr. Agard and the other experts also stated, "The population of immunocompromised individuals--HIV and cancer patients (see above) is likely to be at risk for cancer induction by the high skin dose [of FBS technology radiation]."[42]

Other experts have agreed that FBS radiation could be especially harmful to some segments of the population. In a report restricted to certain agencies and not meant for public dissemination, the Inter-Agency Committee on Radiation Safety said "pregnant women and children should not be subject to scanning."[43] The European Commission report called for a similar exception for pregnant women and children, stating that "Special considerations might also be called for when it comes to passengers that are especially sensitive to ionising radiation, primarily pregnant women and children."[44] In

.eu%2Ftransport%2Fair%2Fsecurity%2Fdoc%2Fcom2010_311_security_scanners_en.pdf&ei=h6k0TODU
FMSBlAenwMzSBw&usg=AFQjCNF7Ck0G64bzz4riFHukJOp4XDaVGA (p. 16)

[36] Kate Schneider, *"Naked" Scanners May Increase Cancer Risk*, news.com.au, May 19, 2010, http://www.news.com.au/travel/news/naked-scanners-may-increase-cancer-risk/story-e6frfq80-1225868706270

[37] *Ben Mutzabaugh,* Full-body Scanners Could Pose Cancer Risk at Airports, U.S. Scientists Warn, *USA Today, July 1, 2010, http://travel.usatoday.com/flights/post/2010/07/full-body-scanners-pose-cancer-risk-at-airports-us-scientists-warn/98552/1*

[38] Sedat, Agard, Shuman, and Stroud, *supra* note 15.

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] Jonathan Tirone, *Airport Body Scan Raises Radiation Exposure, Committee Says,* Feb. 5, 2010, http://www.bloomberg.com/apps/news?pid=20601209&sid=aoG.YbbvnkzU

[44] Commission to the European Parliament, *Communication on the Use of Security Scanners at EU Airports,* June 15, 2010, http://www.google.com/url?sa=t&source=web&cd=1&ved=0CBIQFjAA&url=http%3A%2F%2Fec.europa

his recent address to the Congressional Biomedical Caucus, Columbia Professor Dr. David Brenner agreed, stating that the dose of radiation delivered by FBS machines would be particularly risky for children and members of the population with a genetically higher sensitivity to radiation.[45]

Experts have also reported that body scanners may emit up to twenty times the reported amount of radiation.[46] Dr. Brenner noted that FBS machines expose the skin of the scalp to up to twenty times the reported amount of radiation.[47] He pointed out that skin is one of the most radiation-sensitive parts of the body.[48]

Dr. Agard and the other drafters of the letter to the Assistant to the President for Science and Technology called for a truly independent review of FBS technology because the true extent of the risk "can only be determined by a meeting of an impartial panel of experts that would include medical physicists and radiation biologists at which all of the available relevant data is reviewed."[49] In his address to the Congressional Biomedical Caucus, Dr. Brenner also called for greater testing of FBS technology and the effects of "low dose" radiation.[50]

These concerns have been underscored by a recent letter by three United States senators to the Secretary Napolitano and TSA Administrator, John Pistole.[51] Senators Collins (R-ME), Burr (R-NC), and Coburn (R-OK) noted that "[t]he issue of radiation associated with the backscatter x-ray AIT machines has not been adequately addressed by TSA."[52] The senators expressed particular concern for the well-being of frequent flyers who "would receive heightened exposures from multiple AIT scans" and airport and airline personnel "who work at the airport and therefore could receive multiple doses of radiation every work day."[53]

These examples illustrate the "imminent threat to the life or physical safety" to not just one individual, but the entire American traveling public, and especially to select kinds of travelers: children, pregnant women, immunocompromised individuals, frequent fliers, and TSA personnel.

---

.eu%2Ftransport%2Fair%2Fsecurity%2Fdoc%2Fcom2010_311_security_scanners_en.pdf&ei=h6k0TODU FMSBlAenwMzSBw&usg=AFQjCNF7Ck0G64bzz4riFHukJOp4XDaVGA (p. 16)

[45] Brenner, *supra* note 6.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] Sedat, Agard, Shuman, and Stroud, *supra* note 15.

[50] Brenner, *supra* note 6.

[51] United States Senate Committee on Homeland Security and Government Affairs, *Press Release: Senator Collins Sends Letter to Top DHS Officials, Noting Safety Questions About New Airport Scanning Machines*, Aug. 6, 2010, available at:
http://hsgac.senate.gov/public/index.cfm?FuseAction=Press.MinorityNews&ContentRecord_id=48bdf98d-5056-8059-76f0-36d9d201328e&Is.

[52] *Id.*

[53] *Id.*

## 2. EPIC's Request Involves An Urgency to Inform the Public About an Actual or Alleged Federal Government Activity and is Made by an Organization Primarily Engaged in Disseminating Information

EPIC's request involves an urgency to inform the public about an actual or alleged federal government activity and is made by an organization primarily engaged in disseminating information. A District of Columbia Circuit Court has articulated a test to determine whether requestors have demonstrated "urgency to inform," and hence "compelling need;" courts must consider at least three factors: (1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity.[54]

EPIC's request satisfies the first prong of this test because it concerns a matter of current exigency to the American public. As discussed above, in recent months, many experts have questioned the safety of the TSA's FBS devices.[55] In late July 2010, TSA has announced its intent to continue to expand the FHS program to airports across the country.[56] New airports are receiving FBS machines every week.[57]

In an August 6, 2010 letter, three senators questioned the safety of these devices.[58] In that letter, Senators Collins (R-ME), Burr (R-NC), and Coburn (R-OK), wrote:

> As the Department of Homeland Security (DHS) continues the deployment of Advanced Imaging Technology (AIT) machines at airport passenger screening checkpoints, we urge the Department to better address an issue with the new technology that remains a persistent question with the American people. The issue of radiation associated with the backscatter x-ray AIT machines has not been adequately addressed by TSA... TSA's privacy assessment on AIT does little to assuage fears over the level of radiation that individuals are exposed to at airports. TSA's privacy assessment does note that the level of radiation absorbed from a single scan is "equivalent to the radiation received in two minutes of airplane flight at altitude." This is intended apparently to answer passengers who have real and legitimate concerns with exposure to even low doses of radiation. Frequent flyers, however, would receive heightened exposures from multiple AIT scans, and other travelers have expressed the belief that "there is *no* safe level of radiation exposure..." Furthermore, we have not seen TSA address the issue of airport and airline personnel who work at the airport and therefore could receive multiple

---

[54] *Al-Fayed v. CIA*, 254 F.3d 300, 310 (D.C. Cir. 2001).

[55] *See e.g.* Brenner, *supra* note 6; Sedat, Agard, Shuman, and Stroud, *supra* note 15.

[56] Department of Homeland Security, *Press Release: Secretary Napolitano Announces Additional Recovery Act-Funded Advanced Imaging Technology Deployments*, July 20, 2010, available at: http://www.dhs.gov/ynews/releases/pr_1279642622060.shtm

[57] *See e.g.* Carol Pucci, *Full-Body Scans of Passengers to Start at Sea-Tac in September*, The Seattle Times, Aug. 18, 2010, http://seattletimes.nwsource.com/html/travel/2012663519_bodyscanners19.html

[58] United States Senate Committee on Homeland Security and Government Affairs, *supra* note 51.

doses of radiation every work day. It also may be possible for TSA personnel to receive collateral doses of radiation while working in the vicinity of backscatter x-ray AIT machines.[59]

Also, a bill has recently been introduced in the Senate that would mandate deployment of FBS machines as primary screening devices in all commercial airports across the country.[60] FBS machines are obviously the topic of current and urgent debate and lawmaking.

EPIC's request also satisfies the second prong of this test: the consequence of delaying a response would compromise a significant recognized interest. A failure by the agency to disclosure records detailing risk and safety assessments of FBS machines denies the American public the opportunity to make in informed decision about this technology. As mentioned above, a Senate bill has been introduced that would make FBS machines primary screening at every commercial airport across the country. At the same time, several senators have expressed concerns regarding the safety of these machines. The public must be informed in order to participate in the current debate over FBS machines. Courts have been persuaded to require expedited process when Congress is considering legislation on an issue at the time of the request[61] or where Congress has expressed interest in a particular topic.[62]

The agency's failure to disclose documents in an expedient manner compromises not only the democratic decision-making process, but also the safety of American travelers and TSA employees. As discussed above, many experts have indicated that the radiation exposure created by FBS technology presents a threat to American travelers. Few interests are more significant than the health of the American traveling public.

EPIC's request also clearly fulfills the third prong of this test: it concerns federal government activity. As discussed in Section III, above, the TSA is responsible for "security at the nation's airports and [has] deployed a Federal workforce to meet Congressional deadlines for screening all commercial airline passengers and baggage."[63] The TSA is currently employing FBS machines to screen air travelers.[64] The TSA has contracted for the development of this technology, is distributing FBS machines to airports around the country, and employs workers to operate this equipment in American airports. EPIC's FOIA Request seeks records regarding the testing of FBS devices used by the TSA.[65] As such, the request for "All records concerning …tests regarding body scanners and radiation emission or exposure" done by TSA or third party contractors directly and clearly concerns the TSA's operations and activities.

---

[59] United States Senate Committee on Homeland Security and Government Affairs, *supra* note 51.
[60] S.3536, 111th Cong. (2010).
[61] *Gerstein v. CIA*, 2006 U.S. Dist. LEXIS 89883 (N.D. Cal. Nov 29, 2006).
[62] *Natural Res. Def. Council v. DOE*, 191 F. Supp. 2d 41, 43-44 (D.D.C. 2002).
[63] TSA: What is TSA, http://www.tsa.gov/who_we_are/what_is_tsa.shtm (last visited Aug. 18, 2010).
[64] TSA: Imaging Technology, http://www.tsa.gov/approach/tech/imaging_technology.shtm (last visited June 7, 2010).
[65] TSA: Mission, Vision, and Core Values, http://www.tsa.gov/who_we_are/mission.shtm (last visited Aug. 6, 2010).

Regarding EPIC's status as an organization "primarily engaged in disseminating information," as the TSA has already acknowledged in its response, EPIC is a news media organization and is primarily engaged in disseminating information. EPIC's status as a news media organization[66] and an organization that is "primarily engaged in disseminating information" for the purposes of expediting the request has been recognized by District of Columbia Courts.[67]

## V.  EPIC is Entitled to Expedited Processing on This Appeal

Pursuant to 5 U.S.C. § 552(a)(6)(E)(ii)(II) and 6 C.F.R. § 5.5, EPIC is entited to expedited processing for this appeal. 6 C.F.R. § 5.5 sets forth the same requirements for expedited processing of appeals as for requests, that is, that requests and appeals will be taken out of order and given expedited treatment whenever it is determined that they involve:

    (i) Circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

    (ii) An urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information.

For all of the reasons stated above in Section IV, EPIC has fulfilled both of these requirements (though only one is required) and this appeal qualifies for expedited processing.

---

[66] *EPIC v. Department of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003).
[67] *ACLU v. DOJ*, 321 F. Supp. 2d 24, 30 (D.D.C. 2004).

## VI.  Conclusion

EPIC appeals the TSA's failure to grant a fee waiver and expedited processing as requested in EPIC's FOIA Request. EPIC also requests expedited processing for this appeal.

Thank you for your consideration of this appeal. I anticipate that you will make a determination on this appeal within ten (10) days.

## VII.  Certification

The undersigned certifies that the statements in this appeal are true and correct, to the best of her knowledge (in accordance with 6 C.F.R. § 5.5(d)(3)).

Sincerely,

Ginger P. McCall
Staff Counsel
Electronic Privacy Information Center

13

**Appendix 1**
EPIC's July 13, 2010 FOIA Request to the DHS

## Appendix 2

DHS's July 29, 2010 Letter of Acknowledgment to EPIC and Referral to TSA and S&T

## **Appendix 3**
TSA's August 13, 2010 Letter of Acknowledgment to EPIC and Denial of Fee Waiver
and Expedited Processing

# Exhibit E to
# Declaration of Paul Sotoudeh



U.S. Department of Homeland Security
Washington, DC 20528-6020

**Transportation
Security
Administration**

**September 21, 2010**

Ms. Ginger P. McCall
Staff Counsel
Electronic Privacy Information Center (EPIC)
1718 Connecticut Ave., NW
Suite 200
Washington, DC  20009

Re:  **TSA 10-0674**

Dear Ms. McCall:

This letter acknowledges receipt of your Freedom of Information Act/Privacy Act (FOIA/PA) appeal to the Transportation Security Administration (TSA), dated August 27, 2010, appealing TSA's denial of EPIC's fee waiver and expedited processing for the above listed FOIA request.  Specifically, you requested:

1. All records concerning TSA tests regarding body scanners and radiation emission or exposure.
2. All records concerning third party tests regarding body scanners and radiation emission or exposure.

If you have any questions or would like to discuss this matter, please feel free to contact this office at 571-227-2300 or 1-866-364-2872 and refer to **TSA10-0674**.

Sincerely,

Howard Plofker
Acting FOIA Officer
Freedom of Information Office

# Exhibit F to
# Declaration of Paul Sotoudeh



U.S. Department of Homeland Security
Office of Special Counsel
Arlington, VA 20598-6033

**Transportation
Security
Administration**

NOV 2 4 2010

Ginger P. McCall
Electronic Privacy Information Center
1718 Connecticut Ave NW Ste 200
Washington, DC 20009

**Re: FOIA Case Number:    TSA10-0674
                            Fee Waiver & Expedited Treatment Appeal**

Dear Ms. McCall:

This is in response to your letter dated August 27, 2010, appealing the August 12, 2010, denial by TSA of your request that TSA waive all fees and grant expedited processing of your request for information under the Freedom of Information Act (FOIA), 5 U.S.C. §552.  Your initial request for information, dated July 13, 2010, asked for all records concerning TSA or third party tests regarding body scanners and radiation emission or exposure.  In addition, you also requested that TSA waive all fees and grant expedited processing of your request for information.  After reviewing your appeal and the administrative file, I hereby affirm TSA's initial expedited processing denial but agree to waive the fees.

<u>Expedited Treatment</u>

In your July 13, 2010, letter, you requested records under the FOIA related to tests regarding body scanners and radiation emission or exposure.  You requested that TSA expedite processing because a lack of expedited processing "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," and because your request stated that (1) you are journalists primarily engaged in disseminating information; (2) the public has an urgent need for information about the safety of AIT programs; and (3) many alleged experts have raised questions about AIT safety.

The FOIA requires agencies to promulgate regulations providing for the expedited processing of requests if the requester demonstrates a "compelling need".[1]  A requester bears the burden of showing "compelling need" by demonstrating either circumstances in which a lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical

---

[1] 5 U.S.C. §552(a)(6)(E) (2000).

safety of an individual or, for requesters primarily engaged in disseminating information, by demonstrating that an "urgency to inform the public concerning actual or alleged Federal Government activity" exists.[2] An "urgency to inform" would be found to exist if (1) the request concerns a "matter of current exigency to the American public," and (2) the consequences of delaying the response would "compromise a significant recognized interest."[3] I note that the courts have held that these categories are to be "narrowly applied"[4] so that other requesters would not be unduly disadvantaged.

You state that the public may be at risk because AIT "exposes air travelers to unnecessary radiation," and that "many experts" have stated that "exposure to radiation, even in low doses, could reasonably be expected to create a greater risk of cancer and birth defects." This, in addition to concerns raised by Members of Congress, leads you to argue that AIT may reasonably pose an imminent threat to safety. I disagree, noting that previous statements and releases by TSA and DHS have made clear that AIT is safe and meets national health and safety standards.

You also argue that the requests are a matter of current exigency in that the records specifically concern TSA's transportation security functions, recent news stories and "experts" have raised questions about AIT safety, and Members of Congress have introduced bills concerning AIT. While the news articles demonstrate that TSA's responses to evolving threats to transportation security are newsworthy, you have presented no evidence that a pressing or urgent situation exists that requires immediate action. General coverage of homeland security programs, even acknowledging the public's need to know, does not meet this standard. In addition, the numerous statements and documents TSA has made available to the public also make clear that no exigency exists.[5] Accordingly, I affirm the denial of your request for expedited processing.

This is the final decision pertaining to your appeal for expedited processing. I am the person responsible for this decision. If you wish, you may seek judicial review of this final decision in the United States District Court for the district in which you reside, have principal place of business, where the records are located, or in the District of Columbia.

Sincerely,

Kimberly Walton
Special Counselor

---

[2] *Id.* at (E)(i). *See also* 6 CFR §5.5(d)(1) (2005).
[3] *Al-Fayed v. CIA*, 254 F.3d 300, 310 (D.C. Cir. 2001).
[4] *Id.*
[5] Please refer to the studies posted to the TSA FOIA Electronic Reading Room, at http://www.tsa.gov/research/reading/index.shtm.

2

# Exhibit G to
# Declaration of Paul Sotoudeh



U.S. Department of Homeland Security
Freedom of Information Act Office
601 South 12th Street
Arlington, VA 20598-6020

**Transportation
Security
Administration**

**FOIA Case Number: TSA10-0674**

DEC 2 2 2010

Ms. Ginger P. McCall
Electronic Privacy Information Center
1718 Connecticut Ave, NW
Suite 200
Washington, DC 20009

Dear Ms. McCall:

This letter is an interim response to your Freedom of Information Act (FOIA) request dated July 13, 2010, in which you requested agency records concerning radiation and health testing of advanced imaging technology ("AIT") devices. Specifically, you requested the following records:

1. All records concerning the Transportation Security Administration (TSA) tests regarding body scanners and radiation emission or exposure.
2. All records concerning third party tests regarding body scanners and radiation emission or exposure.

Your request is currently being processed under the FOIA, 5 U.S.C. § 552.

Please be advised that certain records that may be responsive to your request are publicly available and are posted or linked to on TSA's web page on AIT safety, http://www.tsa.gov/approach/tech/ait/safety.shtm, and in the TSA Electronic Reading Room (http://www.tsa.gov/research/reading/index.shtm). These records include:

- *Assessment of the Rapiscan Secure 1000 Body Scanner for Conformance with Radiological Safety Standards*, National Institute of Standards and Technology (NIST), U.S. Department of Commerce, July 21, 2006, http://www.tsa.gov/assets/pdf/nist_rapiscan_secure_1000.pdf
- *Radiation Safety Engineering Assessment Report for the Rapiscan Secure 1000 in Single Pose Configuration*, Applied Physics Laboratory (APL), Johns Hopkins University, October 2009 & August 2010 (Versions 1 & 2), http://www.tsa.gov/assets/pdf/jh_apl_v1.pdf, http://www.tsa.gov/assets/pdf/jh_apl_v2.pdf
- *TSA Memorandum on Implementing the Recommendations from the APL Assessment*, October 7, 2010, http://www.tsa.gov/assets/pdf/tsa_safety_study_ait_info_memo.pdf
- *White House Blog: Backscatter Back-Story*, TSA Blog, November 9, 2010, http://blog.tsa.gov/2010/11/white-house-blog-backscatter-back-story.html

- *Fact Sheet: Advanced Imaging Technology (AIT) Health & Safety*, Department of Homeland Security, Office of Health Affairs, http://www.tsa.gov/assets/pdf/ait_fact_sheet.pdf

In addition, information and links to material on this subject matter can be found on other Executive Branch and executive agency websites including:

- *Products for Security Screening of People, Radiation-Emitting Products & Procedures,* Web Site, U.S. Food and Drug Administration, http://www.fda.gov/Radiation-EmittingProducts/RadiationEmittingProductsandProcedures/SecuritySystems/ucm227201.htm
- *Backscatter Back-Story*, Executive Office of the President, Office of Science and Technology Policy blog post, November 8, 2010, http://www.whitehouse.gov/blog/2010/11/08/backscatter-back-story (containing Letter of Concern by John W. Sedat, Ph.D, and responses by John P. Holdren, Director, Executive Office of the President, Office of Science and Technology Policy, John L. McCrohan, Deputy Director for Technical and Radiological Initiatives, U.S. Food and Drug Administration, and Karen R. Shelton Waters, Deputy Assistant Administrator / Chief Administrative Officer, Designated Safety and Health Official, TSA)

TSA is waiving any applicable fees associated with the processing of your request. In addition, as TSA's response to this request is currently the subject of litigation, the administrative appeal rights that normally accompany a FOIA response are not being provided.

If you have any questions regarding this release, please contact Jesse Grauman, U.S. Department of Justice, at 202-514-2849.

Sincerely,

Howard Plofker
Acting FOIA Officer
Freedom of Information Act Office

# Exhibit H to
# Declaration of Paul Sotoudeh

U.S. Department of Homeland Security

Freedom of Information Act Office
601 South 12th Street
Arlington, VA  20598-6020



**Transportation
Security
Administration**

**FOIA Case Number: TSA10-0674**

June 6, 2011

Ms. Ginger P. McCall
Electronic Privacy Information Center
1718 Connecticut Ave, NW, Suite 200
Washington, DC  20009

Dear Ms. McCall:

This letter is the second interim response to your Freedom of Information Act (FOIA) request
dated July 13, 2010, in which you requested agency records concerning radiation and health
testing of advanced imaging technology ("AIT") devices.  Specifically, you requested the
following records:

1.  All records concerning the Transportation Security Administration (TSA) tests regarding
    body scanners and radiation emission or exposure.

2.  All records concerning third party tests regarding body scanners and radiation emission or
    exposure.

Your request is currently being processed under the FOIA, 5 U.S.C. § 552.

A reasonable search within the TSA was conducted and documents (135 pages) responsive to your
request were located.  These documents have been reviewed and 84 pages are being released in
their entirety.  However, portions of 42 pages are being withheld pursuant to Exemptions (b)(2),
(b)(4), (b)(5), and (b)(6).  In addition, nine pages are being withheld in their entirety pursuant to
Exemption (b)(5).  A more complete explanation of these exemptions is provided below.

<u>Exemption (b)(2)</u>

Exemption (b)(2) exempts from mandatory disclosure records that are "related solely to the
internal personnel rules and practices of an agency."  We have determined that certain portions of
the requested records contain personnel rules and/or internal practices of the TSA and are thus
properly withheld from disclosure under this exemption.

### Exemption (b)(4)

We have determined that portions of the responsive document are exempt from disclosure under Exemption (b)(4) and must be withheld in order to protect the submitter's proprietary interests. Exemption (b)(4) protects trade secrets and commercial or financial information obtained from a person that is privileged or confidential. The courts have held that this subsection protects (a)

confidential commercial information, the disclosure of which is likely to cause substantial harm to the competitive position of the person who submitted the information and (b) information that was voluntarily submitted to the government if it is the kind of information that the provider would not customarily make available to the public.

### Exemption (b)(5)

Exemption (b)(5) protects from disclosure those inter- or intra-agency documents that are normally privileged in the civil discovery context. The three most frequently invoked privileges are the deliberative process privilege, the attorney work-product privilege, and the attorney-client Of those, we have determined that some of the information in the documents you have requested is appropriately withheld under all three privileges. Under the deliberative process privilege, disclosure of those records would injure the quality of future agency decisions by creating public confusion resulting from disclosure of reasons and rationales that were not in fact ultimately the grounds for agency action. Secondly, the attorney work-product privilege protects the adversarial trial process by insulating the attorney's preparation from scrutiny. Finally, this information is also being withheld under the attorney-client privilege. This part of Exemption 5 protects the communications between an attorney and his/her client relating to a matter for which the client has sought legal advice, as well as to protect facts divulged by client to attorney and any opinions given by attorney based on these facts.

### Exemption (b)(6)

Exemption (b)(6) permits the government to withhold all identifying information that applies to a particular individual when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." This requires the balancing of the public's right to disclosure against the individual's right to privacy. After performing this analysis, we have determined that the privacy interest in the identities of the individuals in the records you have requested outweigh any minimal public interest in disclosure of the information. Please note that any personal interest you may have in that information does not factor into the aforementioned balancing test.

TSA is waiving any applicable fees associated with the processing of your request. In addition, as TSA's response to this request is currently the subject of litigation, the administrative appeal rights that normally accompany a FOIA response are not being provided.

If you have any questions regarding this release, please contact Jesse Grauman, U.S. Department of Justice, at 202-514-2849.

Sincerely,

Yvonne L. Coates
Freedom of Information Act Officer
Office of the Special Counsel
Transportation Security Administration

Enclosure

Exhibit I to
Declaration of Paul Sotoudeh

**U.S. Department of Homeland Security**

Freedom of Information Act Office
601 South 12th Street
Arlington, VA  20598-6020

 **Transportation
Security
Administration**

JUN 2 0 2011

**3600.1
FOIA Case Number: TSA10-0674**

Ms. Ginger P. McCall
Electronic Privacy Information Center
1718 Connecticut Ave, NW, Suite 200
Washington, DC  20009

Dear Ms. McCall:

This letter is the Transportation Security Administration's (TSA) final response to your Freedom of Information Act (FOIA) request dated July 13, 2010, in which you requested agency records concerning radiation and health testing of Advanced Imaging Technology (AIT) devices. Specifically, you requested the following records:

1. All records concerning the Transportation Security Administration (TSA) tests regarding body scanners and radiation emission or exposure.

2. All records concerning third party tests regarding body scanners and radiation emission or exposure.

Your request has been processed under the FOIA, 5 U.S.C. § 552.

A reasonable search within TSA was conducted and additional documents (69 pages) responsive to your request were located. These documents have been reviewed and 25 pages are being released in their entirety. However, portions of 44 pages are being withheld pursuant to Exemptions (b)(2), (b)(4), (b)(5), and (b)(6). A more complete explanation of these exemptions is provided below. In addition to these records, TSA has posted radiation surveys for every backscatter imaging technology unit deployed in U.S. airports on its website. The test results come from testing conducted in March 2011, in addition to site acceptance and factory acceptance tests conducted on every unit prior to and immediately after installation in an airport since TSA began deploying the technology in 2009. To provide additional transparency, all future radiation survey reports will be posted on www.tsa.gov after they are completed.

These records can be found on TSA's website at:
http://www.tsa.gov/research/reading/xray_screening_technology_safety_reports.shtm.

Pursuant to an agreement to narrow the scope of the request on January 19, 2011, the search for responsive records was limited to records pertaining to vendors and technologies that are either

currently being deployed by TSA or are under consideration by TSA. Finally, TSA has attempted to account for and eliminate all duplicate copies of identical records.

## Exemption (b)(2)

Exemption (b)(2) exempts from mandatory disclosure records that are "related solely to the internal personnel rules and practices of an agency." We have determined that certain portions of the requested records contain personnel rules and/or internal practices of TSA and are thus properly withheld from disclosure under this exemption.

## Exemption (b)(4)

We have determined that portions of the responsive document are exempt from disclosure under Exemption (b)(4) and must be withheld in order to protect the submitter's proprietary interests, which protects trade secrets and commercial or financial information obtained from a person that is privileged or confidential. The courts have held that this subsection protects (a) confidential commercial information, the disclosure of which is likely to cause substantial harm to the competitive position of the person who submitted the information and (b) information that was voluntarily submitted to the government if it is the kind of information that the provider would not customarily make available to the public.

## Exemption (b)(5)

Exemption (b)(5) protects from disclosure those inter- or intra-agency documents that are normally privileged in the civil discovery context. The three most frequently invoked privileges are the deliberative process privilege, the attorney work-product privilege, and the attorney-client privilege. Of those, we have determined that some of the information in the documents you have requested is appropriately withheld under the deliberative process privilege. Under the deliberative process privilege, disclosure of those records would injure the quality of future agency decisions by discouraging the open and frank policy discussions between subordinates and superiors.

## Exemption (b)(6)

Exemption (b)(6) permits the government to withhold all identifying information that applies to a particular individual when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." This requires the balancing of the public's right to disclosure against the individual's right to privacy. After performing this analysis, we have determined that the privacy interest in the identities of the individuals in the records you have requested outweigh any minimal public interest in disclosure of the information. Please note that any personal interest you may have in that information does not factor into the aforementioned balancing test.

TSA is waiving any applicable fees associated with the processing of your request. In addition, as TSA's response to this request is currently the subject of litigation, the administrative appeal rights that normally accompany a FOIA response are not being provided.

2

If you have any questions regarding this release, please contact Jesse Grauman, U.S. Department of Justice, at 202-514-2849.

Sincerely,

Yvonne L. Coates
Freedom of Information Act Officer
Office of the Special Counsel
Transportation Security Administration

Enclosure

# Exhibit J to
# Declaration of Paul Sotoudeh

**Grauman, Jesse (CIV)**

| | |
|---|---|
| **From:** | Grauman, Jesse (CIV) |
| **Sent:** | Wednesday, September 07, 2011 6:49 PM |
| **To:** | John Verdi |
| **Subject:** | EPIC v. DHS (Radiation testing) (First email) |
| **Attachments:** | TSL1075-1189.pdf; TSL1190-1198.pdf; TSL1199-1279.pdf |

John –

Attached to this email (and subsequent emails due to file size) are records being released or re-released by DHS to EPIC in EPIC v. DHS, No. 1:10cv1992 (radiation testing regarding advanced imaging technology).  As you know, in an effort to narrow the issues for review, DHS has been reviewing withholdings made pursuant to Exemption 4, pursuant to the one-month extension we negotiated in early August.  In addition, certain records had been temporarily withheld by DHS pending completion of the submitter notice process and review for sensitive security information (SSI).  Both of these processes are complete and the following three categories of records are being released:

**I: Records previously withheld temporarily pending completion of submitter notice and SSI review and now being released upon completion of that review:**
TSL1075-1189
TSL1190-1198
TSL1199-1279
TSL1280-1360

**II. Records previously withheld in full pursuant to Exemption 4, now being released in part after further review:**
TSL1361-1378
TSL1379-1382

**III. Records previously withheld in part pursuant to Exemption 4 now being released with fewer or no Exemption 4 withholdings after further review:**
TSA178-191
TSA192-195
TSL774-788
TSL919-922
TSL-MISC (comprising TSL13, 26, 32-38, 41, 153, 165, 171, 176, 651, 841, 874)

The bases for any withholdings in these records will be identified in the Vaughn indices and declarations that will be filed with our upcoming motion for summary judgment on Monday.  Please contact me if you have any questions or concerns.

Jesse

Jesse Grauman
Trial Attorney
U.S. Department of Justice, Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW, Room 5374
Washington, DC 20001
jesse.z.grauman@usdoj.gov
Phone: (202) 514-2849
Fax: (202) 305-8517

Exhibit K to
Declaration of Paul Sotoudeh
(TSA <u>Vaughn</u> Index)

**EPIC v. DHS**, Civil Action 1:10-cv-1992
**US District Court, District of Columbia**

**TSA Vaughn Index**

Description of responsive TSA records withheld in full or in part pursuant to FOIA Exemptions.

| | BATES NUMBER | EXEMPTION | PAGES WITHHELD | DESCRIPTION OF MATERIAL REDACTED |
|---|---|---|---|---|
| **EMAILS** | | | | |
| | 000001 | **Exemption 6** | 1 page withheld in part | Internal employee email addresses |
| | 000007-000008 | **Exemption 6** | 2 pages withheld in part | Internal employee names and email addresses |
| | | **Exemption 5 Deliberative Process Privilege** | 2 pages withheld in part | Internal government email exchange containing deliberative, questions, and answers regarding agency policies as to compliance with consensus standards regarding radiation, and authority of various federal agencies with regard to AIT safety |
| | 000015-000016 | **Exemption 6** | 2 pages withheld in part | Internal employee names, email addresses and phone number |
| | 000017-000019 | **Exemption 6** | 3 pages withheld in part | Internal employee names, email addresses and phone number |
| | 000018 | **Exemption 5 Deliberative Process Privilege** | 1 page withheld in part | Internal deliberations, discussions, and opinions of author regarding TSA's response to correspondence from Ralph Nader and its implications for AIT policy in general |
| | 000026-000027 | **Exemption 6** | 2 pages withheld in part | Internal employee names, email addresses and phone number |
| | | **Exemption 5 Deliberative Process Privilege and Attorney Client Privilege** | 1 page withheld in part | Internal email, including draft language, from attorney in TSA Office of Chief Counsel to TSA official regarding suggested response letter to EPIC's petition to suspend use of AIT |
| | 000037-000038 | **Exemption 6** | 2 pages withheld in part | Internal employee names, email addresses |
| | 000038 | **Exemption 5 Deliberative Process** | 1 page withheld in part | Excerpts of recommendations section of internal memorandum on AIT safety; withheld portion contains |

1

| | | **Privilege** | | recommendation from internal memorandum regarding future efforts by TSA regarding development of AIT radiation safety standards |
|---|---|---|---|---|
| Attachment to 000037 - Memo Briefing re: Guidance on Radiation Safety | 000042 | **Exemption 6**<br><br>**Exemption 5 Deliberative Process Privilege** | 1 page withheld in part | Internal employee names<br><br>Excerpt of internal memorandum to DHS Undersecretary containing recommendations for future steps by TSA/DHS regarding development of AIT radiation safety standards (same excerpts withheld at TSA38) |
| | 000047 | **Exemption 6** | 1 page withheld in part | Internal employee names, email addresses |
| | 000049-000051 | **Exemption 6** | 2 pages withheld in part | Internal employee names, email addresses and phone number |
| | 000052 | **Exemption 6**<br><br>**Exemption 5 Deliberative Process Privilege** | 1 page withheld in part<br><br>1 page withheld in part | Internal employee names, email addresses<br><br>Internal deliberations concerning TSA's response to congressional inquiry, including draft language for response |
| | 000053-000054 | **Exemption 6** | 2 pages withheld in part | Internal employee names, email addresses |
| | 000055-000056 | **Exemptions 6** | 2 pages withheld in part | Internal employee names, email addresses and phone number |
| | 000069-000070 | **Exemption 6**<br><br>**Exemption 5 Deliberative Process Privilege** | 2 pages withheld in part | Internal employee names, email addresses<br><br>Internal deliberations concerning cover memo for JHU/APL report on AIT safety, including draft language for memorandum |
| | 000071-000072; 000071A | **Exemption 6**<br><br>**Exemption 5 Deliberative Process Privilege** | 2 pages withheld in part; 1 page withheld in full | Internal employee names, phone number<br><br>Summary by TSA Office of Chief Counsel attorney describing results of JHU/APL study on Rapiscan Secure 1000, and summarizing internal agency discussions and deliberations regarding radiation safety and any impact of the results of the JHU/APL study for whether TSA would deploy Rapiscan AIT systems |

| | | | | |
|---|---|---|---|---|
| | 000073 | **Exemption 6** | 1 page withheld in part | Internal employee names, email addresses and phone number |
| | 000106 | **Exemption 6** | 1 page withheld in part | Internal employee names |
| | 000107-000108 | **Exemption 6** | 2 pages withheld in part | Internal employee names, phone number |
| | 000111-000112 | **Exemption 6** | 2 pages withheld in part | Internal employee names, email addresses and phone number |
| | 000127, 000129 | **Exemption 6** | 2 pages withheld in part | Internal employee names, email addresses and phone number |
| | 000128 | **Exemption 5 Deliberative Process Privilege** | 1 page withheld in part | Recommendation by National Institute for Occupational Safety and Health (NIOSH) regarding future steps to be taken in internal government study measuring radiation emissions at selected airports |
| | 000133-000135 | **Exemption 6** | 3 pages withheld in part | Internal employee names, email addresses and phone number |
| | 000136, 000139, 000140 | **Exemption 6** | 5 pages withheld in part | Internal employee names and phone numbers |
| | 000141-000143 | **Exemption 6** | 3 pages withheld in part | Internal employee names |
| **REPORTS, AGREEMENTS, CORRESPONDENCE** | | | | |
| **Draft Cover memorandum for JHU/APL report on AIT safety** | 000070A-000070C | **Exemption 5 Deliberative Process Privilege** | 3 pages withheld in full | Draft version (including tracked changes) of cover memorandum for JHU/APL report on AIT safety (document attached to email on 000069-70) |
| **Assessment of the Rapiscan Secure 10000 Body Scanner for Conformance with Radiological Safety Standards** | 000092 | **Exemption 3 (49 U.S.C. § 114(r); 49 C.F.R. § 1520.5(b)(9)(vi))** | 1 page withheld in part | Scatter phantom image generated by Rapiscan Secure 1000 |
| | 000077 | **Exemption 4** | 2 pages withheld in part | Name and model number of type of X-Ray tube used in |

| | | | | |
|---|---|---|---|---|
| | | | | Rapiscan Secure 1000 |
| | 000086 | | | Description of method used to shape X-Ray beam in Rapiscan Secure 1000

This information is contained within a government report authored by Frank Cerra on the conformance of Rapiscan's Secure 1000 Scanner to radiological safety standards.  Mr. Cerra performed the work underlying this report while at the Food and Drug Administration's Center for Devices and Radiological Health ("FDA/CDRH"), but wrote the report when he was affiliated with the National Institute on Standards and Technology ("NIST").  The information withheld on page 77 (name and model information) was obtained via a personal communication with Steve Gray of Rapiscan. The information withheld in page 86 (method used to shape X-Ray beam) was obtained either from the system itself that was used for testing, or from information provided by Rapiscan in connection with the testing.

The withheld information specified above is not of the type Rapiscan would normally release to the public. Moreover, its release is likely to cause Rapiscan substantial competitive harm because it could enable competitors to more effectively design and build their own systems using Rapiscan's proprietary information. Modica Decl. ¶¶ 4-7; Sotoudeh Decl. ¶¶ 54-58. |
| **Draft TSA Assessments and Findings of the Radiation Output of AIT Machines** | 000108A-000108F | **Exemption 5 Deliberative Process Privilege** | 6 pages withheld in full | Draft version (including tracked changes) of TSA assessment/findings regarding radiation output of AIT machines (document attached to email on 000107-000108) |
| **DHS Reimbursement Agreement** | 000113-000114 | **Exemption 6** | 2 pages withheld in part | Internal employee names, phone number |
| **US Army Center for Health Promotion and** | 000115-000118 | **Exemption 6** | 4 pages withheld in part | Internal employee names, email addresses and phone numbers |

| | | | | |
|---|---|---|---|---|
| **Preventive Medicine: Information regarding interagency agreement** | | | | |
| **DHHS Public Health Service Letter, 9/1/10** | 000120 | **Exemption 6** | 2 pages withheld in part | Internal employee names, titles, phone numbers, and signature |
| **Department of Army Letters re: Army/TSA Memorandum of Agreement, AIT Survey Worksheets and Exit Briefing Notes** | 000145-000149, 000151-000152, 000154, 000156-000160, 000165, 000167-000171, 000174 | **Exemption 6** | 20 pages withheld in part | Internal employee names and phone numbers |
| **David Bogdan: Radiation Safety Engineering Assessment of the Rapiscan Secure 1000 in Preliminary Single-Pose Configuration: Preliminary Quick-Look Brief, 8/10/09** | 000181 | **Exemption 6** | 1 page withheld in part | Name of non-government physicist who performed third-party radiation testing on Rapiscan Secure 1000 |
| | 000191 | **Exemption 4** | 1 page withheld in part | Beam width measurement of Rapiscan Secure 1000<br><br>This information is contained within a "quick look brief" summarizing a radiation safety study on the Rapiscan system, conducted for TSA by the Johns Hopkins University Applied Physics Laboratory in 2009.  This testing was conducted at Rapiscan, which voluntarily hosted APL at its plant and provided a representative unit there, also voluntarily, for radiation and safety testing.<br><br>The withheld information specified above (beam width measurement) was obtained either from the Rapiscan system itself that was provided for testing, or from information provided by Rapiscan in connection with the testing.  This information is not of the type Rapiscan would normally release to the public.  Moreover, its release is likely to cause Rapiscan substantial commercial harm because it could enable competitors to more effectively design and build their own systems using Rapiscan's proprietary information.  Modica Decl. ¶¶ 4-5; Sotoudeh Decl. ¶¶ 54-58. |
| **NIST Assessment of Radiation Safety and Compliance with** | 000192-000195 | **Exemption 6** | 4 pages withheld in part | Name of non-government physicist who performed third-party radiation testing on Rapiscan Secure 1000. |

| | | | | |
|---|---|---|---|---|
| **ANSI N43.17-22, Rapiscan Dual Secure 1000 Personal Scanner** | | | | |
| **Site Acceptance Tests ("SATs") and Factory Acceptance Tests ("FATs"), posted online at http://www.tsa.gov/research/reading/xray_screening_technology_safety_reports_march_2011.shtm and referenced in TSA's June 20, 2011 letter to EPIC** | N/A | **Exemption 6** | Numerous pages withheld in part | Names, signatures, and initials of government and non-government employees contained throughout. |