**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER )<br><br>Plaintiff, )<br>v. )<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY )<br><br>Defendant. ) | No. 1:10-01992 (ABJ) |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS
CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff, the Electronic Privacy Information Center ("EPIC") submits the following reply in support of its motion for summary judgment against Defendant the U.S. Department of Homeland Security ("DHS"). EPIC challenges the DHS's assertion of Freedom of Information Act ("FOIA") Exemptions 3, 4, and 5. EPIC also seeks attorneys' fees and costs in this lawsuit. EPIC qualifies for such relief irrespective of the outcome of the parties' cross-motions for judgment.

In summary, the agency is wrongly withholding documents under 49 U.S.C. §114(r), which is not a qualifying statute under FOIA Exemption 3. The agency is also wrongly withholding government-produced documents under Exemption 4, contrary to the plain meaning of the statute. Further, the agency is asserting that purely factual information may be withheld by the agency under Exemption 5. This would be a radical expansion of Exemption 5, unsupported by case law, and would be directly contrary to FOIA's intended narrow interpretation of exemptions.

1

Finally, the agency is withholding purportedly "draft" documents under Exemption 5 without a properly identifying the corresponding final documents. If the agency wishes to withhold draft documents, it must identify the final documents associated with those drafts.

## ARGUMENT

EPIC has correctly challenged the agency's withholding of documents under Exemptions 3, 4, and 5. The agency is wrongly withholding documents under 49 U.S.C. §114(r), which is not a qualifying statute for the purpose of FOIA Exemption 3. The agency is also wrongly withholding government-produced documents under Exemption 4. Lastly, the agency is wrongly withholding factual information and documents under Exemption 5, as well as drafts for which it has not properly identified an associated final document.

## I.   49 U.S.C. §114(r) is Not a Qualifying Statute Under FOIA Exemption 3

FOIA Exemption 3 permits an agency to withhold responsive records "specifically exempted from disclosure by statute," if the statute:

> (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

5 U.S.C. § 552(b)(3). In enacting FOIA, the Senate's floor report stated "it is the purpose of the present bill to…establish a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." 111 Cong. Rec. 26820 (October 13, 1965). Congress emphasized the import of "clear definitive guidelines in setting information policies." *Id.* Despite these clearly stated goals, the DHS now argues that the vague standards in 49 U.S.C. § 114(r) ("Section 114(r)") may qualify as an exemption statute under Exemption 3. Incredibly, the agency even argues that Section 114 "supersede[s] FOIA's disclosure

requirements," allowing information to be withheld "under FOIA or otherwise." Def.'s Reply Br. at 5-6.

> i.     *49 U.S.C. § 114(r) is Not Sufficiently Specific to Qualify as an Exemption 3 Statute*

Section 114(r) is not sufficiently specific to qualify as an Exemption 3 statute. The DHS primarily relies on *Public Citizen v. FAA*, 988 F.2d 186 (D.C. Cir. 1993), arguing that the case "compels" the conclusion that information withheld under Section 114(r) "is exempt from disclosure under FOIA." Def.'s Reply Br. at 7. *Public Citizen*, however, does not bind the Court as to Section 114(r). In fact, *Public Citizen* does not even resolve the question of whether the statute at issue in that case, 49 U.S.C. § 1357(d)(2) ("Aviation Security Improvement Act of 1990"), qualifies as an Exemption 3 statute.

In *Public Citizen*, the parties did not contest that Section 1357(d)(2) was sufficient to support a withholding under the FOIA. *Id*. at 194 ("Petitioners argue that by expressly including this phrase, Congress plainly meant § 1357(d)(2) not to shield information from disclosure under any statute *other than FOIA*.") (emphasis added). The only issue addressed by the DC Circuit was the propriety of the agency's invocation of Section 1357(d)(2) to prevent disclosure under the Aviation Security Improvement Act of 1990. *Id*. ("The precise question here at issue is whether the FAA may use § 1357(d)(2) to avoid disclosure under statutes other than FOIA."). *Public Citizen* acknowledges that the language of Section 1357(d)(2) seeks to "specifically exempt [records] from disclosure by statute," thus satisfying the first prong of the Exemption 3 test. 5 U.S.C. § 552(b)(3). However, *Public Citizen* does not hold that Section 1357(d)(2) satisfies the second prong of Exemption 3's requirements – that the underlying statute "requires that the matters be withheld from the public in such a manner as to leave no discretion to the agency" or "establishes particular criteria for withholding or refers to particular types of matters

to be withheld." Indeed, *Public Citizen* does not engage in an Exemption 3 analysis at all – the issue was simply not before the court. Congress's specific exemption of records from disclosure by statute is a necessary, but not a sufficient, aspect of a qualifying Exemption 3 statute.

Under Exemption 3, a statute must "specifically exempt matters from disclosure" and either "require[] that the matters be withheld from the public in such a manner as to leave no discretion to the agency" or "establish[] particular criteria for withholding or refer[] to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). Thus, statutes qualify as a basis for Exemption 3 withholdings only when "Congress ha[s] itself made the basic decision, and ha[s] left to the administrator only the task of administration." *Am. Jewish Cong. v. Kreps*, 574 F.2d 624, 630 (D.C. Cir. 1978); *see also id.* at 628-29 ("Nondisclosure is countenanced by [the 'particular criteria' or 'particular types of matters' standard] if, but only if, the enactment . . . incorporates a formula whereby the administrator may determine precisely whether disclosure in any instance would pose the hazard that Congress foresaw").

Section 114(r) prohibits disclosure of information "if the Under Secretary decides that disclosing the information would . . . be detrimental to the security of transportation," 49 U.S.C. § 114(r)(1)(C). Contrary to the DHS's assertion, Section 114(r) does not refer to "particular types of matters to be withheld" nor does it "delineate[] specific categories of information that Congress determined should not be disclosed." Def.'s Reply Br. at 9. Section 114(r)'s standard, "detrimental to the security of transportation," refers to matters that are far less "particular" than those contained in other Exemption 3 statutes.[1] *See Colonial Trading Corp. v. Dep't of Navy*,

---

[1] The DHS cites several cases in support of the claim that many other Exemption 3 statutes are written as broadly as Section 114(r). *See* Def.'s Reply Br. at 9. None of these cases are apposite. *Nat'l Inst. Of Military Justice v. DOD* assumed, without deciding, that 10 U.S.C. § 130c, which exempts "information of foreign governments," qualified as an Exemption 3 statute. 404 F. Supp. 2d 325 (D.D.C. 2005). Unlike Section 114(r), Section 130c provides a detailed list of determinations that must be made before the information is withheld. See 10 U.S.C. § 130c(b). The DHS also relies heavily upon *Ancient Coin Collectors Guild v. U.S. Dep't of State*, which held that Exemption 3 was satisfied by a statute that permitted withholding "whenever and to the extent it is determined by the President or his

735 F. Supp. 429, 431 (D.D.C. 1990) ("technical data with military or space application");

*Founding Church of Scientology of Wash. v. NSA*, 610 F.2d 824 (D.C. Cir. 1979) ("any

information with respect to the activities thereof, or of the names, titles, salaries, or number of

persons employed by [the National Security Agency]"); *Medina-Hiincapie v. Dep't of State*, 700

F.2d 737 (D.C. Cir. 1983) ("records . . . pertaining to the issuance or refusal of visas or permits

to enter the United States"); *Hodes v. U.S. Dept. of Hous. & Urban Dev.*, 532 F. Supp. 2d 108,

114 (D.D.C. 2008) ("Nonpublic personal information" of customers of financial institutions);

*Mudge Rose Guthrie Alexander & Ferdon v. U.S. Int'l Trade Comm'n*, 846 F.2d 1527, 1530

(D.C. Cir. 1988) ("information submitted . . . which is designated as proprietary by the

[submitter]"); *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856,

869 (D.C. Cir. 1981) ("the identities of witnesses or jurors, the substance of testimony, the

strategy or direction of the investigation, the deliberations or questions of the jurors, and the

like") (citation omitted). These statutes all involve the administrative categorization of

information into particular categories—for example, "names, titles, salaries," "the identities of

witnesses or jurors," or "technical data with military or space application"—rather than the

discretionary review required to determine whether something is "detrimental to the security of

transportation."

---

designee that the disclosure of matters involved in the Committee's proceedings would compromise the Government's negotiating objectives or bargaining positions on the negotiations of any agreement authorized by this chapter." 641 F.3d 504, 510-11 (D.C. Cir. 2011). However, the court provided no analysis as to why the statute's criteria were "particular," and implied that a statute concerning domestic affairs might need to be more particular to qualify for Exemption 3. *Id.* at 511 (stating that the Act's criteria were "at least as 'particular' as one can expect criteria to be *in the realm of foreign affairs.*") (emphasis added). Finally, the DHS cites the court's approval of the Atomic Energy Act, 42 U.S.C. § 2162(a) in *American Jewish Congress v. Kreps*, a statute the agency claims allows release of information only if it "can be published without undue risk to the common defense and security." 574 F.2d 624, 629 (D.C. Cir. 1978). However, the DHS plainly misstates the Atomic Energy Act's withholding provision. The Act actually allows withholding of information that creates "undue risk to the common defense and security" *only if* the information *also* constitutes "restricted data," a term the statute defines as "data concerning (1) design, manufacture, or utilization of atomic weapons; (2) the production of special nuclear material; or (3) the use of special nuclear material in the production of energy, but shall not include [declassified data]." 42 U.S.C. § 2014 (y). Nothing resembling the articulation of such particular criteria exists in Section 114®.

Indeed, the language of Section 114(r) is so broad that in order to define and specify exactly the nature of information that is "detrimental to the security of transportation," the agency has had to promulgate lengthy regulations containing a non-exhaustive list of *fifteen* different types of information that the DHS may withhold. *See* 49 CFR § 1520.5(b)(1)-(16). In fact, the agency also interprets Section 114 to allow it to take into account the "interests of public safety" as an additional reason for withholding records that are otherwise subject to disclosure under the FOIA. 49 CFR § 1520.5(b) ("except as otherwise provided in writing by DHS in the interest of public safety or in furtherance of transportation security, the following information, and records containing such information, constitute SSI"). Under the agency's view, the full authority for determining whether or not documents are releasable is in the hands of the agency. Thus, Section 114(r) is precisely the sort of broad statute permitting "wholly discretionary non-disclosure" that Congress excluded as a basis for Exemption 3 withholdings and the Court should hold that it does not qualify under FOIA Exemption 3. *Lee Pharmaceuticals v. Kreps*, 577 F.2d 610, 615 (1978).

Finally, the agency attempts to save the statute by citing its own implementing regulations. The DHS argues that the agency's withholdings are justified by "unambiguous Congressional command that SSI need not be disclosed under FOIA," and by "the implementing regulations [49 C.F.R. § 1520.5], together with the statute [Section 114(r)]." Def.'s Reply Br. at 6, 10. These statements simply confuse the issue, which is whether Section 114(r) *alone* justifies the withholding under Exemption 3. *See* 5 U.S.C. § 52(b)(3) ("[FOIA] does not apply to matters that are . . . specifically exempted from disclosure *by statute*.") (emphasis added). Section 114(r)(1) contains no "unambiguous Congressional command" supporting the DHS's withholdings because Congress never used the term "Sensitive Security Information," let alone

commanded that it be withheld. Both the term and the definitions of what it encompasses were developed by the agency, not by Congress. Moreover, the DHS's regulations have no authority to support an Exemption 3 withholding, and they do not gain this authority merely because they were promulgated pursuant to statute. *Founding Church of Scientology, Inc. v. Bell*, 603 F.2d 945, 952 (D.C. Cir. 1979) (rejecting Exemption 3 withholding based on Federal Rules of Civil Procedure even though the rules were "issued by the Supreme Court under rulemaking powers delegated by Congress.").

ii.     *49 U.S.C. § 114(r) does Not Supersede FOIA's Disclosure Requirements*

The DHS argues that 49 U.S.C. § 114(r) was intended to "supersede FOIA's disclosure requirements." Def.'s Reply Br. at 5. The agency relies heavily on the fact that Section 114(r) introduces itself with the clause "[n]otwithstanding section 553 of title 5." 49 U.S.C. § 114(r)(1). Courts have recognized, however, that "nothwithstanding" clauses often do not have the dispositive function that the agency would assign to them. *See Fed'n of Civic Associations, Inc. v. Volpe*, 434 F.2d 436, 447 (D.C. Cir. 1970) (holding that "notwithstanding any of provision of law" superseded only the "District [of Columbia] government's 'administrative action' which had stopped further interstate construction."); *Oregon Natural Resources Council v. Thomas*, 92 F.3d 792 (9th Cir. 1996) (holding that the phrase "notwithstanding any other provision of law" in the Rescissions Act superseded only environmental laws). Furthermore, the agency ignores the fundamental change that such a displacement would work as well as the dissimilarities between Section 114 and other FOIA-displacing statutes.

Superseding or displacing FOIA would negate the presumption in favor of disclosure "across the length and breadth of the Federal Government," *Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1266 (2011) by removing the Act's requirement that the agency bear the burden of

justifying its withholding. *See* 5 U.S.C. § 552(a)(4)(B). If the DHS were able to withhold

information under Section 114(r) alone, a court would review its decision to withhold under the

highly deferential "arbitrary and capricious" standard rather than conducting a de novo review

and forcing the agency bear the burden of justifying nondisclosure under one of the statutory

exemptions. *DeSalvo v. I.R.S.*, 861 F.2d 1217, 1218-19 (10th Cir. 1988) ("If section 6103

preempts FOIA, then the provisions of the Administrative Procedure Act govern, and court

review is limited to determining if the agency decision not to disclose was "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law.").

    Indeed, the D.C. Circuit has found only one statute that displaces FOIA's disclosure

scheme. *See Ricchio v. Kline*, 773 F.2d 1389, 1395 (D.C. Cir. 1985). In *Ricchio*, a doctoral

candidate filed suit under FOIA to compel the Administrator of General Services to release 44 of

the transcripts that the Watergate Force had made of the Nixon tapes. *Id.* at 1391. The court held

that the Presidential Recordings and Materials Preservation Act ("Materials Act"), 44 U.S.C. §

2107 (2010), not FOIA, exclusively governed the release of the transcripts. *Id.* at 1391. The court

based this conclusion on the existence of a congressionally adopted, "comprehensive regulatory

scheme" governing the preservation and disclosure of President Nixon's records. *Id.* at 1393.[2]

Thus, in order to displace FOIA, Congress must provide a "comprehensive, carefully tailored and

detailed procedure," *id.* at 1395, that has the effect of "duplicating and hence presumably

---

[2] The Materials Act directed the Administrator to "provide for the orderly processing and screening by Executive Branch archivists of [Presidential papers and recordings] for the purpose of returning to appellant those that are personal and private in nature, and (2) determine the terms and conditions upon which public access may eventually be had to those materials that are retained." Id. (citation omitted). The Act also required the Administrator to promulgate regulations governing public access to the materials and to take into account seven specified factors, including "'(1) the need to provide the public with the full truth, at the earliest reasonable date, of the abuses of governmental power popularly identified under the generic term 'Watergate;' and "(6) the need to provide public access to those materials which have general historical significance . . . .'" Id; see also id. at 1395 ("In the Materials Act Congress provided a comprehensive, carefully tailored and detailed procedure designed to protect both the interest of the public in obtaining disclosure of President Nixon's papers and of President Nixon in protecting the confidentiality of Presidential conversations and deliberations.").

replacing the dispositions of FOIA." *Church of Scientology of California v. I.R.S.*, 792 F.2d 146, 149 (D.C. Cir. 1986). Congress provides no such scheme in Section 114, which requires the DHS to "prescribe regulations prohibiting the disclosure of [sensitive security] information" but does not establish "comprehensive, carefully tailored and detailed" procedures for public access to such information and certainly does not "duplicat[e]" the provisions of FOIA.

Moreover, in passing the Homeland Security Act of 2002, which created Section 114(r), Congress vigorously debated the creation of a FOIA exemption for "critical infrastructure information."[3] *See* H.R. Rep. No. 107-609, at 1 (2002) (summarizing the concerns of four of the nine members of the Select Committee on Homeland Security regarding the potentially expansive scope of the CIIA). The same Congress said virtually nothing about the DHS's nondisclosure of sensitive security information. It strains credulity to imagine that Congress would debate at length an *exemption* to FOIA while simultaneously *superseding* FOIA entirely without any debate or discussion.

## II.    FOIA Exemption 4 Does Not Permit the Agency to Withhold Body Scanner Radiation Reports Because the Reports Were Not "Obtained From a Person"

FOIA Exemption 4 permits an agency to withhold "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552 (b)(4). Exemption 4's requirement that the information be "obtained from a person," has been interpreted to require that the information "have not been generated within the government." *Bd. of Trade v. Commodity Futures Trading Comm'n*, 627 F.2d 392, 405 (D.C. Cir. 1980). The DHS fails to establish that the radiation reports created by the agency itself using materials supplied by AS&E were "obtained from a person" as required by Exemption 4.

---

[3] Section 114(r) was initially enacted as 49 U.S.C. § 114(s) in the Homeland Security Act of 2002, Pub. L. No. 107-296, § 1601, 116 Stat. 2135, 2312 (2002). The Act also contained the Critical Infrastructure Information Act of 2002 ("CIIA"), enacted as subtitle B of Title II of the Homeland Security Act.

The agency argues that a 2006 radiation study conducted by the government was "nonetheless 'obtained from a person'" because it was performed using the scanning equipment of AS&E, a private vendor. Def.'s Reply Br. at 15. The DHS also argues that a 2008 report that also evaluates AS&E scanning equipment was "obtained from a person" because the government based its analysis on "data submitted to the government by AS&E . . ." *Id.* at 14. In fact, reports, analyses, or tests that are the product of "government personnel and expertise and equipment" are considered "generated within the government," even if their production depended on private information or equipment. *Consumers Union of U. S., Inc. v. Veterans Admin.*, 301 F. Supp. 796, 803 (S.D.N.Y. 1969) ("Using government personnel and expertise and equipment, the VA produced the [hearing-aid test] data now sought.").

The radiation reports at issue are the product of government personnel, specifically Frank Cerra, and were conducted using government equipment that measured levels of radiation. *See* Def.'s Reply Br. at 15 (noting that the withholdings "reflect the government's own radiation measurements conducted on an AS&E Smart Check machine."). Furthermore, as the DHS's filings make clear, significant resources and expertise are involved in testing and evaluating equipment provided by private vendors. *See* Def.'s Mot. Summ. J. at 3 ("TES 'develop[s] standards for all types of equipment, products and services including standards for the detection of chemical, biological, radioactive, nuclear and explosives substances for use throughout DHS and the private sector.); *id.* ("With regard to AIT systems specifically, TES supports DHS in their certifying and testing AIT systems before they are deployed at airports."); *id.* at 4 ("TSL, a component of TES within S&T, performs research, development and validation of solutions to address threats to transportation security, including explosive devices."). Holding that the DHS's reports were "obtained from outside the government" because the scanning technology was

given to it for testing is "to ignore the substantial public expense needed to support the program." *See Consumers Union of U. S., Inc. v. Veterans Admin.*, 301 F. Supp. at 803.

Indeed, the DHS's theory would expand Exemption 4 well beyond the intention of FOIA in these types of cases. The DHS is involved in standardizing, testing, and certifying screening systems before they are deployed at airports. Def.'s Mot. Summ. J. at 3. Because the agency does not produce the screening systems itself, any test or evaluation that it conducts will necessarily involve the provision of some private information or equipment. Thus, the agency's theory would permit the withholding of nearly any government-created report that evaluates, measures, or analyzes any device. This interpretation runs counter to the Supreme Court's command that FOIA exemptions "must be 'narrowly construed." *Milner*, 131 S. Ct. at 1262 (citing *FBI v. Abramson*, 456 U.S. 615, 630 (1982)).

None of the cases cited by the DHS bind this court, and the agency concedes that most of them fail to address the question at issue: whether the information was "obtained from a person." Def.'s Reply Br. at 15-16 (citing *Lion Raisins, Inc. v. USDA*, 354 F.3d 1072 (9th Cir. 2004), and *Mulloy v. Consumer Product Safety Commission*, No. 85-645, 1985 U.S. Dist. LEXIS 17194, at *2 (S.D. Ohio Aug. 2, 1985)). The *Lion Raisins* court examined only whether disclosure of "Line Check Sheets" containing information about raisin production would cause "substantial competitive harm" 354 F.3d at 1081. *Mulloy* is similarly irrelevant, as the court stated clearly that "[t]he only issue between the parties is whether the withheld information is privileged or confidential within the meaning of [Exemption 4]." 1985 U.S. Dist. LEXIS 17194, at *3.

The only case cited by the DHS that comes from within this circuit, *Silverberg v. Department of Health & Human Services*, is easily distinguishable. *See* No. 89-2743, 1991 WL 633740 (D.D.C. June 14, 1991). The only documents withheld under Exemption 4 in *Silverberg*

were "laboratory names and addresses, laboratory identification numbers, names of laboratory

employees and officials, as well as the dates of certain documents and names of NLCP

inspectors." *Id.* at *2. Although the *Silverberg* court "follow[ed] the practice of the parties" by

referring to this information as "testing and inspection information," *see id.*, this information was

not produced or created in any way by *government* testing, evaluation, or analysis.[4] In contrast,

the DHS's withholdings are reports that contain "the government's own radiation

measurements," Def.'s Reply Br. at 15, "measurements and geometry of x-ray beam[s],"

"Specific Radiation Dose Levels Emitted," and "[a]ssessments of, and recommendations for

improving, radiation safety of AS&E Dual SmartCheck." TSL Vaughn at 897-99.

### III. Under Exemption 5, The Agency Wrongly Withheld Purely Factual Information and Has Failed to Identify Final Documents That Correspond to the Documents it Has Labeled as Drafts

EPIC has correctly challenged the agency's Exemption 5 withholding of several sets of

documents, listed in Exhibit 1 to EPIC's Motion for Summary Judgment. DHS has wrongly

withheld purely factual information and has failed to identify final documents that correspond to

the many documents it has labeled as "drafts."

As a preliminary matter, to clear up any confusion regarding EPIC's challenged

withholding of DHS 107-108, this was meant to reference DHS 108A-108F, as discussed on

page 4 of the DHS Vaughn Index. The Vaughn states that this document is a draft version of

---

[4] Similarly, other cases cited by the DHS do not involve a level of government expertise, analysis, or measurement comparable to the instant case. *Freeman v. Bureau of Land Management* withheld information that the BLM merely duplicated from a private party. 526 F. Supp. 2d 1178, 1187-88 (D. Or. 2007) ("Freeman provided the government with the precise locations where he gathered ore samples, and the assay results. The government then followed in Freeman's tracks, taking samples from the identical locations-even using the same trenches, whenever possible-and compared the laboratory analysis of the samples it gathered with the results reported by Freeman."). Finally, *OSHA Data/C.I.H., Inc. v. U.S. Dep't of Labor*, involved the government simply calculating a ratio based on two numbers provided by outside persons rather than. *See* 220 F.3d at 157 (defining "Lost Work Day Injury and Illness (LWDII) rates" as the "number of incidences of serious injuries and illnesses to the number of employee work hours performed at that work site during a given time period."); *id.* at 162 n. 23 (Because "the LWDII rate is merely a ratio calculated from individual components all of which are obtained from employers, we find that the LWDII rate, like the other information sought by OSHA Data, is obtained from a person.'").

"DHS assessment/findings regarding radiation output of AIT machines (document attached to email on 107-108)." The Defendant has withheld this document in full (6 pages), pursuant to Exemption 5, as EPIC stated in its original Motion for Summary Judgment.

i.    <em>The Agency has Wrongly Withheld Purely Factual Information</em>

Contrary to the Defendant's assertion, courts routinely draw a distinction between factual material, which must be disclosed, and material embodying officials' opinions, which may be withheld. *See Petroleum Info. Corp. v. U.S. Dept. of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992), *citing EPA v. Mink,* 410 U.S. 73, 87-91 (1972)(endorsing the fact/opinion distinction); *Quarles v. Department of Navy,* 893 F.2d 390, 392 (D.C. Cir.1990) (observing that "the prospect of disclosure is less likely to make an adviser omit or fudge raw facts, while it is quite likely to have just such an effect" on materials reflecting agency deliberations). "Purely factual reports and scientific studies cannot be cloaked in secrecy by an exemption designed to protect only 'those internal working papers in which opinions are expressed and policies formulated and recommended.'" *Bristol-Myers Company v. FTC,* 424 F.2d 935, 939 (D.C. Cir. 1970), *quoting Ackerly v. Ley,* 420 F.2d 1336, 1341 (D.C. Cir. 1969).

Defendants assert that the fact/opinion distinction is essentially meaningless, but cite only one case which states simply "[p]urely factual material usually cannot be withheld under Exemption 5 unless it reflects an 'exercise of discretion and judgment calls.'" *Ancient Coin Collectors Guild v. U.S. Dept. of State*, 641 F.3d 504, 513 (D.C. Cir. 2011).[5] Despite the agency's arguments to the contrary, the Supreme Court has recognized that "virtually all of the courts that have thus far applied Exemption 5 have recognized that it requires different treatment

---

[5] As Defendant notes, *Ancient Coin Collectors*, 641 F.3d 504, cites *Montrose Chem. Corp. of California v. Train*, 491 F.2d 63, 71 (D.C. Cir. 1974), a case in which the court held that "the Government would bear the burden of putting the record in such shape that all facts are in the public record, separate from analysis which need not be disclosed."

for materials reflecting deliberative or policy-making processes on the one hand, and purely

factual, investigative matters on the other." *EPA v. Mink*, 410 U.S. at 89. The D.C. Circuit

follows the fact / opinion distinction, *Playboy Enterprises, Inc. v. Dep't of Justice*, 677 F.2d 931,

936 (D.C. Cir. 1982) (finding that the factual material in a government report was not protected

under the deliberative process privilege and must be released); *Coastal States Gas Corp. v. Dep't*

*of Energy*, 617 F.2d 854, 858 (D.C. Cir. 1980) (holding that memoranda from regional counsel

issued in response to requests for interpretations of regulations were not exempt under the

deliberative process privilege because they were "straightforward explanations of agency

regulations"), and District of Columbia courts have routinely held that factual materials are not

protected from disclosure under Exemption 5. *See, e.g., Judicial Watch, Inc. v. U.S. Dept. of*

*Treasury*, CIV.A. 09-01508 BAH, 2011 WL 2678930 (D.D.C. July 11, 2011) (holding that

headers at the top of several sets of minutes were factual and, hence, segregable and must be

released); *CREW v. DHS,* 648 F. Supp. 2d 152 (D.D.C. 2009) (holding that "It is well-established

that the deliberative process privilege generally does not shield purely factual information from

disclosure").

The agency's own description of the withheld documents indicates that they are clearly

factual, not "advisory opinions, recommendations, and deliberations that are part of a process by

which governmental decisions and policies are formulated." *Klamath Water Users,* 532 U.S. at 8.

It would be difficult to think of a more axiomatic example of a factual document than one that

the agency itself has described as a "fact sheet." *See e.g.* TSL Vaughn, Withheld-in-full C.

     *ii.*    *The Agency has Wrongly Withheld "Draft" Documents*

The agency seems incredulous that EPIC would "seriously dispute that "[a]s a general

matter, 'drafts' of documents are exempt from disclosure under the deliberative process

privilege," DHS Reply at 20. However, despite what the agency may *wish* the law to be, case law makes clear that drafts are not presumptively privileged. *See Arthur Andersen & Co. v. IRS,* 679 F.2d 254, 257 (D.C. Cir. 1982); *see also Reliant Energy Power Generation, Inc. v. F.E.R.C.,* 520 F. Supp. 2d 194, 204 (D.D.C. 2007) (holding that drafts are not "*per se* exempt from disclosure"); *Judicial Watch, Inc. v. U.S. Postal Serv.,* 297 F. Supp. 2d 252, 261 (D.D.C. 2004). While a document's characterization as a "draft" is one factor in a court's determination, an agency's representation that something is a "draft" is simply not sufficient to *prove* that a document can be withheld under Exemption 5. The agency must provide additional information to the plaintiff and the court in order to justify its withholdings. Here, the agency must point to a final document corresponding to its drafts.

Many court decisions establish that the agency must do more than just rubber-stamp a document with "draft" in order to withhold it. *See e.g., SafeCard Services, Inc. v. S.E.C.,* 926 F.2d 1197 (D.C. Cir. 1991) (finding that "in order to carry its burden, the agency must describe not only the contents of the document but also enough about its context, *viz.* the agency's decisionmaking process, to establish that it is a pre-decisional part thereof" and that "[b]ecause the SEC has failed to disclose the substance of those final decisions, and has failed to explain the decisionmaking process in such a way as to make it clear that there is no need for such disclosure, it has not met its burden of demonstrating that the deliberative process exemption is applicable).

D.C. district courts have followed *SafeCard* and said that the agency must indicate, in some way, what final document the draft contributed to and even how the draft contributed to that final document. *See e.g., Judicial Watch, Inc. v. U.S. Postal Serv.,* 297 F. Supp. 2d 252, 261 (D.D.C. 2004) *(*finding that USPS's affidavit was inadequate because it "does not specify

whether these draft chronologies were antecedent to final policies, and therefore are predecisional; whether the drafts were adopted as final policy (and therefore are no longer predecisional); and whether the agency has not already used the documents in communications with the public"). A failure by the agency to "indicate whether these drafts were (1) adopted formally or informally, as the agency position on an issue; or (2) used by the agency in its dealings with the public… will defeat a claim of privilege." *Judicial Watch, Inc. v. U.S. Postal Serv.,* 297 F. Supp. 2d 252, 261 (D.D.C. 2004)(internal quotations omitted).

Contrary to the DHS's suggestion, DHS Reply at 21, EPIC is not asking the agency to demonstrate differences between drafts and final documents as in *U.S. v. Phillip Morris USA Inc.,* 218 F.R.D. 312 (D.D.C. 2003). EPIC is not disputing that such a dissection of differences could possibly expose agency deliberations. EPIC is simply asking that the agency point to a final document that is associated with each draft. This exposes no deliberations or agency thought process. It risks no "chilling" of communication within the agency. *Dudman Communications Corp. v. Dep't of the Air Force,* 815 F.2d 1565, 1569 (D.C. Cir.1987). It merely ensures that the agency has properly assessed the documents sought and has not simply relied on a rubber-stamped "draft" designation.

Arguably, the court could require far more of the DHS than EPIC has suggested in this case. EPIC found the agency's withholdings deficient because the agency failed to identify a final document corresponding to each draft. In service to its attenuated argument, the agency has twisted this request into something broader; it has acted as though EPIC has demanded that it indicate "precisely what policies were under consideration." EPIC has made no such demands – though, as indicated by *SafeCard Services, Inc. v. S.E.C.*, 926 F.2d 1197, *Judicial Watch, Inc. v. U.S. Postal Serv.,* 297 F. Supp. 2d 252, and other cases, the Court could demand far more detail

from the agency. The agency's description of documents suggests that each draft corresponds to a related finite, concrete final document. EPIC has merely asked that the agency comply with the FOIA statute by indicating what final document corresponds to each withheld "draft" document.

The agency, for example, claims that it has only withheld "drafts or preliminary fact sheets," but it refuses to point to a final version that has either been made public or has been released to EPIC in response to EPIC's FOIA request. If the documents that the agency has identified as "draft" documents are, indeed, draft documents, then, in most cases, some corresponding final document must exist. And that document must have either already been disclosed to EPIC (unless it has already been made public elsewhere), or disclosure should be required now. To allow the agency to withhold a document as a "draft" document without ever identifying the corresponding final decision would undermine the transparency and judicial review aims that are central to the FOIA. *Rein v. U.S. Patent & Trademark Office*, 553 F.3d 353, 369 (4th Cir. 2009)(holding that "[t]o find such superficial entries to be sufficient would permit the Agencies to evade judicial review because the district court and we are entirely dependent upon the Agencies' assertions that the documents were appropriately withheld").

## IV.    EPIC is Entitled to Recover its Costs and Fees

On the fees issue, the DHS focuses its reply on the argument that EPIC's request is premature. Def.'s Reply Br. at 23 ("[T]he Court should defer consideration of attorney's fees and costs until after it resolves the merits of the case."). However, the Federal Rules specifically contemplate summary adjudication of liability, even when the amount of damages is uncertain. Fed. R. Civ. P. 56(d)(2) ("An interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages."). EPIC seeks just such a

judgment in this case—Plaintiff has proved its entitlement to attorneys' fees, asks for summary judgment as to the DHS's liability, and will submit a bill of costs at the conclusion of the lawsuit.

The DHS attempts to convince the Court that EPIC's argument on this point is improper because the parties may be able to resolve the matter without Court intervention. Def.'s Reply Br. at 24 ("The United States and its agencies frequently settle fee disputes in FOIA cases . . . and there is simply no need for the Court to rule on the issues of eligibility and entitlement for fees at this early stage."). However, a finding by the Court as to EPIC's eligibility for fees will not pre-empt the parties from resolving the dispute as to the amount of attorneys' fees between one another without resorting to Court involvement. On the contrary, a decision by the Court will serve judicial economy by narrowing the issues and guiding these discussions for the parties toward a faster resolution. Here, the issue at hand—EPIC's entitlement to attorneys' fees and costs—is clear. As discussed in EPIC's Motion, EPIC is plainly entitled to recover its attorneys' fees in this matter under 5 U.S.C. § 552(a)(4)(E). The DHS fails to rebut EPIC's entitlement to fees in this case. The agency argues that EPIC's request is premature, but does not cite any authority that prohibits the Court from granting EPIC's request for fees. The agency cites a handful of rules in support of the proposition that EPIC may petition the Court for fees after the parties' cross-motions are resolved. *See* Def.'s Reply Br. at 24 (citing Fed. R. Civ. P. 54(d)(2)(B), Local Civ. R. 54.1(a), and Local Civ. R. 54.2(a)). These rules "contemplate" the post-judgment settlement of attorneys' fees, but they do not require it, nor do they prohibit the Court from granting EPIC's request for fees at this stage. Though Defendant argues otherwise, the record certainly contains sufficient information to justify an award of fees.

In order for a court to award attorneys' fees, it must first determine that a plaintiff is eligible for fees because it has "substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(ii)(II). One way

in which a plaintiff may "substantially prevail" is if its lawsuit elicits a "voluntary or unilateral change in position by the agency." *Id.* The key question under this "catalyst theory" is whether "the institution and prosecution of the litigation cause[d] the agency to release the documents obtained during the pendency of the litigation." *Church of Scientology of Cal. v. Harris*, 653 F.2d 584, 587 (D.C. Cir. 1981). As one D.C. court has recently held, "[a]lthough the mere filing of the complaint and the subsequent release of documents is insufficient to establish causation it is certainly a salient factor in the analysis," *EPIC v. DHS,* CIV.A. 09-2084 RMU, 2011 WL 4014308 (D.D.C. Sept. 12, 2011) *quoting Weisburg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1496 (D.C. Cir. 1984); *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 2009 WL 1743757, at *3 (D.D.C. 2009) (internal quotations omitted).

In that case, the court ruled that EPIC had substantially prevailed because "the plaintiff's lawsuit has clearly elicited a voluntary or unilateral change in [DHS's] position." *Id.* The facts in that case were strikingly similar to those in the present case: EPIC filed two FOIA requests with DHS, yet it was not until EPIC filed suit that DHS finally produced hundreds of pages of documents. Although DHS subsequently showed that a portion of the records in its possession were properly withheld, it did not make a similar showing for the approximately 1,766 pages of non-exempt documents ultimately produced to the EPIC during this litigation. *Id.*

Consequently, the court found that "[g]iven DHS's long record of non- compliance to the plaintiff's FOIA requests, followed by DHS's disclosure of a substantial quantity of non-exempt records in response to this suit, the court concludes that the plaintiff obtained relief with regard to the non-exempt records by catalyzing a voluntary change in DHS's conduct. The plaintiff has thus 'substantially prevailed' and is eligible for attorney's fees." *Id., citing Judicial Watch, Inc.*, 2009 WL 1743757, at *9 (D.D.C. 2009) (awarding fees based on the catalyst theory of recovery).

Here, too, EPIC's lawsuit plainly served as a catalyst for DHS's disclosure of thousands of pages of documents. As detailed in EPIC's Motion for Summary Judgment, EPIC filed its FOIA request concerning body scanners on July 13, 2010. On November 19, 2010, EPIC filed this lawsuit challenging the agency's wrongful withholding of documents.  Finally, on June 6, 2011, DHS produced 126 pages of responsive documents. On June 21, 2011, DHS produced an additional 69 pages and S&T produced 1,677 pages of responsive documents. On September 7, 2011, the agency released an additional 208 pages of documents. "The institution and prosecution" of this suit plainly "cause[d] the agency to release the documents obtained during the pendency of the litigation."

EPIC is also entitled to fees because it has satisfied the four relevant factors: – 1) "the benefit to the public, if any, deriving from the case;" 2) "the commercial benefit of the complainant;" 3) "the nature of [the complainant's] interest in the records sought"; and 4) "whether the government's withholding of the records sought had a reasonable basis in law." H. Comm. on Gov't Operations and S. Comm. on the Judiciary, 94th Cong., *Freedom of Information Act and Amendments of 1974 (Pub. L. No. 93-502) Source Book,* 189-90 (J. Comm. Print 1975); *Davy v. C.I.A.*, 550 F.3d 1155, 1159 (D.C. Cir. 2008).

DHS argues in its Reply that EPIC has not satisfied the first and fourth factors. Def. Reply at 26-27. This is false. There was great public benefit derived from this case, as detailed in EPIC's Motion for Summary Judgment:

> EPIC's FOIA suit provided substantial benefit to the public. EPIC maintains two of the most popular websites in the world - www.epic.org and www.privacy.org - for searches on the term "privacy." EPIC disseminated the agency records it received on its www.epic.org web site[6] and to the approximately 8,000 recipients of its bi-weekly newsletter.[7] EPIC's FOIA work in this matter was prominently featured in *Time Magazine*… Frances Romero, "Did Airport Scanners Give Boston DHS Agents Cancer,"

---

[6] http://epic.org/2011/08/documents-reveal-new-details-a.html
[7] http://epic.org/alert/epic_alert_1818.html

*Time*, June 30, 2011.[8] Other news organizations reported on the documents EPIC obtained, as well. *See, e.g.,* Sara J. Welch, "Airport Body Scanners and Health," *New York Times,* July 12, 2011; Kate Taylor, "DHS 'ignored warnings' on cancer cluster," *TG Daily*, June 28, 2011.[9]

DHS asserts that the reasonableness of its withholding of documents cannot be evaluated at this time. However, the agency's actions in this case strongly indicate that its withholdings were not reasonable. Even if it can justify every withholding that it has argued in its Motion for Summary Judgment, the agency still wrongly withheld over 2,000 pages of documents that were released to EPIC only after the initiation of this lawsuit, nearly a year after EPIC's initial FOIA request was filed. The agency has made no proper assertion that the withholding of these documents – which have subsequently been disclosed to EPIC – was reasonable. It has made no excuse because there is no excuse: the agency simply failed to comply with the law.

**CONCLUSION**

For the reasons stated herein and in the Plaintiffs Motion for Summary Judgment, the Court should grant summary judgment in Plaintiff's favor.

Respectfully submitted,

_____*/s/ Ginger McCall*_____
MARC ROTENBERG
JOHN VERDI
GINGER MCCALL
David Jacobs *
Electronic Privacy Information Center
1718 Connecticut Ave. NW, Suite 200
Washington, DC 20009
(202) 483-1140
*Counsel for Plaintiff*

---

[8] http://healthland.time.com/2011/06/30/did-airport-scanners-give-boston-DHS-agents-cancer/#ixzz1c6bhX5ZL
[9] http://www.tgdaily.com/hardware-features/56899-DHS-ignored-warnings-on-cancer-cluster

Dated: December 2, 2011

*Admission pending in New York

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of December 2011, I served the foregoing PLAINTIFF'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT, including all exhibits and attachments, by electronic case filing upon:

    TONY WEST
    Assistant Attorney General
    U.S. Department of Justice

    JESSE GRAUMAN
    U.S. Department of Justice
    Civil Division, Federal Programs Branch

                            */s/ Ginger McCall*
                            Ginger McCall
                            *Counsel for Plaintiff*